IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LAST ATLANTIS CAPITAL LLC, LOLA
LLC, LULU LLC, GOODBUDDY SOCIETY
LLC, FRIENDLY TRADING LLC, and
SPEED TRADING LLC, BRYAN RULE,
BRAD MARTIN, and RIVER NORTH
INVESTORS, LLC,

          Plaintiffs,

   v.

CHICAGO BOARD OPTIONS EXCHANGE,
INC., AMERICAN STOCK EXCHANGE LLC,
PACIFIC EXCHANGE, INC.,
PHILADELPHIA EXCHANGE, INC., AGS
SPECIALIST PARTNERS, BEAR HUNTER
STRUCTURED PRODUCTS LLC, BEAR
WAGNER SPECIALISTS LLC, BOTTA
CAPITAL MANAGEMENT LLC, COHEN,
DUFFY, MCGOWAN & CO., INC., D.A.
DAVIDSON & CO., INC., EQUITEC
PROPRIETARY MARKETS, LLC, EQUITEC
STRUCTURED PRODUCTS, LLC, EQUITEC
TRADING LLC, EQUITEC-PREMIER LLC,
EQUITEC-BROWN LLC, EQUITEC-FELDMAN
LLC, EQUITEC-FURMAN LLC, EQUITEC-
SCHWARTZ LLC, GENEVA DPM LLC,
GROUP ONE TRADING LP, KNIGHT
FINANCIAL PRODUCTS LLC, KNIGHT
TRADING GROUP, INC., LABRANCHE &
CO., INC., LABRANCHE STRUCTURED
PRODUCTS LLC, MDNH TRADERS LLC,
MDNH PARTNERS LP, MORGAN STANLEY,
MORGAN STANLEY DW, INC., MORGAN
STANLEY & CO., INC., SLK-HULL
DERIVATIVES LLC, SPEAR, LEEDS &
KELLOGG LP, SPECIALISTS DPM LLC,
SUSQUEHANNA INTERNATIONAL GROUP
LLP, SUSQUEHANNA INVESTMENT GROUP,
SUSQUEHANNA SECURITIES, TD OPTIONS
LLC, VAN DER MOOLEN OPTIONS USA
LLC, VAN DER MOOLEN HOLDINGS NV,
and WOLVERINE TRADING LP,

          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 04 C 397

1

## MEMORANDUM OPINION AND ORDER

Plaintiffs Last Atlantis Capital LLC, Lola LLC, Lulu LLC, Goodbuddy Society LLC, Friendly Trading LLC, Speed Trading LLC, Bryan Rule, Brad Martin, and River North Investors, LLC allege numerous violations of federal and state law by defendants. Defendants include the Chicago Board Options Exchange, Inc. ("CBOE"), the American Stock Exchange LLC ("AMEX"), the Pacific Exchange, Inc. ("PCX"), and the Philadelphia Exchange, Inc. ("PHLX"), collectively, the "exchange defendants", as well as 35 securities brokers and/or dealers, collectively, the "specialist defendants." Specifically, plaintiffs allege that the specialist defendants violated § 10b of the Exchange Act and SEC Rule 10b-5 (a), (b) and (c) (Claim I); that the exchange Defendants violated § 10b of the Exchange Act and SEC Rule 10b-5 (a), (b) and (c) (Claim II); that all defendants are in breach of contract (Claim III); that all defendants have engaged in common law fraud (Claim IV); that the specialist defendants breached their fiduciary duty to plaintiffs and that the exchange defendants aided and abetted that breach of fiduciary duty (Claim V); that all defendants violated the Illinois Consumer Fraud and Deceptive Practices Act, 815 Ill. Comp. Stat. 505/2 (Claim VI); and that all defendants

have engaged in tortuous interference with the plaintiffs'
businesses (Claim VII).

The plaintiffs' allegations concern activities related to
the trading of options. An option is a contract that provides
its owner the right to purchase or sell a fixed quantity of the
underlying interest (here, securities traded on a national
securities exchange) at a fixed price when certain conditions are
met. Dealers, who effect transactions for themselves, and
brokers, who effect transactions for others, supply the market
for publicly-traded options. A bid price is the highest price at
which a dealer or broker is willing to buy an option; an ask or
offer price is the lowest price at which a dealer or broker is
willing to sell an option. The exercise price is the price at
which the option owner has the right to exercise the option to
buy or sell.

The following facts come from plaintiffs' complaint: A
specialist is a dealer/broker tasked with the responsibility of
establishing the quote (the bid and offer prices) for every
option in the option class it has been designated. The
specialist must execute ("fill") orders submitted to it by buyers
and sellers by either: 1) matching orders to buy options with
contra-side customer orders to sell options at the same prices or
2) in the event there are no existing contra-side customer

orders, by buying or selling the designated options from its own proprietary account.

