IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LAST ATLANTIS CAPITAL LLC, LOLA LLC, LULU LLC, GOODBUDDY SOCIETY LLC, FRIENDLY TRADING LLC, and SPEED TRADING LLC, BRYAN RULE, BRAD MARTIN, and RIVER NORTH INVESTORS, LLC,<br><br>        Plaintiffs,<br><br>  v.<br><br>AGS SPECIALIST PARTNERS, AGS SPECIALISTS LLC, BEAR HUNTER STRUCTURED PRODUCTS LLC, BEAR WAGNER SPECIALISTS LLC, BOTTA CAPITAL MANAGEMENT LLC, COHEN, DUFFY, MCGOWAN & CO. LLC, COHEN, DUFFY, MCGOWAN LLC, D.A. DAVIDSON & CO., INC., EQUITEC PROPRIETARY MARKETS, LLC, EQUITEC STRUCTURED PRODUCTS, LLC, EQUITEC TRADING LLC, EQUITEC-PREMIER LLC, EQUITEC-BROWN LLC, EQUITEC-FELDMAN LLC, EQUITEC-FURMAN LLC, EQUITEC-SCHWARTZ LLC, GENEVA DPM LLC, GROUP ONE TRADING LP, KNIGHT FINANCIAL PRODUCTS LLC n/k/a CITIGROUP DERIVATIES MARKETS, INC., KNIGHT TRADING GROUP, INC., MDNH TRADERS LLC, MDNH PARTNERS LP, MORGAN STANLEY, MORGAN STANLEY DW, INC., MORGAN STANLEY & CO., INC., SLK-HULL DERIVATIVES LLC, GOLDMAN SACHS EXECUTION AND CLEARING, LP f/k/a SPEAR, LEEDS & KELLOGG LP, n/k/a GOLDMAN SACHS EXECUTION AND CLEARING, LP SPECIALISTS DPM LLC, SUSQUEHANNA INTERNATIONAL GROUP LLP, SUSQUEHANNA INVESTMENT GROUP, TD OPTIONS LLC, VAN DER MOOLEN OPTIONS USA LLC, VAN DER MOOLEN HOLDINGS NV, and WOLVERINE TRADING LLC,<br><br>        Defendants. | No. 04 C 397 |

1

## MEMORANDUM OPINION AND ORDER

Plaintiffs Last Atlantis Capital LLC, Lola LLC, Lulu LLC, Goodbuddy Society LLC, Friendly Trading LLC, Speed Trading LLC, Bryan Rule, Brad Martin, and River North Investors, LLC allege numerous violations of federal and state law by defendants. Defendants include several securities brokers and/or dealers, collectively, the "specialist defendants," and six entities alleged to own and/or control certain specialist defendants, the "affiliates." The amended consolidated complaint alleges that the specialist defendants violated § 10b of the Exchange Act and SEC Rule 10b-5 (a), (b) and (c) (Claim I); the affiliates violated § 10b of the Exchange Act and SEC Rule 10b-5 (a), (b) and (c) (Claim II); the specialist defendants are in breach of contract (Claim III); all defendants have engaged in common law fraud (Claim IV); the specialist defendants breached their fiduciary duty to plaintiffs (Claim V); all defendants violated the Illinois Consumer Fraud and Deceptive Practices Act, 815 Ill. Comp. Stat. 505/2 (Claim VI); all defendants have engaged in tortuous interference with the plaintiffs' business relationships (Claim VII); and all defendants have engaged in tortious interference with contracts (Claim VIII).

Presently before me is defendants' motion to reconsider my March 22, 2007 order, allowing plaintiffs to file the amended consolidated complaint ("ACC" or "the complaint"), in light of *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007).[1] Defendants have previously filed multiple Rule 12(b)(6) motions and therefore general familiarity with the facts, as alleged in the complaint, is presumed. *See Last Atlantis Capital LLC v. Chicago Bd. Options Exchange, Inc.*, 455 F. Supp. 2d 788 (N.D. Ill. 2006) ("*Last Atlantis II*"); *Last Atlantis Capital LLC v. Chicago Bd. Options Exchange, Inc.*, No. 04 C 397, 2005 WL 3763262 (N.D. Ill. Mar. 30, 2005) ("*Last Atlantis I*").

I.

In assessing defendants' motion to dismiss under FED. R. CIV. P. 12(b)(6), I must accept all well-pleaded facts in the complaint as true. *Tellabs*, 127 S. Ct. at 2509. However, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550

---

[1] Plaintiffs' object to this motion as untimely. However, they also rely heavily on recent Seventh Circuit precedent interpreting the *Tellabs* decision in arguing against dismissal. I do not find defendants' motion prejudices plaintiffs in light of the significant change in the law as a result of *Tellabs* and the recent (and, according to plaintiffs, arguably beneficial) developments in Seventh Circuit law. *See Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990).

