# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **LAST ATLANTIS CAPITAL LLC, et al.,** ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> **AGS SPECIALIST PARTNERS, et al.,** ) <br> ) <br> Defendants. ) <br> ) <br> ) <br> ) | Nos. 04 C 397 <br> 05 C 5600 <br> 05 C 5671 |

## MEMORANDUM OPINION AND ORDER

Presently before me is a motion by Knight Financial Products, LLC ("Knight") for summary judgment. In that motion, Knight argues for dismissal of the Rule 10b-5 claim against it, and also argues that I should decline to exercise jurisdiction over any remaining state law claims. Both Knight and plaintiffs have inundated this court with filings related to Knight's motion for summary judgment. In addition to filing a response to Knight's motion, plaintiffs have also filed a Rule 56(f) affidavit, in which plaintiffs' counsel avers both that plaintiffs' response is adequate to defeat Knight's motion *and* that plaintiffs require additional discovery to adequately respond to Knight's motion. I have reviewed these submissions, and conclude that summary judgment is warranted here. Thus, Knight's motion for summary judgment is granted. In addition, I reject plaintiffs' request that they should be entitled to take more discovery before responding to Knight's motion.

## I. Factual Background

I borrow from Magistrate Judge Keys's apt summation of the key dispute in this case:

> At the heart of plaintiffs' claim is an inherent tension between direct access customers and specialists, stemming from their competing efforts to profit from market anomalies. The Specialist Defendants are dealer/brokers charged with establishing the bid and offer prices for every option in a designated option class; this price is known as "the quote." Specialists fill orders by matching buyers' orders to purchase options with contra-side customer orders to sell options at the same price. In the event that there are no existing contra-side customer orders, specialists execute orders by buying or selling the designated option from their own proprietary account. Direct access customers, like Plaintiffs, utilize arbitrage trading strategies in an attempt to take advantage of price discrepancies in the options markets. For example, if a specialist's buy bid on one exchange is $5.00 and a specialist's sell bid on a different exchange for that same option is $4.90 on another exchange, Plaintiffs attempt to execute simultaneous orders to sell on the first exchange and buy on the second exchange to achieve a 10 percent profit per option, while incurring minimal risk.
>
> Plaintiffs claim that, like the direct access customers, specialists also profit from capitalizing on market anomalies. Specialists are able to realize significant profits from such "spreads," if and when they are able to fill orders from their own proprietary accounts. However, because direct access customers purportedly have access to better information and technology than typical customers, they have cut substantially into the specialists' profits. Plaintiffs claim Defendants intentionally discriminated against orders placed by direct access customers since April 1, 2001, in favor of more lucrative orders placed by less sophisticated customers. Specifically, Plaintiffs charge that the Specialist Defendants have: "[I]dentified the origin, and then knowingly mishandled the execution of thousands of orders to buy and sell options that were sent to defendants by engaging in various illegal trading practices such as refusing to automatically, or promptly, execute the orders or send confirmations upon the

execution of orders, changing (or "fading") the quoted prices after receiving the orders, delaying the execution of orders, refusing to honor requests to cancel orders, and unilaterally terminating or adjusting the prices on orders that were previously executed and confirmed, and conducting thousands of proprietary trades for the Specialists' own accounts that were executed in advance of, or instead of, executing Plaintiffs' marketable limit orders (i.e. order to purchase or sell a set amount of options at a specific price equal to the bid or offer price actually disseminated by a Specialist on a particular exchange)."

Defendants have consistently denied discriminating against orders placed by direct access customers in general, and Plaintiffs in particular. Defendants acknowledge that a higher-than-average percentage of direct access customers' orders go unexecuted, but explain that this is a result of the proliferation of the software used by direct access customers; because these customers rely upon the same kind of computer program to identify market anomalies, and because these computer programs instruct direct access customers to place virtually identical orders at the same time, direct access customers flood specialists with multiple orders for the same options, making it impossible to fill them all.

11/23/09 Report and Recommendation, Docket # 725 at 3-5.