Plaintiffs characterize themselves as direct access customers implementing arbitrage trading strategies which attempt to take advantage of price discrepancies of options. For example, if a specialist's buy bid on one exchange is $5.00 and a specialist's sell bid on a different exchange for that same option is $4.90, plaintiffs would attempt to execute simultaneous orders to sell on the first exchange and buy on the second exchange in order to achieve a .10 cent profit per option while incurring minimal risk.

According to plaintiffs, in general, specialists make significant profit from the "spread" when they are able to fill orders from their proprietary accounts. Plaintiffs allege that (as direct access customers who have better access to information and technology than typical customers) their placement of limit orders at a better price than a specialist is offering (which are required to be filled before a specialist can trade out of its own proprietary account) have greatly cut into specialists' profits. As a result, plaintiffs allege that since April 1, 2001, the specialist defendants have engaged in a practice of discrimination against their orders. Specifically, plaintiffs allege that the specialist defendants have:

4

[I]dentified the origin, and then knowingly mishandled the execution of thousands of orders to buy and sell options that were sent to defendants by engaging in various illegal trading practices such as refusing to automatically, or promptly, execute the orders or send confirmations upon the execution of orders, changing (or "fading") the quoted prices after receiving the orders, delaying the execution of orders, refusing to honor requests to cancel orders, and unilaterally terminating or adjusting the prices on orders that were previously executed and confirmed, and conducting thousands of proprietary trades for the Specialists' own accounts that were executed in advance of, or instead of, executing Plaintiffs' marketable limit orders (i.e. orders to purchase or sell a set amount of options at a specific price equal to the bid or offer price actually disseminated by a Specialist on a particular exchange).

In addition to this scheme of intentional mishandling, plaintiffs allege that the specialist defendants made implied and express misleading statements regarding their order handling. Plaintiffs allege that the exchange defendants intentionally developed the technology to facilitate the abovementioned scheme and also made misleading statements regarding order handling on their respective exchanges.

I.

The specialist defendants and the exchange defendants have each filed a motion to dismiss. On a motion to dismiss, I accept all well pled allegations in the complaint as true, *Turner/Ozanne v. Hyman/Power*, 111 F.3d 1312, 1319 (7th Cir. 1997), and grant the motion only if the plaintiff can prove no

5

set of facts to support the allegations in her claim. *Strasburger v. Bd. of Educ.*, 143 F.3d 351, 359 (7th Cir. 1998). A "plaintiff can plead himself out of court by alleging facts which show that he has no claim, even though he was not required to allege those facts." *Soo Line R.R. Co. v. St. Louis S.W. Ry.*, 125 F.3d 481, 483 (7th Cir. 1997).

II.

Section 10(b) of the Exchange Act provides in pertinent part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange-
> . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.

SEC Rule 10b-5 provides in pertinent part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,

6

     (b)   To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

     (c)  To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

"To state a claim under Rule 10b-5(a) and (c), a plaintiff must allege that the defendant (1) committed a deceptive or manipulative act (2) with scienter, (3) that the act affected the market for securities or was otherwise in connection with their purchase or sale, and (4) that defendants' actions caused the plaintiffs' injuries." *In re Parmalat Sec. Lit.*, 414 F.Supp. 2d 428, 432 (S.D.N.Y. 2006). To state a claim under Rule 10b-5(b), the plaintiffs must allege that "1) the defendant made a misstatement or omission 2) of material fact 3) with scienter 4) in connection with the purchase or sale of securities 5) upon which the plaintiff justifiably relied 6) and that the false statement or omission proximately caused the plaintiff's damages." *Otto v. Variable Annuity Life Ins. Co.*, 134 F.3d 841, 851 (7th Cir. 1998). Additionally, both SEC Rule 10b-5 and FED. R. CIV. P. 9(b) require that plaintiffs plead these claims of

fraud with particularity. *See In re Health Care Compare Corp. Sec. Litig.*, 75 F.3d 276, 280-81 (7th Cir. 1996) ("Pleading fraud with specificity is both an element of the SEC Rule 10b-5 cause of action and a pleading requirement of the Federal Rules."). To satisfy the particularity requirement, plaintiffs must allege "the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