3

U.S. - -, 127 S. Ct. 1955, 1965 (May 21, 2007); *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776-77 (7th Cir. 2007).

Plaintiffs must also comply with the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), which requires that the complaint specify each allegedly misleading statement and the reasons why it is misleading. 15 U.S.C. § 78u-4(b)(1). The PSLRA also requires that plaintiffs, "with respect to each act or omission alleged, state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]" for claims brought under any section of 10b-5. 15 U.S.C. § 78u-4(b)(2). Scienter is "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 756 (7th Cir. 2007)*; see also Makor Issues & Rights, Ltd. v. Tellabs Inc.*, - - F.3d - -, 2008 WL 151180, at *1 (7th Cir. Jan. 17, 2008) ("*Makor II*"). In *Tellabs*, the Supreme Court held that a "strong inference" of scienter is one which "must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." 127 S. Ct. at 2504-05; *see also Makor*, 2008 WL 151180, at *2.

The allegations in the complaint must be considered collectively. *Tellabs*, 127 S. Ct. 2509.

II.

Defendants contend that plaintiffs' allegations fail to give rise to a strong inference of scienter as set forth in *Tellabs*. Plaintiffs' allegations can be generally categorized as follows: 1) defendants' general motive and opportunity; 2) the American Stock Exchange LLC ("AMEX") consent orders implicating 11 specific specialist defendants;[2] 3) allegations that "it was common practice for [d]efendant SIG and all [s]pecialists charged with maintaining orderly markets in [o]ptions traded on [the] CBOE as [designated market makers ("DPMs")] . . . to regularly identify the [c]learing [f]irms from which [o]rders were sent, and then disengage the Auto-ex [s]ystem in order to discriminate against [o]rders sent from [f]irms used by [p]laintiffs and other [direct access customers ('DACs')]," (ACC at ¶21); 4) allegations that plaintiffs' receipt of automatic, or prompt manual,

---

[2]The 11 defendants are: AGS Specialists LLC ("AGS"), Bear Hunter Structured Products LLC ("Bear Hunter"), Cohen Duffy & McGowan LLC ("CDM"), Speer Leads and Kellogg LLP, known as Goldman Sachs Execution and Clearing LLP ("GS"), Group One Trading, LP ("Group One"), SLK-Hull Derivatives LLC ("SLK-Hull"), Susquehanna Investment Group ("SIG"), TD Options LLC ("TDO"), Wolverine Trading LLC ("Wolverine,"), and Knight Financial Products LLC ("Knight Financial"). Collectively these defendants are referred to herein as "sanctioned specialists."

5

executions on marketable limit orders was statistically lower than the rates of executions provided to non direct access customers; and 5) allegations of actual trades mishandled by specific defendants during periods identified in the 2006 AMEX sanctions orders, the SEC Staff Report, and the Battalio Study. I will examine these allegations and their respective competing inferences.

First, as I have already found, plaintiffs' general allegations concerning defendants' financial motive and opportunity to mishandle plaintiffs' trades — alone — are not enough to establish a strong showing of scienter. Plaintiffs' general allegations describe a situation in which every specialist has the motive and opportunity to mishandle every single trade in which a direct access customer has presented a more competitive bid than their own. Plaintiffs have made additional allegations, however.

Second, with respect to the AMEX consent orders, these specifically implicate only eleven of the defendants. With respect to these eleven defendants, the complaint sets forth that they consented to the entry of written findings that they had individually violated certain SEC Rules and AMEX Exchange Rules and articles of the AMEX Constitution by improperly handling orders to buy and sell options on hundreds of occasions during

6

specific periods between June 1, 2002 through January 31, 2005. Plaintiffs argue that although the AMEX sanction orders do not find that each of the sanctioned defendants acted recklessly or intentionally, they nonetheless provide a basis for inferring scienter because if these defendants "truly believed that there were innocent explanations for each of the thousands of instances of misconduct cited in the [s]anction [o]rders, they surely would not have stipulated to contrary findings, nor would they have paid tens of thousands of dollars in fines." (Pl. Br. at 15.) As a preliminary matter, plaintiffs' explanation in support of their proposed inference of scienter is not particularly sound. As conceded by plaintiffs, the violations in question are not scienter-based but the result of negotiated settlements in regulatory proceedings. There are additional available explanations for the violations and settlement which do not necessarily rise to the level of intentional fraud, such as system problems or negligence. Defendants also correctly set forth that the absence of a scienter-based charge lends, at a minimum, an equally strong inference against scienter. That said, plaintiffs' proposed inference of scienter against the eleven sanctioned specialists, based on the nature of the specific conduct identified, is "at least as compelling" and cogent as the competing inferences.