## II. Analysis

### A. Summary Judgment Standard

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Once the moving party shows that there is no genuine issue of material fact, the burden of proof shifts to the nonmoving party to

3

designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

   **B.   Rule 10b-5**

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), prohibits the use "in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." Pursuant to this section, the SEC promulgated Rule 10b-5, which provides in pertinent part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Knight argues for summary judgment because plaintiffs have failed to put forward any evidence that Knight expressly communicated a falsehood to plaintiffs. Plaintiffs respond by

4

asserting[1] that there are genuine issues of material fact in dispute with respect to whether Knight issued express and implied misrepresentations in violation of Rule 10b-5(b), and whether Knight committed a deceptive or manipulative act in violation of Rule 10b-5(a) and (c). Plaintiffs further argue that even if I accept Knight's argument, they have presented sufficient evidence of Knight's express misrepresentations to plaintiffs to survive summary judgment.

### C. Claims under Rule 10b-5(a) and (c)

To prove a claim under Rule 10b-5(a) or (c), a plaintiff must show that the defendant (1) committed a deceptive or manipulative act, (2) with scienter, (3) that the act affected the market for securities or was otherwise in connection with their purchase or sale, and (4) that defendants' actions caused the plaintiffs' injuries. *Last Atlantis Capital LLC v. Chicago Bd. Options Exch., Inc.*, 455 F. Supp. 2d 788, 793 (N.D. Ill. 2006).

The parties' primary argument centers on whether, when dealing with an options specialist, Rule 10b-5 allows for an implied misrepresentation, or whether an express representation is required. Plaintiffs assert that under the "shingle theory," specialists, such as Knight, may be liable for securities fraud

---

[1] Plaintiffs' position that the arguments raised by Knight are barred by the law of the case doctrine is unsupported. While I have issued numerous opinions in this case, I have not addressed the issues Knight raises here.

5

based on implied misrepresentations. Under the "shingle theory," a broker-dealer that "does business with the public . . . impliedly represents that he will deal fairly with the public." *Brennan v. Midwestern United Life Ins. Co.*, 286 F. Supp. 702 (N.D. Ind. 1968). "[A] broker-dealer, by accepting an order . . . impliedly represents that the order will be executed in a manner consistent with the duty of best execution." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 135 F.3d 266, 269 (3d Cir. 1998). Relying on the shingle theory, plaintiffs' primary argument is that Knight, by hanging out its professional shingle as a specialist, impliedly represented to plaintiffs that it would follow all applicable rules and that it deceived plaintiffs when it engaged in certain actions which violated those rules.

In support of its assertion that an express representation is required for a specialist to be liable under Rule 10b-5, Knight points me to the Second Circuit opinion in *United States v. Finnerty*, 533 F.3d 143 (2d Cir. 2008) ("*Finnerty III*"). Rather frustratingly, Knight glosses over the subtleties of the history of *Finnerty III*, and makes no attempt to parse out the differences between sections (a), (b) and (c) of Rule 10b-5. A detailed examination of the history of *Finnerty III* is critical to understand what the Second Circuit actually held.

In *United States v. Finnerty*, Nos. 05 Cr. 393 DC, 05 Cr. 397 DC, 2006 WL 2802042, at *1-2 (S.D.N.Y. Oct. 2, 2006) ("*Finnerty

6

*I*"), a New York Stock Exchange ("NYSE") specialist was charged with criminal violations of Section 10(b) and Rule 10b-5 based on alleged mishandling of customers' options orders in violation of NYSE rules. The district court dismissed the Rule 10b-5(b) charge, concluding that with respect to section (b) – which requires an "untrue statement of fact" or the omission of a material fact necessary to make another statement not misleading – the shingle theory was not available to specialists. *Finnerty I*, 2006 WL 2802042, at *7. In distinguishing cases involving excessive markups which allowed for omission liability (that is, liability in the absence of express statements), the district court noted that "the securities dealer [in the excessive markup cases] solicits customers by actively holding himself out as someone who is representing the best interests of the customer." *Id*. at *6. The district court went on to conclude that specialists do not actively solicit customers, do not "hang [] out [their] professional shingle," and do not impliedly represent themselves the way that securities dealers in excessive markup cases do. *Id*.

Thus, the district court in *Finnerty I* dismissed the Rule 10b-5(b) charge, but allowed the counts under sections (a) and (c) to proceed to trial. After trial, the district court concluded that the government failed to put on sufficient evidence of a "deceptive act" as required by sections (a) and (c). *United States v. Finnerty*, 474 F. Supp. 2d 530, 538 (S.D.N.Y. 2007) ("*Finnerty II*").