Furthermore, plaintiffs must comply with the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), which requires that the complaint specify each allegedly misleading statement and the reasons why it is misleading. 15 U.S.C. § 78u-4(b)(1). The PSLRA also requires that plaintiffs, "with respect to each act or omission alleged, state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]" for claims brought under any section of 10b-5. 15 U.S.C. § 78u-4(b)(2). Scienter is an "intent to defraud or recklessness." *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 650 (7th Cir. 1997) (citing *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1043-45 (7th Cir. 1977)). "We [] understand a 'strong inference' of scienter to be a conclusion logically based upon particular facts that would convince a reasonable person that the defendant knew a

statement was false or misleading." *Makor Issues & Rights, Ltd.
v. Tellabs, Inc.*, 437 F.3d 588, 602 (7th Cir. 2006) (quoting
*Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1105 (10th Cir.
2003)). "Motive and opportunity may be useful indicators, but
nowhere in the statute does it say that they are either necessary
or sufficient." *Id.* at 601; *See also Stephenson v. Hartford Life
& Annuity Ins. Co.*, 2003 U.S. Dist. LEXIS 17036, at *24-25 (N.D.
Ill. 2003) ("The complaint may plead facts showing motive and
opportunity, but there still must be *specific* facts supporting a
strong inference that the defendant acted with [scienter].")In
multiple defendant cases, the allegations must create an
inference of scienter against each specific defendant. *Makor*,
437 F.3d at 602-03.

## II.

I turn first to the specialist defendants' motion to
dismiss.[1]  As already discussed, plaintiffs' complaint makes

---

[1] An earlier draft of plaintiffs' complaint was dismissed
because plaintiffs had failed to plead their claims with the
particularity required by FED. R. CIV. P. 9(b) and the PSLRA. In
that opinion, I held that the complaint failed to properly allege
the who, what, when, where, and how of the misleading statements
and failed to "allege facts to support a 'strong inference of
scienter.' *See Last Atlantis Capital LLC v. Chicago Bd. Options
Exch., Inc.*, 2005 U.S. Dist. LEXIS 23930, at *15 (N.D. Ill.
2005). In that opinion, I also stated that "[w]hile plaintiffs
need not detail each allegedly fraudulent transaction (of which
they claim there are hundreds, if not thousands), they must plead
at least one such transaction where, if the plaintiffs'

general allegations against all specialist defendants describing the trading process between direct access customers and specialists. Plaintiffs' allegations describe a situation in which a specialist would have a financial motive and the opportunity to mishandle plaintiffs' orders in order to trade from their own proprietary accounts. Plaintiffs' claims, whether cast as a manipulative scheme under 10b-5(a) and (c), or as false and misleading statements under 10b-5(b), fail to state a claim because plaintiffs have failed to allege facts that give rise to a strong inference of scienter.

Plaintiffs attempt to meet their burden of pleading facts that lead to a strong inference of scienter in three ways: 1) through allegations of motive and opportunity; 2) by citation to three documents: a) a letter to the SEC from Interactive Brokers Group ("IAG") commenting on a proposed rule of the Boston Stock

---

allegations are true, defendants' statements are false." *Id.* at * 13. Regrettably, this sentence was poorly worded and was interpreted by plaintiffs as stating that it would be sufficient for a single plaintiff to plead its claims with specificity (i.e. plead specific example transactions) against the specialist defendants. This is not the case. In multiple defendant cases, a single plaintiff must plead with specificity and raise an inference of scienter against all defendants. *Makor*, 437 F.3d at 602-03. It naturally follows that each plaintiff has the burden to plead with specificity and raise an inference of scienter against all defendants in a multiple plaintiff-multiple defendant case. Although this has created a deficiency with plaintiffs' complaint, this deficiency was not outcome determinative.

Exchange; b) a letter to the SEC from the head of the Options Market Makers Association of AMEX; and c) an SEC Staff report on AMEX Options Order Handling; and 3) by detailing a number of allegedly mishandled transactions (contained in Exhibits A and B attached to their complaint) between a single plaintiff, Last Atlantis, and the specialist defendants. In concluding that plaintiffs have failed to raise a strong inference of scienter, I have considered all of plaintiffs' allegations in the aggregate. *Makor*, 437 F.3d at 603 ("[W]e will aggregate the allegations in the complaint to determine whether it creates a strong inference of scienter . . . .").

Turning to these specific allegations, first, plaintiffs have alleged facts demonstrating that each specialist defendant had a financial motive and the opportunity to mishandle plaintiffs' trades. Plaintiffs' general allegations, however, have described a situation in which every specialist has the motive and opportunity to mishandle every single trade in which a direct access customer has presented a more competitive bid than their own. Under these circumstances, plaintiffs' allegations of motive and opportunity may be relevant, but are not strong indicators of scienter. *See e.g. Stephenson*, 2003 U.S. Dist. LEXIS 17036 at *25 ("[A]llegations of financial motive cannot alone satisfy plaintiff's burden of pleading scienter.").