Regardless of the strength of the inference of scienter with respect to the eleven sanctioned specialist, I cannot find "at least as compelling" the inference that the remaining unsanctioned defendants had the requisite scienter based solely on the AMEX orders. Based on the absence of specific regulatory findings against the remaining defendants, the inference that they did not engage in this sort of conduct during the identified period, or at least not significantly, is slightly more compelling than plaintiffs' proposed inference: that their mere presence on the different exchanges and co-existence with the sanctioned specialists suggest the remaining defendants necessarily engaged in the same conduct with respect to the plaintiffs. Therefore, I must take into consideration additional allegations before concluding there is a strong inference of scienter against the remaining defendants.

Third, plaintiffs' allegations that "it was common practice of [d]efendant SIG and all [s]pecialists charged with maintaining orderly markets in [o]ptions traded on the CBOE as [designated market makers ('DPMs')] . . . to regularly identify the [c]learing [f]irms from which [o]rders were sent, and then disengage the Auto-ex System in order to discriminate against Orders sent from Firms used by Plaintiffs and other [direct access customers]," (ACC at ¶21) is based on a specific

declaration by Anthony Zangrilli, which plaintiffs' failed to attach to the complaint, and other unidentified sources. (Id.) Defendants argue that these allegations should be discounted because 1) the Zangrilli declaration was not attached to the complaint and 2) the remaining sources are completely unidentified.

I agree with defendants that plaintiff's failure to attach the Zangrilli declaration, or even identify him by name in the complaint, after they had submitted his declaration in support of plaintiffs' previous motion for reconsideration and seeking leave to file the amended consolidated complaint, is problematic.[3] The Seventh Circuit has stated that "[i]t is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist." *Higginbotham*, 495 F.3d at 757. Unlike in *Makor II*, 2008 WL 151180 at *8, the only description of a single confidential source (arguably Zangrilli) consists simply of the following: "a former market maker who traded Options of underlying securities of Microsoft as

---

[3]Moreover, although plaintiffs argue Zangrilli is one of their sources in their briefs, they fail to address the absence of any specific reference to him by name in the complaint.

9

a member of the trading crowd on CBOE in which SIG was the appointed DPM." (ACC at ¶ 21-22.) This information does not disclose "numerous" sources, is vague about the source's basis of personal knowledge, and is not "corroborated by multiple sources." *Id*. (noting "the information that the [numerous] confidential informants are reported to have obtained is set forth in convincing detail . . . [and] corroborated by multiple sources"); *see also Higginbotham*, 495 F.3d at 757 ("anonymity conceals information that is essential to the sort of comparative evaluation required by *Tellabs*."). The allegation that this source "was a member of the trading crowd on CBOE" is not indicative of the extent or type of contact this source had with defendants, in particular defendants other than SIG, or of the source's insight into the alleged actions taken by defendants, particularly outside the CBOE. And while the complaint also alleges that the AMEX MM Letter corroborates these particular allegations, the text of this letter is very general, does not identify defendants, and only vaguely references anecdotal evidence that specialists on the CBOE were still in possession of technology which identified the origin of public customer limit orders. Therefore, I will discount (but not ignore) these allegations. *See Higginbotham*, 495 F.3d at 757.

10

Defendants also dispute that plaintiffs' allegations concerning the Auto-ex system against the remaining defendants do not compel an inference of scienter in light of the fact that these systems are designed to shut down when the markets are crossed or locked per exchange rules. Plaintiffs do not appear to dispute this, instead arguing that all defendants failed to promptly execute their marketable limit orders at the quoted bid or offer price manually on the trading floor *after* the Auto-ex system was disengaged. Accordingly, the former allegation is not indicative of scienter.

Fourth, plaintiffs point to allegations that plaintiffs' receipt of automatic, or prompt manual, executions on marketable limit orders was statistically lower than the rates of executions provided to non-direct access customers ("public retail customers"). Specifically, 20-30% of plaintiffs' marketable limit orders were promptly executed by defendants, whereas over 90% of the marketable limit orders sent by public retail customers who were not DACs were promptly executed at the quoted prices. (ACC at ¶ 38.) In support, plaintiffs refer to, but fail to attach,[4] 1) trading data examined by the SEC Staff Report

---

[4]Although plaintiffs attempt to incorporate by reference the SEC Staff Report "a copy of which was filed as an exhibit to the original complaint filed in this [a]ction," (ACC ¶ 24), this is inaccurate. No such report is attached to the original