7

The court reasoned that in order for the specialist's conduct to be deceptive, there must be evidence of what the customers expected when they were allegedly deceived. *Id*. at 539. Because the government failed to put forward evidence of the customers' expectations (i.e., proof of what the customers "think they are getting"), the government failed to show how the customers were deceived. *Id*. The district court stated that "[e]ven assuming Finnerty violated NYSE rules against interpositioning,[2] the Government still had to demonstrate that the customers were deceived – that they were aware of the rules, expected the specialists to comply with them, and acted in accordance with those expectations." *Id*. at 541. Without evidence of a "deceptive act," then, the district court granted the motion for judgment of acquittal for the charges based on Rule 10b-5(a) and (c). *Id*. at 545.

On appeal, the government appealed *only* the granting of the judgment of acquittal, which dealt exclusively with Rule 10b-5(a) and (c), and did not appeal the ruling relating to Rule 10b-5(b) (in which the district court rejected the application of the shingle theory to a specialist). *Finnerty III*, 533 F.3d at 148. Thus, the Second Circuit's opinion in *Finnerty III* could not have

---

[2]"Interpositioning" describes when a specialist trades on his own account between existing investor orders (thereby earning a profit on the discrepancy in prices) when there are buy and sell orders that can be matched. *Finnerty II*, 474 F. Supp. 2d at 533.

8

addressed the district court's conclusion that, under Rule 10b-5(b), a specialist is not liable for implied misrepresentations under the shingle theory. Instead, the Second Circuit addressed only the district court's ruling on Rule 10b-5(a) and (c), and the district court's requirement of a "deceptive act." *Id*. at 146.

In arguing for reversal, the government maintained that Finnerty had held himself out as a specialist obligated to follow exchange rules, that customers would have expected him to follow the rules, and they were therefore deceived when he failed to follow them. *Id*. at 149-50. While it never refers to this argument as the "shingle theory," the Second Circuit rejected the equivalent of the shingle theory when it stated,

> Some customers may have understood that the NYSE rules prohibit a specialist from interpositioning, and that the rules amount to an assurance (by somebody) that interpositioning will not occur. As a consequence, some customers may have expected that Finnerty would not engage in the practice. But unless their understanding was based on a statement or conduct by Finnerty, he did not commit a primary violation of § 10(b)[.]

*Id*. at 150. The Second Circuit, therefore, took the district court's reasoning a step further and held that a specialist may be liable under sections (a) and (c) if the customers expected that the specialist would not engage in a practice prohibited by exchange rules *and* if that understanding was "based on a statement or conduct by" the specialist.

9

With no Seventh Circuit case law directly on point[3], I will follow the Second Circuit's holding in *Finnerty III* that implied misrepresentations[4] under the shingle theory are insufficient to prove securities fraud under Rule 10b-5(a) and (c). Knight has provided undisputed evidence that, putting aside the options orders ultimately received by Knight, plaintiffs did not have any direct

---

[3] Plaintiffs provided an *amicus curiae* brief submitted by the SEC to the Second Circuit in support of the pending appeal in *In re Refco Capital Mkts. Ltd. Brokerage Customer Sec. Litig.*, 586 F. Supp. 2d 172 (S.D.N.Y. 2008). The district court in *In re Refco* granted a broker-dealer's motion to dismiss because its former customers failed to allege any express deceptive acts by their broker-dealer that could support a securities fraud claim. The SEC did not argue that *Finnerty III* was wrongly decided, but argued that a customer can state a securities fraud claim against its own broker-dealer under the shingle theory of implied misrepresentations. Because *In re Refco* and the related appeal do not involve claims against a specialist, and in light of the difference between typical broker-dealers and specialists (as highlighted in the *Finnerty* cases), I do not find the argument presented by the SEC to be on point here.

[4] Plaintiffs point to an administrative settlement that the SEC reached with Finnerty on May 28, 2009 to support their argument generally that implied misrepresentations may form the basis for a securities fraud claim against a specialist. I do conclude that consideration of this administrative settlement is not appropriate. As Knight pointed out, such settlements are not precedent. *In re Finnerty, et al.*, Release No. 381, at 65 (SEC July 13, 2009) (stating that SEC settlements have no precedential value). Further, on July 13, 2009, the SEC issued an adjudicated decision in which the Administrative Law Judge dismissed securities fraud charges against the non-settling defendants, stating, "[e]ven if the defendant knew he had violated a NYSE rule and tried to cover it up, violation of an NYSE rule does not establish securities fraud, even in the civil context." *In re Finnerty, et al.*, Release No. 381, at 62 n.90 (citing *Finnerty III*, 533 F.3d at 151). Therefore, the later adjudicated decision relied on *Finnerty III* to reject the argument propounded by plaintiffs here.