Second, plaintiffs point to the three aforementioned documents discussing specialist behavior. These documents generally state that specialists mishandle trades on various exchanges, but do not contain facts implicating any specific specialist defendant in this case. Therefore, these documents do not help raise an inference of scienter against any of the specific specialist defendants. *See Gurfein v. Ameritrade*, 411 F. Supp. 2d 416, 426 (S.D.N.Y. 2006).

Plaintiffs quote language from the IAG letter dated February 12, 2003 stating that specialists, in general, have the motive and opportunity to mishandle orders and that specialists do in fact mishandle orders.[2] The letter, however, only makes general allegations that such practices occur on "some exchanges" and

---

[2] The quoted text reads in relevant part:

[O]n the floor based exchanges, market makers and specialists have an inherent time and place advantage because they can see orders before others can see them and can often take their time to decide whether to interact with these orders or not. . . specialists can and do fade their quotes after receiving an order, and the likelihood of an execution goes up as the market maker moves against the customer . . . on some exchanges specialists simply disable auto-ex systems seemingly at will, regardless of whether there is a valid reason. Once orders are kicked out of auto-ex systems and on to the floor, they are subject to faded quotes, delays in execution, or disparate treatment, based on the originating order entry firm (if that firm's order flow is perceived to be 'smart'). . . .

does not in any way identify or implicate any specialist defendant in this case or any transaction conducted by a plaintiff in this case.

Similarly, the letter to the SEC from the head of the Options Market Makers Association of AMEX dated April 12, 2004 fails to raise a strong inference of scienter. The author of the letter states that "it is the position of the AMEX as well as the SEC to honor all customer orders with fair and equitable execution, unlike many of our competitors."[3]  Again, nothing in this document in any way identifies or implicates any specialist defendant in this case.

Plaintiffs also rely on an SEC Staff Report (the "staff report") from June 16, 2003.  The report analyzed "audit trail data from the week of October 22, 2001 to evaluate order handling by AMEX specialists."  The report concluded that "AMEX specialists routinely violated the firm quote rule" and that

---

[3] The letter goes on to state:

Currently the AMEX specialists doesn't even know whom he is trading with until after the trade is consummated, so on the AMEX we treat everyone equally. Conversely on other exchanges they see the 'give up' of the order and fade non advantageous option originated orders . . . . This happens on a regular basis, but since it happens on the CBOE we on the AMEX seem not to have any way of policing this flagrant violation.

specialists discriminated against direct access customers' orders.[4]

Because the staff report dealt solely with the AMEX, my analysis of its effect on plaintiffs' claims naturally divides into two groups: 1) those transactions that occurred on the AMEX; and 2) those transactions that occurred on another exchange. Turning to the non-AMEX transactions first, the staff report does not help plaintiffs meet their burden of pleading scienter with regard to any transaction on the CBOE, the PCX, or the PHLX because it does not contain any findings that relate to specialists on these exchanges.

With respect to plaintiffs' transactions that occurred on the AMEX, the findings of the staff report undeniably call into question specialist behavior on the AMEX. It must be pointed out, however, that the staff report only analyzed a sample of

_____

[4] The report found that:

[When AMEX specialists were busy,] 37.6% of the orders from customers of direct access firms and 5.2% of the orders from other firms were handled in likely violation of the firm quote rule. The staff also analyzed the fill rate for market orders and found that when specialists were not busy . . . 24.5% of market orders from direct access firms and 2.5% of market orders from other customers went unfilled in likely violation of the firm quote rule.

orders placed by three major direct access firms[5] that were handled by an unspecified number of unidentified specialists over a one week period in October 2001. Under circumstances nearly identical to those in this case, the court in *Gurfein* addressed whether this very same report met the PSLRA pleading requirements against an AMEX specialist defendant. *Gurfein*, 411 F. Supp. 2d at 426. The court held that the report did not help raise a strong inference of scienter and stated:

> Since the [staff report's] conclusions rest on different transactions by different specialists in different options classes, placed through different direct access firms, at times over a year earlier and not involving any defendant in this case, they cannot be taken as evidence of a defendant's participation in the scheme to defraud, or give rise to the 'strong inference' of scienter necessary to state a securities-violation claim against the defendants.

*Id.*

In this case, plaintiffs' Exhibits A and B do include a number of transactions conducted by Last Atlantis on the AMEX. Similar to the transactions analyzed in *Gurfein*, however, Last Atlantis' transactions occurred more than a year and a half after the staff report was published in 2001.[6] Also similar to

---

[5] The three firms whose data was analyzed are: Spear, Leeds and Kellogg; Interactive Brokers; and Preferred Capital Markets.