11

for the studied week of trading on AMEX starting October 22, 2001; 2) trading data for the month of January 2002 on all four exchanges that was examined as part of an academic study which was set forth in an article in the Journal of Finance (plaintiffs do not specify when) ("the Battalio study"); and 3) actual trading data of orders sent by plaintiff Last Atlantis in the months of May, July, and September for each year from 2001-2006 and "estimated fill rates of between 25%-30% for most of the other [p]laintiffs." (ACC at ¶ 39.) With respect to the SEC Staff Report, the complaint identifies four specialists who made markets as designated specialists on AMEX in one or more of the nine studied options during the studied week: SLK-Hull, SIG, TDO, and CDM. These are also the specialists identified with respect to the specific orders sent by plaintiff Last Atlantis. As I already set forth in my September 13, 2006 Memorandum Opinion and Order, the SEC Staff Report dealt solely with the AMEX and therefore leaves unaddressed any transactions that occurred on other exchanges.

Defendants contend the discrepancy in fill rates is the result of plaintiffs' arbitrage trading strategies, for plaintiffs must necessarily compete with each other and other

---

complaint. (*See* Doc. Entry # 1.)

DACs with whom they claim a common trading strategy in the race to buy and sell the limited number of options contracts quoted in locked and crossed markets whereby the "winner's" order is filled and the others' are not. Defendants also cite to exchange rules as requiring specialists to execute a customer's order to buy or sell options at a quoted price if another customer has already purchased or sold the set of amount of options that are quoted and available at that price. While a legitimate competing inference, the inference of scienter is equally compelling based on the allegations contained in the four corners of the complaint with respect to defendants SLK-Hull, SIG, TDO, and CDM.[5] Plaintiffs do allege engaging in arbitrage trading, but also allege that their fill rates were lower than "similar market orders and marketable limit orders submitted for other public customers to buy or sell the same [o]ptions during similar market conditions." (ACC at ¶ 24.) When this is taken as true, the inference of scienter is "at least as compelling" and cogent as defendants' competing inference as the disparity among the fill rates is certainly not insignificant.

This inference of scienter is limited to the defendants who are identified as having used the relevant clearing firms in the

---

[5]These four defendants are already part of the eleven sanctioned specialists.

AMEX. Again, without more, plaintiffs' allegations against the remaining defendants do not give rise to a strong inference of scienter because the complaint is silent with respect to whether the market orders and marketable limit orders submitted for other public customers on the other exchanges, or with other clearing firms, were similar. Furthermore, the complaint is also silent as to whether the market conditions were similar with respect to transactions which occurred in unspecified time periods or outside of the time period identified in the SEC Staff Report. Finally, there are a number of reasons why a transaction may fail that are unrelated to a specialist's intentional or reckless mishandling; for example, the exchange rules allow trades to go unexecuted or quotes to be adjusted under certain circumstances. Moreover, trades may go unexecuted or be adjusted due to unintentional error.

In sum, the allegations in the complaint, when viewed collectively and taken as true, give rise to a strong inference of scienter as set forth in *Tellabs* with respect to the eleven sanctioned specialists. These defendants are specifically identified in the regulatory findings and as having used the clearing firms identified in the SEC Staff Report. With respect to the remaining defendants, plaintiffs allege facts obtained from a single and vague confidential source and provide limited,

14

isolated data concerning patterns of activity, but which are not specific with respect to the conditions in the markets and similarity among orders which would allow for at least an equally compelling inference of scienter. Accordingly, the complaint fails to state a claim against the remaining defendants.[6]

### III.

For the foregoing reasons, the motion for reconsideration is granted in part and denied in part. The motion is denied with respect to the following defendants: AGS, Bear Hunter, CDM, GS, Group One, SLK-Hull, SIG, TDO, Wolverine, and Knight Financial. The remaining defendants are dismissed.

---

[6] In their response to the motion to reconsider plaintiffs also seek leave to file yet another amended complaint. The motion is denied based on the length of the litigation (four years), the number of previously filed complaints (five) and numerous rounds of motions to dismiss or for reconsideration that have already been filed and fully briefed by the parties and resolved by this court. At some point, there must be some endpoint to this time-consuming and expensive cycle which results in undue prejudice to defendants. *U.S. ex. Rel. Fowler v. Caremark RX, LLC*, 496 F.3d 730, 740 (7th Cir. 2007) (citing *Emery v. Am. Gen. Fin., Inc.*, 134 F.3d 1321, 1322-23 (7th Cir. 1998)) ("Despite the fact that the deficiencies could [potentially] be cured through an appropriate pleading, [dismissal was appropriate] when the plaintiff continually fails to provide a valid pleading in compliance with the federal rules.").

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

DATED: February 7, 2008