10

communications with Knight.[5]  Plaintiffs have put forward no evidence that they were clients of, or had accounts with, Knight. Because of the similarities between Knight and Finnerty, I find the holding in *Finnerty III* to be persuasive.[6]

Thus, pursuant to the holding in *Finnerty III*, in order to prove a claim under either of these sections, plaintiffs must provide evidence of: (1) customer expectations, and (2) a deceptive statement or act on the part of the specialist. *Finnerty III*, 533 F.3d at 150. Plaintiffs assert that they have provided evidence of those two requirements.

---

[5] Plaintiffs' attempt to deny Knight's Statement of Undisputed Facts 9 is rejected. As an initial matter, plaintiffs' general citation to all of the plaintiffs' affidavits is improper. Next, plaintiffs cite to "Lowry Supp. Decl. At ¶¶ 4,8 and Ex. A thereto at ¶¶ 11,13," which does not support the notion that Knight and plaintiffs communicated to each other. Rather, all the citations provided by plaintiffs support the fact that plaintiffs placed orders to either buy or sell options, which orders (once they were routed to their own broker-dealers and then sent to the respective Exchanges) ultimately were received by Knight. This is not the type of direct communications which would support the argument that Knight had a typical customer/broker relationship with plaintiffs.

[6] Plaintiffs point to *Kurz v. Fidelity Mgmt. & Research Co.*, 556 F.3d 639 (7th Cir. 2009), to support their argument that a specialist may be liable for securities fraud based on implied misrepresentations. Plaintiffs' reliance on *Kurz* is misplaced. While the Seventh Circuit did make the general observation that "not revealing to investors a failure to comply with one's duties about transactions in their securities can lead to liability under the securities acts," *id*. at 642, such a statement is not dispositive here because *Kurz* did not involve options specialists, such as Knight.

While plaintiffs have provided evidence relating to the *Finnerty III* requirements, ultimately they have failed to tie together the two requirements. Through affidavits, plaintiffs have provided evidence that they expected Knight would act in accordance with all applicable rules when handling and executing the orders they submitted to the Exchanges. Plaintiffs also provided evidence that they relied on Knight to execute their orders in a fair and proper manner. In addition, plaintiffs provided evidence that Knight made public statements regarding its promise of "best execution" through press releases and through its own website. Pls' Am. St. of Add'l Facts 19 (citing Friedman Decl. at Exs. 8-16). Examples of these statements include: "Our appointments of [new executives] will help ensure that our operations and execution capabilities keep pace with our efforts to establish Knight Financial Products as the standard for *best execution* in the options industry," Ex. 10 at 1 (emphasis added); "Knight helps its clients meet their fiduciary obligation of obtaining *best execution* for the securities orders that they route on behalf of their customers," Ex. 8 at 2 (emphasis added).

However, despite providing these important pieces of evidence, plaintiffs fail to provide any proof that the plaintiffs' expectations were *based on* the alleged misrepresentations made by Knight. The key language in *Finnerty III* states that a customer's expectation "must be based on a statement or conduct" by Knight.

12

*Finnerty III*, 533 F.3d at 150.  Because plaintiffs failed to put forward evidence that their expectations were based on Knight's alleged misrepresentations, they have failed to put forward sufficient evidence to survive summary judgment.[7]

Finally, plaintiffs also argue, in an apparent attempt to suggest that Knight (although admittedly a specialist) was more like a typical broker-dealer than the specialist in *Finnerty III*, that "Knight actively solicited customers by, *inter alia*, directing monetary payments to certain brokerage firms in exchange for their agreements to direct customer orders to the Exchanges at which Knight was a designated specialist and by holding itself out as a superior specialist firm that provided best execution and that represented the best interest of its customers."  Pls' Am. St. of Add'l Facts 18.  In support, plaintiffs cite to Knight's website and press releases which tout Knight's promise of "best execution."  *Id*. (citing Friedman Decl. at Ex. 8-17).  It is not at all clear

---

[7] Plaintiffs also argue that Knight made false statements when it provided quotes for certain options and then failed to honor those quotes when plaintiffs submitted their orders. Plaintiffs, through their own affidavits, aver that they relied on those quotes and were deceived by them.  Plaintiffs have provided me with no authority to support their argument that the quotes themselves amount to an express misrepresentation.  What they are really arguing is that the price quotations were deceptive because Knight violated exchange rules when handling orders.  As Knight points out, this argument is an attempt by plaintiffs to morph their implied representation argument into something that looks more like an express representation. Because I conclude that this argument is merely another way of stating their implied misrepresentation theory, I reject it.