[6] Beyond these specific examples of Last Atlantis' trading, the complaint only generally alleges that all plaintiffs traded on all four exchanges during the relevant period. This allegation is far too vague for the court to conclude that any

15

*Gurfein*, plaintiffs have not alleged that any plaintiff used any of the three direct access firms analyzed in the staff report, that any plaintiff traded any of the option classes specifically mentioned in the staff report, that any specialist defendant in this case was analyzed by the study, or otherwise forged a link between the report and the transactions for which plaintiffs seek recovery (beyond the fact that plaintiffs generally alleged that they traded on the AMEX). I am persuaded by the court in *Gurfein* that the staff report does not help plaintiffs meet their burden of alleging scienter under the PSLRA. To hold otherwise and find that each plaintiff had raised an inference of scienter against each specialist defendant would, in essence, hold that any direct access customer could meet the scienter requirement for a § 10b-5 claim by alleging a failed transaction with any AMEX specialist for a transaction executed at any point in time regardless of whether the specialist defendant was ever implicated in improper activity.

Third, plaintiffs point to Exhibits A and B, which provide the details of a series allegedly mishandled orders placed by Last Atlantis. Exhibit A lists approximately 195 orders that

---

specific plaintiff conducted any trade with any specific specialist on the AMEX during the time period in which the SEC took its sample.

plaintiff Last Atlantis attempted with the specialist defendants between January and September 2003 that were ultimately cancelled or never executed.[7] According to the complaint, Exhibit A shows that each specialist defendant found in the exhibit cancelled or failed to execute between one and forty trades with Last Atlantis during the sample period. Exhibit B lists approximately 30 trades that Last Atlantis attempted during the same time period with the specialist defendants that were all allegedly mishandled in some manner. Plaintiffs argue in conclusory fashion that these transactions raise an inference of scienter, but do not explain their reasoning. It would appear, however, that plaintiffs are attempting to imply that the fact that these transactions failed in and of itself demonstrates scienter. This type of result-based reasoning, which attempts to infer scienter from the fact that a transaction has failed, is impermissible. See *Gurfein*, 411 at 426 ("nor do the failures of execution of [plaintiff's] orders on December 6, 2002 support that inference

---

[7] The actual Exhibit A chart contains a spreadsheet with transaction data. While some of the columns of data are self-explanatory, others have only cryptic headings such as "Exit Px" or "Exit Trade Price," the meaning of which the court is unaware. Accordingly, since plaintiffs never attempt to explain the significance of the vast majority of the data in this chart, the court will rely solely on the textual description of these transactions found in plaintiffs' complaint in evaluating the significance of these exhibits.

[of scienter] . . . [m]ore is required in a securities fraud case"); *see generally*, *DiLeo*, 901 F.2d at 627-28.[8]

The problem with plaintiffs' complaint originates in the fact that it generally makes allegations on behalf of all plaintiffs against all the specialist defendants and lacks any information detailing the relationship between any of the individual plaintiffs and any of the individual specialist defendants. *See Makor*, 437 F.3d at 603 (group pleading impermissible under the PSLRA). Thus, the complaint does nothing more than allege a general scheme under which every specialist

---

[8] Moreover, the allegations describing these transactions appear to be missing key facts that would make it fair to conclude that many of these transactions actually are representative of the manipulative scheme alleged by plaintiffs. For example, Exhibit A lists 195 transactions between Last Atlantis and specialist defendants that were ultimately cancelled or never executed. Plaintiffs' complaint describing three of the transactions found in Exhibit A states that "MDNH unilaterally canceled three (3) executed trades after confirming to Plaintiffs that its Orders had been executed in violation of PSE's Honor Executed Trade Exchange Rules." The manipulative scheme alleged in plaintiffs' complaint, however, describes a scenario in which the specialist defendants would intentionally mishandle plaintiffs' orders under circumstances in which it would be advantageous for the specialist defendant to trade from (or refrain from trading from) its own proprietary account (or else there would be no motive to mishandle). Yet completely absent from plaintiffs' description of these transactions are any allegations that demonstrate or explain why it was advantageous for MDNH to cancel these specific orders. Thus, it would seem that these are not truly examples of the manipulative scheme alleged by plaintiffs, but rather just examples of transactions that failed.

would have the motive and opportunity to mishandle every direct access customer order where the specialist could gain financially by trading from its proprietary account and provides nothing more than examples of failed transactions to infer intent. To hold that plaintiffs had stated a claim would, in essence, allow any direct access customer to bring a claim against any specialist based upon any failed transaction. This holding would clearly run afoul of the PSLRA which requires that "with respect to each act or omission alleged, [plaintiffs] state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]." 15 U.S.C. § 78u-4(b)(2).