13

which exhibits, of the ten referred to generally, support plaintiffs' argument regarding monetary payments made by Knight to other brokerage firms. Exhibit 17, attached to Attorney Friedman's Declaration, is simply entitled "Marketing Fees, November 29, 2002" and is practically undecipherable. Plaintiffs fail to explain what the chart is, what the entries mean, what the fees listed (ranging from $0.00 to $0.50) cover or how this chart supports their assertion. In addition, I cannot conclude that Knight, as plaintiffs overstate, "actively solicited customers" by making statements on its own website and in press releases when there is no evidence that plaintiffs, or other public customers, ever saw or had knowledge of these statements. There is no evidence that Knight sought plaintiffs as customers, nor is there evidence that Knight made payments to broker-dealers in an attempt to secure more public customers. For these reasons, I reject plaintiffs' attempt to characterize Knight as more akin to a typical broker-dealer than a specialist as described in *Finnerty III*.

In light of the above, plaintiffs have failed to put forward evidence that their expectations that Knight would follow all applicable rules were based on statements or conduct by Knight. As a result, Knight's motion for summary judgment on Rule 10b-5(a) and (c) is granted.

**D. Claim Under Rule 10b-5(b)**

To prove a claim under Rule 10b-5(b), the plaintiffs must show that (1) the defendant made a misstatement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which plaintiff justifiably relied, and (6) that the false statement or omission proximately caused the plaintiff's damages. *Last Atlantis*, 455 F. Supp. 2d at 793.

In *Finnerty I*, the district court concluded that, under Rule 10b-5(b), the shingle theory was not applicable to specialists where the plaintiff failed to put forward evidence of misleading statements. 2006 WL 2802042, at *6. Relying on the language of subsection (b), the court noted that "the rule's plain language thus makes clear that liability for an omission pursuant to subsection (b) requires a statement to have been made." *Id*. The court went on to distinguish its case from excessive markup cases, in which the securities dealer solicits customers by actively holding himself out as someone who is representing the best interests of the customer. Finally, the court concluded that allowing implied misrepresentations in this case would "render the text of subsection (b) meaningless." *Id*. at *7. In particular, the "part that says an omission is prohibited if it 'make[s] the statements made, in the light of the circumstances under which they

were made, not misleading' would be superfluous." *Id*. (quoting Rule 10b-5(b)).

I am persuaded by the *Finnerty I* court's reasoning with respect to specialists. For the reasons given above, plaintiffs failed to provide evidence that their expectations that Knight would follow all applicable rules was based on Knight's allegedly false statements. As a result, Knight's motion for summary judgment on the Rule 10b-5(b) claim is granted.

### E. Fiduciary Duty

Plaintiffs maintain that their Rule 10b-5 claim should nonetheless survive summary judgment because a fiduciary-type relationship[8] existed between Knight and plaintiffs. Further, plaintiffs argue that a jury should decide whether Knight owed plaintiffs a fiduciary duty.

---

[8] Through a notice of additional legal authority filed after briefing was completed, plaintiffs provided me with a copy of Rule 2320 issued by the Financial Industry Regulatory Authority ("FINRA"). In light of the fact that Knight was not a member of FINRA (or its predecessor, NASD), I conclude that this rule is not relevant in this case.

16

Plaintiffs have cited no controlling or persuasive authority[9] suggesting that Knight, as a specialist, owed plaintiffs a fiduciary duty. Instead, plaintiffs point to cases which discuss when a fiduciary duty is created between a broker-dealer and a customer. "Under some circumstances, a broker or dealer will have a fiduciary duty to a particular customer. That duty, however, is not based on one's status as a dealer. A fiduciary relationship arises only when the dealing between the customer and the dealer presuppose a special trust or confidence." *Cong. of the Passion, Holy Cross Province v. Kidder Peabody & Co., Inc.*, 800 F.2d 177, 182 (7th Cir. 1986). Even assuming that this general statement could be applied to specialists, plaintiffs have failed to put forward evidence from which a reasonable jury could conclude that plaintiffs had a special relationship of trust and confidence with Knight. As the Seventh Circuit made clear, it is not enough that Knight acted as a broker-dealer for them. Plaintiffs, in their affidavits, attempt to bolster their claims of a fiduciary duty by