Plaintiffs concede that there are a number of reasons why a transaction may fail that are unrelated to a specialist's intentional or reckless mishandling. For example, plaintiffs acknowledge that the exchange rules allow trades to go unexecuted or quotes to be adjusted under certain circumstances. Moreover, trades may go unexecuted or be adjusted due to unintentional error. The complaint lacks any information from which I could strongly infer that the failures set forth in plaintiffs' complaint were mishandled with scienter. Plaintiffs do not allege any facts obtained from confidential sources suggesting scienter (*see e.g. Makor*, 437 F.3d at 596), they do not rely on SEC findings implicating any of the specific specialist

19

defendants (*see e.g. NYSE Specialists*, 405 F. Supp. 2d 281, 292–96, 313–14 (S.D.N.Y. 2005)), and they do not provide any data demonstrating unusual patterns of activity (i.e. data demonstrating that their trades were failing at a higher rate than non-direct access customers).[9]

Having failed to raise a strong inference of scienter on the part of any individual specialist defendant, plaintiffs' claims for violation of 10b-5 against the specialist defendants are dismissed.

## IV.

Plaintiffs also bring claims against the exchange defendants under both 10b-(5)(b) for false and misleading statements and 10b(5)(a) and 10b(5)(c) for participation in a fraudulent and manipulative scheme. Although the complaint is filled with allegations that the exchange defendants failed to enforce their own rules, in their opposition brief, plaintiffs have made clear that they are not seeking to impose liability on the exchange

---

[9] Plaintiffs do allege that they submitted hundreds of thousands of trades and tens of thousands of those trades failed. Assuming *arguendo*, that this aggregated allegation is suggestive of the fact that plaintiffs' orders were failing at an unusual rate, the allegation still fails to demonstrate that any particular plaintiff's orders submitted to any specific specialist defendant failed at an unusual rate.

defendants for failure to enforce exchange rules.[10]   Plaintiffs
argue two different theories of liability: 1) that the exchange
defendants participated in a manipulative scheme with the
specialist defendants by developing the technology that allowed
the specialists to discriminate against them in violation of 10b-
5(a) and (c); and 2) that the exchange defendants made false and
misleading statements regarding the operations of their markets
in violation of 10b-5(b).

Turning to plaintiffs' first theory, plaintiffs allege that
the exchange defendants directly participated in a scheme to
defraud by developing their proprietary auto execution systems to
include features that: 1) allowed the specialist defendants to
identify the source of orders placed; and 2) allowed the
specialist defendants to disable the auto-execution feature and
manually fill orders.

Plaintiffs' have failed to plead facts that lead to a strong
inference of scienter with respect to this claim.  The only facts
contained in the complaint supporting an inference of scienter go
toward showing that the exchange defendants had motive and

---

[10] In any event, plaintiffs would be unable to bring these
claims because there is no private right of action against an
exchange for violation of its own rules.  *See Spicer v. Chicago
Bd. of Options Exch., Inc.*, 977 F.2d 255, 259-61 (7th Cir. 1992).

opportunity. According to plaintiffs, the exchange defendants' motives were: 1) to provide this technology to specialists (who desired this technology in order to increase their own profitability) in order to encourage the specialists to remain members of their respective exchanges; and 2) to increase exchange revenues, which are in part based upon profits earned by specialists and cancellation fees. Given that there are countless legitimate reasons to develop these features aside from discrimination, these allegations of motive do not create a strong inference of scienter. *See Stephenson*, 2003 U.S. Dist. LEXIS 17036 at *25 (financial motive alone is insufficient to create strong inference of scienter). Because the complaint group-pleads these allegations against all of the exchange defendants, it is devoid of specific factual information from which I could conclude that the development of any specific exchange technology was in any part driven by a desire to foster discrimination against direct access customers. Beyond this general financial motive, plaintiffs' argument amounts to a suggestion that because these technological features exist at all, and because these features were subsequently abused by the specialist defendants, the exchange defendants must have developed these features in concert with the specialists as part of a scheme to defraud direct access customers. As discussed

22

earlier, this type of result-based reasoning and unsupported speculation is insufficient to meet the requirements of the PSLRA, which requires plaintiffs to allege facts from which I could strongly infer scienter at the time the technology was developed.

Plaintiffs' second theory of liability against the exchange defendants is that the exchanges made false and misleading statements and omissions regarding order handling by specialists on their exchanges. Under § 10b-5(b) plaintiffs must allege that "1) the defendant made a misstatement or omission 2) of material fact 3) with scienter 4) in connection with the purchase or sale of securities 5) upon which the plaintiff justifiably relied 6) and that the false statement or omission proximately caused the plaintiff's damages." *Otto*, 134 F.3d at 851.