---

[9] While plaintiffs cite many cases in support of their claim of a fiduciary relationship, none of those cases involve options specialists and in all of those cases the defendant, unlike Knight, had direct dealings with the investors. *See, e.g., Kurz v. Fidelity Mgmt. & Research Co.*, 556 F.3d 639 (7th Cir. 2009) (noting that an investment company had a duty to disclose to its own customers that it was not providing them with best execution of their trades, and therefore could be held liable under the securities laws for such conduct); *Wsol v. Fiduciary Mgmt. Assoc., Inc.*, 266 F.3d 654, 657 (7th Cir. 2001) (noting that executing brokers have a fiduciary relationship with their customers). Given the differences between typical broker-dealers and specialists, I do not find these cases persuasive.

stating conclusorily that they placed special trust in Knight. Without more than just an averment that this "special trust" existed, including how such a relationship was formed and why the relationship between plaintiffs and Knight engendered such trust, plaintiffs have failed to provide sufficient evidence of a special relationship of trust or confidence. Plaintiffs have not submitted any evidence that they had any direct communications or contact with Knight or that they were clients of Knight's. There is no evidence that plaintiffs maintained accounts with Knight. Plaintiffs' involvement with Knight sprung solely from the fact that their orders were submitted through plaintiffs' own brokers to the exchanges which routed them to Knight as a specialist.

Other district courts have concluded that no fiduciary duty exists between a specialist and an investor, mainly due to the impersonal nature of the relationship between the two. In *United States v. Hunt*, No. 05 Cr. 395(DAB), 2006 WL 2613754, at *6 (S.D.N.Y. Sept. 6, 2006), the court held that '[w]hile specialists may have an obligation to maintain the market economy, they do not owe the public a fiduciary duty, and therefore an alleged breach of fiduciary duty cannot serve as a basis for security fraud." Because specialists serve two masters, both the buyer and seller, they "have no loyalty to buyers or sellers, as they execute orders for both." *Id*. at *6; *see also Finnerty II*, 474 F. Supp. 2d at 544 (noting that the case law supports argument that there is no

fiduciary duty between a specialist and his public customers).

In *Spicer v. Chicago Bd. Options Exch., Inc.*, No. 88 C 2139, 1990 WL 172712, at *15 (N.D. Ill. Oct. 30, 1990), a case from this district dealing with market makers,[10] the court found that plaintiff failed to put forward evidence which would support his argument that the market makers owed a fiduciary duty to investors. Contrasting market makers to brokers who act as agents of their clients when they are determining which investments to make on behalf of their clients, the court concluded that "market makers are not fiduciaries for investors even in the sense that brokers may be – nothing in the complaint alleges that market makers advise or influence investors or hold or spend money for them." *Id*. at 15.

In light of the above, and based on the evidence submitted, I cannot conclude that a reasonable jury could find that plaintiffs and Knight had a fiduciary relationship.

**III. Additional Discovery Denied**

The main evidence lacking here concerns whether or not plaintiffs relied on the alleged misrepresentations contained in the Knight press releases and on the Knight website in forming

---

[10] The function of "market-makers," who are "individual traders appointed to maintain a fair, orderly and liquid market in one ore more classes of option contracts," is similar, although not identical, to that of specialists. *Spicer v. Chicago Bd. of Options Exch., Inc.*, 977 F.2d 255, 256 (7th Cir. 1992).

19

their expectations that Knight would provide "best execution," and otherwise follow all rules applicable to specialists. Because this information resides with plaintiffs themselves, I see no need to allow plaintiffs additional time for discovery. Plaintiffs' request for additional discovery, pursuant to its submission of a Rule 56(f) affidavit, is therefore denied.

## IV. Conclusion

For all the foregoing reasons, Knight's motion for summary judgment [584] is granted. Knight's motion for leave to file a response to plaintiffs' notice of controlling legal authority [747] is granted. Likewise, plaintiffs' motion for leave to file a reply to Knight's response to plaintiffs' notice of controlling legal authority [749] is granted. Plaintiffs' motion to continue or deny the motion for summary judgment filed by Knight pursuant to Fed. R. Civ. P. 56(f) until after completion of discovery [651] is denied. In light of the fact that all federal claims against Knight are dismissed, I decline to exercise jurisdiction over the remaining state law claims. Therefore, any state law claims against Knight are dismissed, as well.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: March 26, 2010