In their response, plaintiffs repeatedly argue in general terms that their complaint alleges in detail numerous misleading statements and omissions, but do not point the court to any specific misrepresentations in their complaint.[11] For the most part, the complaint is filled with generalized allegations such as "[t]he Defendants each directly represented, and / or are

---

[11] Plaintiffs directed the court to paragraphs 7, 8, 69, 71 and 101-02. I found no specific misstatements or omissions in those paragraphs, however.

aware of, and responsible for, express representations made by the Exchanges, in documents filed with the SEC and statements posted on the internet, to the effect that all public customer marketable limited orders and market orders will receive 'instantaneous automatic execution' for up to a predetermined number of contract . . . ." These generalized allegations do not contain the requisite specificity. *Cathedral Trading, LLC v. Chicago Bd. Options Exch.*, 199 F. Supp. 2d 851, 857 (N.D. Ill. 2002).

The exchange defendants have pointed the court to three allegedly misleading statements contained in plaintiffs' complaint that are pled with some specificity.[12] Plaintiffs allege that the exchange defendants made misleading statements in a promotional pamphlet entitled "Understanding Options" (the "options pamphlet") sponsored by the exchange defendants,[13] that

---

[12] Any claim based upon any other misleading statement or omission that has not been brought to the court's attention by either party is deemed waived.

[13] In the options pamphlet, plaintiffs allege that the exchange defendants made misleading statements such as:

Listed options are executed on the trading floors of national SEC-regulated exchanges where all trading is conducted in an open, competitive auction market

and

Orderly, efficient and liquid markets. Flexibility, Leverage. Limited Risk. Guaranteed Contract

exchange defendant PCX made misleading statements in an SEC comment letter,[14] and that PHLX made misleading statements regarding order execution on its website.[15]

With regard to these statements, plaintiffs have failed to state a § 10b-5(b) claim because they have failed adequately to allege justifiable reliance. Plaintiffs do not allege that any plaintiff, let alone all of the plaintiffs, read these statements and were misled by them. Rather, in arguing reliance, plaintiffs cite to a case, *Spicer v. Chicago Bd. Options Exchange, Inc.*, 1990 U.S. Dist. LEXIS 14469 (N.D. Ill. 1990), which applies the

---

Performance. These are the major benefits of options traded on securities exchanges today.

[14] The complaint alleges that PCX made the following statements in a document entitled "Notice of Filing of Proposed Rule Change by the Pacific Exchange, Inc. Implementing a One Year Pilot Program Relating to its Automatic Execution System" submitted to the SEC which reads in part:

The Auto-Ex feature of POETS permits eligible market or marketable limit orders sent from member firms to be executed automatically at the displayed bid or offering price. Participating market makers are designated as the contra side to each Auto-Ex order. . . .

[15] The complaint alleges that PHLX made the following statements on its website that read in part:

AUTOM was created in 1988. It is the Philadelphia Stock Exchange's retail electronic options order execution system and is available for all PHLX-traded equity and index options. The Auto-X function provides automatic execution for all market and marketable limit orders, guaranteeing the price is consistent with the National Best Bid or Offer (NBBO). . . .

fraud-on-the market doctrine of reliance and imply that reliance may be presumed in this case.    I disagree.    The difference between the reliance element in a traditional securities fraud case and one that utilizes the fraud-on-the-market theory has been described as such:

> If this were a traditional securities suit--if, in other words, an investor claimed to have read or heard the statement and, not having access to the truth, relied to his detriment on the falsehood--then plaintiffs' argument would be correct. But this is not a traditional securities claim.    It is a fraud-on-the-market claim. None of the plaintiffs asserts that he read any of Baxter's press releases or listened to an executive's oral statement. Instead the theory is that other people (professional traders, mutual fund managers, securities analysts) did the reading, and that they made trades or recommendations that influenced the price. In an efficient capital market, all information known to the public affects the price and thus affects every investor. *Basic Inc. v. Levinson* holds that reliance on the accuracy of the price can substitute for reliance on the accuracy of particular written or oral statements, when the statements affect the price--as they do for large and well-followed firms such as Baxter, for which there is a liquid public market.

*Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 731 (7th Cir. 2004) (citations omitted). The facts of this case are such that fraud-on-the-market theory cannot be used to presume reliance. Assuming, *arguendo*, that the three statements pointed to by plaintiffs were material and misleading, the fraud-on-the-market doctrine does not apply to plaintiffs' claims because plaintiffs do not seek recovery for a loss caused by the inflation of the

26

price of an underlying security due to the dissemination of misleading information into the marketplace.[16]   As a result, absent any actual reliance, there is no causal link between these statements and the losses for which plaintiffs seek recovery. *See Spicer*, 1990 U.S. Dist. LEXIS 14469  at *35-36 ("The purpose of a reliance requirement is to ensure that causation exists between a defendants' acts and a plaintiff's harm.").

---

[16] Plaintiffs allege that they submitted orders to buy or sell options at a specific price, and that the specialist defendants, after having identified the origin of the order, either raised the price, refused to execute, or induced plaintiffs to cancel their order.  If one were to accept the fraud-on-the-market theory was applicable to the facts of this case, one would presume that misleading information about the operation of the exchanges was disseminated into the marketplace and thereafter inflated the price of options across the marketplace.  *See e.g., Spicer*, 1990 U.S. Dist. LEXIS 14469, at *34-37.  Plaintiffs' claims, however, do not seek recovery for any inflation in price (as reflected in an option quote) that may have existed in the options that they sought to buy or sell. Rather, plaintiffs seek recovery for a different loss.  For example, in the case of a trade that was filled at a less favorable rate than originally quoted, plaintiffs claim their loss would be the differential between the quoted price and the price at which their order was filled.  According to their complaint, this price differential was caused by a specialist defendant's specific discriminatory reaction to the fact that the order was placed by a direct access customer.  That specific loss (i.e., the less favorable price) was experienced only by that single direct access customer in that single trade.  This loss is completely independent from, and unrelated to, the underlying value of the option, which may or may not have been inflated due to misleading information.

Additionally, any reliance (direct or indirect) on these statements would not be justifiable. It is plaintiffs' contention that these statements were misleading (to them and other investors since they argue fraud-on-the-market) because the statements "guarantee" execution. First, reliance would not be justifiable because a number of the factual assertions in these statements are too vague to constitute material representations of fact (e.g., that the exchanges are "orderly" and "efficient" and "liquid"). *See Searls v. Glasser,* 64 F.3d 1061, 1066 (7th Cir. 1995). Furthermore, even if these statements were arguably material, plaintiffs allege in their complaint that each of the exchange defendants has adopted publically available detailed rules that explain the circumstances under which a customer's orders may be cancelled, adjusted, or otherwise not executed in accordance with the original terms of the order (referred to by plaintiffs as the "Firm Quote Rules" and "Obvious Error Rules"). [See complaint Paragraphs 94-102]    Also, the options pamphlet cited by plaintiffs in their complaint states that "[p]rior to buying or selling options, a person must receive a copy of *Characteristics and Risks of Standardized Options* (the "ODD") (and thus the pamphlet incorporates the ODD by reference).    The ODD states that "the systems of an options market . . . may fail or may not work effectively or efficiently at times" and "no

28

system can be expected to work perfectly at all times . . . ."
Given these public statements that are alleged in plaintiffs'
complaint to have been made by each exchange defendant, which
explain the specific circumstances under which order execution is
not "guaranteed," any knowledgeable investor would be aware of
the fact that orders can, and do, go unexecuted. Thus, a
reasonable investor would be aware that these three statements
"guaranteeing" order execution were not accurate. Plaintiffs
themselves allege that they have placed hundreds of thousands of
orders and engage in sophisticated arbitrage trading strategies.
Thus, given the public information available and their own
experiences, even if plaintiffs had in fact read these
statements, any reliance upon them would not be justifiable.
*Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522,
530 (7th Cir. 1985)("The investor cannot ask a court to focus on
the lie and ignore the remaining pieces of information already
available to him (or, in the case of a publicly traded security,
already available to others and reflected in the price of the
security.)"). Similarly, even if I were to accept plaintiffs'
argument that reliance could be presumed in this case, these
three statements could not have been justifiably relied upon by a
reasonable investor and could not have adversely affected the
price paid for options. *Id*; *Asher*, 377 F.3d at 732 ("An investor

29

who invokes the fraud-on-the-market theory must acknowledge that all public information is reflected in the price . . . ."). Plaintiffs' own allegations demonstrate that their claim must fail.

Additionally, this claim also fails because plaintiffs have failed to allege facts from which I could strongly infer that these three statements (if deemed material and misleading) were made with scienter. As discussed above, plaintiffs' complaint alleges that the exchange defendants had each adopted publically available rules to deal with orders that were not executed on their original terms. Furthermore, the options pamphlet incorporated into plaintiffs' complaint incorporates the ODD which states that order execution is not guaranteed at all times and that exchanges will not operate as efficient markets at all times. Therefore, given that each exchange defendant has disseminated information to the public that clearly indicates that trade execution is not "guaranteed," I cannot reasonably infer that the three statements "guaranteeing" execution were made with scienter.

Accordingly, plaintiffs' 10b-5(b) claims against the exchange defendants also fail. The exchange defendants' motion to dismiss is granted.

## III. Conclusion

Having dismissed all of plaintiffs' federal claims, I decline to exercise jurisdiction over plaintiffs' remaining state law claims.

ENTER ORDER:

_Elaine E. Bucklo_

_____

**Elaine E. Bucklo**
United States District Judge

DATED: September 13 , 2006