# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LAST ATLANTIS CAPITAL LLC, et al., )
          )
   Plaintiffs,     )
          )
  v.         )
          ) No. 04 C 397
AGS SPECIALIST PARTNERS, et al., )
          )
   Defendants.    )
          )
          )
          )

## MEMORANDUM OPINION AND ORDER

On March 26, 2010, I granted defendant Knight Financial Products, Inc.'s ("Knight") motion for summary judgment ("March 26, 2010 order"), and have subsequently issued two orders denying plaintiffs' motions for reconsideration of that order. Presently before me is a motion by AGS Specialists LLC ("AGS"), Susquehanna Investment Group, Susquehanna International Group LLC (together, "SIG"), Bear Wagner Specialists LLC ("Bear Wagner"),[1] TD Options LLC ("TD Options"), Goldman Sachs Execution & Clearing, L.P. ("Goldman Sachs"), and SLK-Hull Derivatives LLC ("SLK-Hull") (together, "Goldman Sachs") (collectively, "Certain Defendants" or "defendants")[2] for summary judgment on all claims. Defendants argue for dismissal of the Rule 10b-5 claims against them, and also

_____

[1] Although Bear Hunter Structured Products LLC is listed as a movant, it has since been dismissed from the case by plaintiffs. *See* Docket #815.

[2] These are the defendants remaining in the case.

argue that I should decline to exercise jurisdiction over any remaining state law claims. In addition, SLK-Hull and Goldman Sachs argue that, without a surviving Rule 10b-5 claim against them, plaintiffs' "control person" claims under Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), also fail.

## I.    General Background and the March 26, 2010 Order

Plaintiffs, who are direct access customers, bring this suit against the defendant specialists, who fill orders by matching buyers' orders to purchase options with contra-side customer orders to sell options at the same price. In the event that there are no existing contra-side customer orders, specialists execute orders by buying or selling the designated option from their own proprietary account. Direct access customers, like plaintiffs, utilize arbitrage trading strategies in an attempt to take advantage of price discrepancies in the options markets. Plaintiffs allege that the defendant specialists engaged in improper trading practices, such as refusing to automatically, or promptly, execute the orders, delaying the execution of orders, refusing to honor requests to cancel orders, and conducting thousands of proprietary trades for the specialists' own accounts that were executed in advance of, or instead of, executing plaintiffs' orders. According to plaintiffs, these improper trading practices violated the defendants' duty of "best execution."

In defendant Knight's earlier motion for summary judgment, Knight argued that I should follow the reasoning of the Third Circuit in *United States v. Finnerty*, 533 F.3d 143 (2d Cir. 2008) ("*Finnerty III*"). *Finnerty III* rejected the application of the "shingle theory" to specialists, and concluded that a violation of Rule 10b-5 could only occur if a plaintiff showed that he relied on an express misrepresentation concerning "best execution," and that "best execution" was not provided. Under the "shingle theory," a "broker-dealer, by accepting an order . . . impliedly represents that the order will be executed in a manner consistent with the duty of best execution." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 135 F.3d 266, 269 (3rd Cir. 1998). Relying on *Finnerty III*, I concluded that defendants, as specialists, were different than other broker-dealers and did not fall under the "shingle theory," but rather must have made an express misrepresentation, upon which plaintiffs relied, to have violated Rule 10b-5. Ultimately, I concluded that plaintiffs failed to put forward any evidence that plaintiffs' expectations that Knight would provide "best execution" were based on statements made by Knight. I also concluded that plaintiffs failed to provide evidence from which a reasonable jury could conclude that Knight was a fiduciary.

The remaining defendants have now moved for summary judgment for all the reasons given in my March 26, 2010 order. According to

defendants, "The same undisputed evidence that warranted summary judgment in favor of Knight also establishes that Plaintiffs did not have any direct communications with *any* of the specialists for Defendants, and that Plaintiffs cannot put forth any evidence of a single direct misrepresentation by *any* of the Defendants that would support their fraud claims." Defs' Mem. at 1 (emphasis in original). Like Knight, defendants' primary argument is that none of the defendants made any actionable misrepresentations concerning "best execution." Also like Knight, defendants argue that specialists are not fiduciaries. To be clear, the issue of whether or not plaintiffs have evidence that defendants did not provide "best execution" is not before the court (defendants do not raise this as a basis for summary judgment). For the reasons that follow, the motion for summary judgment is granted in part and denied in part.[3]

---

[3] Plaintiffs' "Motion to Strike All, or Parts, of Defendants' Replies to Plaintiffs' Responses to Defendants' Statement of Undisputed Facts and Certain of Their Responses to Plaintiffs' Statement of Additional Facts" is granted in part. Defendants filed replies to their statements of undisputed fact without first seeking permission to do so. Because these replies were improperly filed, I will strike them. *See Ho v. Taflove*, 696 F. Supp. 2d 950, 952 (N.D. Ill. 2010) (granting motion to strike defendants' reply to plaintiffs' response to defendants' Rule 56.1 statement of facts). With respect to plaintiffs' argument that I should also strike certain responses submitted by defendants to plaintiffs' facts, I decline to do so. I note that *both* parties flagrantly disregarded the rules by including legal argument in responding to facts. In reaching my decision today, I have disregarded all improper arguments made by either side, and only considered properly-supported facts.

## II. Analysis

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Once the moving party shows that there is no genuine issue of material fact, the burden of proof shifts to the nonmoving party to designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

### A. Rule 10b-5

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), prohibits the use "in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." Pursuant to this section, the SEC promulgated Rule 10b-5, which provides in pertinent part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

## 1. Subsections (a) and (c)

To prove a claim under Rule 10b-5(a) or (c), a plaintiff must show that the defendant (1) committed a deceptive or manipulative act, (2) with scienter, (3) that the act affected the market for securities or was otherwise in connection with their purchase or sale, and (4) that defendants' actions caused the plaintiffs' injuries. *Last Atlantis Capital LLC v. Chicago Bd. Options Exch., Inc.*, 455 F. Supp. 2d 788, 793 (N.D. Ill. 2006) ("*Last Atlantis II*").

First, as described more fully above and in the March 26, 2010 order, specialists, such as the defendants here, are not liable under Rule 10b-5 via the "shingle theory" for implied misrepresentations concerning "best execution." *Last Atlantis Capital LLC, et al. v. AGS Specialist Partners, et al.*, Nos. 04 C 397, 05 C 5600, 05 C 5671, 2010 WL 1257765 (N.D. Ill. Mar. 26, 2010); *Finnerty III*, 533 F.3d at 143.

Turning then to the issue of express misrepresentations, I must first determine whether any of the remaining defendants made actionable misrepresentations concerning "best execution." A securities broker-dealer provides "best execution" when it seeks "the optimal combination of price, speed and liquidity for a

6

securities trade[.]" *Kurz v. Fidelity Manag. & Research Co.*, 556
F.3d 639, 640 (7th Cir. 2009). Put another way, "The duty of best
execution, which predates the federal securities laws," requires
"that a broker-dealer seek to obtain for its customer orders the
most favorable terms reasonably available under the circumstances."
*Newton*, 135 F.3d at 270. "Other terms in addition to price are
also relevant to best execution. In determining how to execute a
client's order, a broker-dealer must take into account order size,
trading characteristics of the security, speed of execution,
clearing costs, and the cost and difficulty of executing an order
in a particular market." *Id.* at 270 n.2.

Before I discuss the actionable statements, if any, for the
remaining defendants, I note that the statements identified by
plaintiffs directly concern, or at least point to, the concept of
"best execution." In describing these statements, plaintiffs
continually assert that defendants promised to provide "best
execution" and that they would otherwise follow all applicable
rules. *See, e.g.*, Pls.' Resp. at 14 (stating that the defendants
made promises "to provide 'best execution' and comply with all
applicable Order Handling Rules that were posted on defendants'
internet websites"). Having reviewed the statements made by
defendants, I cannot agree that a promise of "best execution" is
equivalent to the much broader promise of following *all* applicable
rules governing each particular defendant. I find that the

actionable statements discussed for each defendant go to a promise of "best execution" and cannot be read to promise that each defendant would follow *all* applicable rules governing it.[4]

### a. Defendant AGS

#### 1. Statements Directed to "Best Execution"

Plaintiffs have put forward evidence that AGS made the following statements on its website in 2005:

- In describing AGS specialists as facilitators, the website states, "The Specialist facilitates the execution of orders by brokers who represent public customers as well as all orders delivered electronically. He maintains the 'book' in a particular stock, which encompasses all the bids and offers in a particular stock and he provides the brokers with the information they need to execute public orders. He then assures that the trade is executed and reported to the ticker tape quickly and efficiently. *The Specialist does this without interjecting himself into the trade*." Friedman Ex. 1B (emphasis added).

- "AGS operates in an auction market environment with public order priority as the foundation of that marketplace. *Public orders always precede professional orders at the same price*, even if the professional order was received before the public order." Friedman Ex. 1D (emphasis added).

Thus, plaintiffs have put forward evidence showing that AGS stated publicly that: (1) its specialists would not interject themselves into a trade; and (2) its specialists would prioritize public orders over professionals' orders.

_____

[4] Only Goldman Sachs' parent company states that it would follow all laws and rules that govern it. As explained *infra*, I conclude that such a statement is too general to be actionable.

8

Of all the AGS statements pointed to by plaintiffs, only these two arguably invoke the specialists' duty of "best execution." Plaintiffs' theory is that defendants violated their duty of "best execution" when they failed to "seek the most favorable terms" for plaintiffs by improperly inserting themselves into a trade (or failing to execute promptly an order to buy, sell or cancel), rather than matching up existing orders to buy and sell. While these statements do not use the specific words "best execution," I conclude that a reasonable jury could conclude that AGS made these statements and that both invoke AGS' duty of "best execution."

One of the arguments made by defendants is that plaintiffs need to point to "direct communications" from defendants to these particular plaintiffs. Although defendants cite to depositions in which the plaintiffs stated that no defendants made misrepresentations *directly to them*, they have provided no support for their argument that direct communication is necessary. *Finnerty III* did not impose a requirement that the statements at issue be specifically directed to these particular plaintiffs. Rather, it is reasonable for members of the public who trade in options to rely on statements made by options specialists on their public websites, just as it is reasonable for companies maintaining websites to anticipate that current or potential investors might read and rely on website statements. Other courts have analyzed companies' statements on public websites as potentially fraudulent,

and defendants have provided no authority that such analysis was improper. *See, e.g.*, *In re AIG Advisor Group Sec. Litig.*, 309 Fed. Appx. 495 (2d Cir. 2009) (analyzing fraud claim in light of disclosures made on defendant's website); *Desai v. General Growth Prop., Inc.*, 654 F. Supp. 2d 836, 858-59 (N.D. Ill. 2009) (analyzing whether a code of conduct published on company's website could be read as a promise by company to follow the code of conduct); *SEC v. Enterprises Solutions, Inc.*, 142 F. Supp. 2d 561, 577 (S.D.N.Y. 2001) (concluding that two statements made on company's website were false and misleading).

Finally, I conclude this these statements are not merely puffery and are specific enough to be actionable. "Courts have held immaterial as a matter of law 'loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.'" *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1164 (N.D. Ill. 2004) (quoting *Shaw v. Digital Equipment Corp., et al.*, 82 F.3d 1194, 1217 (1st Cir. 1996)). Unlike the terms "orderly," "efficient" and "liquid," which I have already concluded are merely puffery and are too vague to be material, the promise of "best execution" is a defined, specific concept in the securities context. Whether or not "best execution" has actually been provided by a defendant can be ascertained. Finally, such a

promise is material because it would be viewed by a "reasonable investor as significantly altering the total mix of available information." *In re Newell Rubbermaid Inc. Sec. Litig.*, No. 99 C 6853, 2000 WL 1705279, at *7 (N.D. Ill. Nov. 14, 2000) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)). Certainly, a reasonable investor would view the promise of "best execution," in which a specialist promises to seek the best combination of price, liquidity, and speed, as important.

### 2. Puffery and Other Non-Actionable Statements

While plaintiffs point to other examples of supposed misrepresentations by AGS, I conclude that only the two listed above are actionable. The statement in Exhibit 1A that "Our efforts are always directed toward market efficiency and price discovery" is puffery and too generalized and vague to be actionable. Exhibit 1B's statement that "The Specialist . . . acts in the public interest" is also puffery. Likewise, the statement in Exhibit 1B that "The Specialist also acts as a 'broker's broker' by taking limit orders into his care and executing them on behalf of the broker and customer" is also vague puffery. Nothing in the final statement in Exhibit 1B that "the Specialist acts as a 'principal to stabilize the market' under certain circumstances" is actionable. The statement in Exhibit 1C that a specialist has an obligation to maintain "a fair and orderly market in the securities he trades" is non-actionable puffery.

In Exhibit 1D, plaintiffs point to two paragraphs in which AGS describes its "business philosophy" and the fact that all orders are entitled to the benefits it offers as a specialist. No statements in the two paragraphs on page 5 of Friedman's affidavit reference "best execution" or are otherwise actionable. Exhibit 1E are copies of a series of webpages from AGS's website. Having reviewed these pages, I see nothing actionable. Likewise, I see nothing actionable in Exhibit 1F, a copy of a 2004 letter from AGS to the SEC.

In addition, the following AGS statements are not actionable because it is not clear that they would apply to specialists: (1) "Public orders always have priority over orders placed by professional market makers at the same time." Friedman Ex. 1A; and (2) "We believe that the auction market is more efficient because the public investor has total, unimpeded access to the market through their individual brokers – and in the auction market, public orders always have priority over orders placed by professional market makers at the same price." Friedman Ex. 1E. Both of these statements specifically reference "professional market makers," and not specialists. Plaintiffs have provided no argument to explain why such statements should be understood to refer to specialists. It is not the court's job to craft plaintiffs' arguments for them. Therefore, any argument plaintiffs could have raised with respect to these statements is waived. *See*

*Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1002 n.1 (7th Cir. 2001) (perfunctory and undeveloped arguments are waived).

### 3. Reliance

With respect to reliance, Last Atlantis provided an affidavit from Michael Elizondo[5] in which he averred that Last Atlantis based its expectations that AGS would provide best execution on AGS' actionable statements. Defendants argue that I should not consider this affidavit because Elizondo's statements are contradicted by the deposition of Last Atlantis' Rule 30(b)(6) witness, Robert DeMerritt, in the following testimony:

> Q      Do you have any documents or other information which would memorialize or otherwise be usable to refer to any alleged misrepresentations or omissions in statements by the defendants upon which Last Atlantis relied?
>
> A      I don't know how to answer that one. It seems kind of broad in general.
>
> Q      It is broad in general. It's kind of like your complaint. You have alleged, I am sure you are aware, that we made material misrepresentations or omissions of fact, and you relied on them to your detriment.
>
> A      I believe that the market makers have an obligation to maintain a fair and orderly market, and they're required to fill to their quoted quantity –
>
> Q      Hold on a second. I think you're right, but let's point out that you didn't make a complaint against any market makers, only

---

[5] Elizondo was the principal of Last Atlantis responsible for managing its trading operations during the relevant period. Elizondo Aff. ¶ 4.

specialists and DPMs. Let's also take into account that you're not describing statements made by the - I mean, those may be obligations under the rules. And if what you're saying is, well, you're alleging that we violated rules, that's fine. But what I'm asking you for are documents or other information which contain specific misrepresentations made by any defendant upon which you rely to your detriment.

Mr. Friedman:    Object to the form. Are you asking if Last Atlantis has documents?

Mr. Cohen:    Yes, documents or information.

Mr. Friedman:    Okay.

The witness:    I don't believe so.


DeMeritt Dep. at 97. However, as plaintiffs point out, DeMeritt,

a few pages later, states the following:

Q         And then the last item I had was documents regarding misrepresentation by defendants.

Q         Uh-huh.

A         The only information we have is, you know, what they have published on their web sites, that they would follow the rules type of thing. I don't exactly know how to word that.


Q         So what you're essentially saying is they said they would follow the rules, and they didn't follow the rules all the time and that's a misrepresentation?

A         Yes.


The witness clearly testified that the "information" supporting

Last Atlantis' claim that the defendants made misrepresentations

14

was found on defendants' websites. Because all of the actionable statements, as identified in my analysis, were found on defendants' websites, I conclude that Last Atlantis' assertions that it relied on certain statements made by defendants on their websites is not contradicted by the testimony of its Rule 30(b)(6) deponent. The evidence submitted by Last Atlantis with respect to this claim against AGS is sufficient to survive summary judgment.

The remaining four plaintiffs failed to provide any evidence that each relied on AGS' statements listed above. Plaintiff Brad Martin stated that he could not remember reviewing AGS' website but stated that "I probably did review AGS's website during the relevant period." Martin Aff. ¶14, n.6. With no recollection and no reason for his belief that he "probably did" read the statements at issue, this evidence is insufficient. Two other plaintiffs, River North Investors LLC ("River North") and Bryan Rule, do not aver that they relied on these statements. Finally, plaintiff Speed Trading LLC ("Speed Trading") submitted no evidence at all. Thus, Martin, Rule, River North, and Speed Trading's claims against AGS, to the extent they are based on express misrepresentations, fail.

### b.  Defendant Bear Wagner

#### 1.  Statements Directed to "Best Execution"

Plaintiffs put forward evidence that Bear Wagner issued the following public statement on its website[6] during the relevant period:

- "Specialists manage the auction market in the specific securities allocated to them.  They must maintain a fair, competitive, orderly and efficient market at all times, even in those market conditions considered extreme.  This means that *all customer orders* have an equal opportunity to interact and *receive the best price on execution*." Friedman Ex. 2A.

Based on this statement, plaintiffs have put forward evidence that Bear Wagner publicly stated that "all customer orders" will "receive the best price on execution."  As explained in more detail above, statements such as this one which essentially promise "best execution" are specific, material, and thus actionable.

#### 2.  Puffery and Other Non-Actionable Statements

While plaintiffs point to other examples of supposed misrepresentations by Bear Wagner, I conclude that only one, listed above, is actionable.  The remaining statements are too vague to constitute material representations of fact.  *Last Atlantis II*, 455 F. Supp. 2d at 801.  I do not read any of the remaining statements

---

[6]  I note that part of the statement attributed to Bear Wagner by Attorney Friedman in his affidavit is missing from the attached Exhibit 2B.  I have only considered the paragraphs actually included in Exhibit 2B, and find none of them specific enough to be actionable.

in Exhibit 2A describing the specialists' job as directed toward the duty of "best execution."  The statements in Exhibit 2B are certainly puffery.  Likewise the statements in Exhibit 2C, including "our markets continue to be the most efficient and liquid in the world" and "the SEC has for almost sixty years required specialists to provide price continuity," are puffery and are too vague to be actionable.

### 3.  Reliance

Both Last Atlantis and Martin have provided evidence that their expectations that Bear Wagner would provide "best execution" were based on this statement on Bear Wagner's website.  This is sufficient to survive summary judgment.  The other two plaintiffs, River North and Rule, have not provided any evidence of reliance. And, finally, plaintiff Speed Trading provided no evidence at all. Thus, claims by River North, Rule, and Speed Trading, based on express misrepresentations against Bear Wagner, fail.

### c.  Defendants Goldman Sachs and SLK-Hull

### 1.  Statements Directed to "Best Execution"

There is only one statement attributable to Goldman Sachs, and its predecessor, Spear, Leeds & Kellogg ("SLK"), that could possibly be read as a promise of speed (and thus might invoke "best execution").  On an SLK website page from 2000, a statement read:

> Specialists act as agents for other firms.  They receive orders from floor brokers which, either because of pricing restrictions, complexity or size, require special

> handling. They also receive orders electronically from
> NYSE and AMEX member firms, and from members of the
> regional exchanges.
>
> Today, 90% of orders received by specialists are
> delivered electronically. These orders are either
> "market" orders for immediate execution, or "limit"
> orders for execution at a specific price. *At SLK, 75% of
> all market orders are executed within 30 seconds of their
> receipt by the specialist*. The remaining 25% are
> "stopped" in order to seek price improvement for the
> investor.

Friedman Ex. 3B at 7 (emphasis added). Defendants argue that these

statements describe *equity* specialists, and not options

specialists. I agree plaintiffs could only have reasonably relied

on statements concerning options specialists (which are the subject

of this lawsuit). In the end, it is not at all clear if the

website page containing this statement involves equity or option

specialists or both. The next page states that "Our NYSE and AMEX

divisions are the equity specialists in the securities of nearly

600 public companies." *Id*. at 8. Another website page states that

"In addition to being the leading specialist in stocks on the NYSE

and AMEX, we are also the specialist for over 150 stock options on

the AMEX, more than 120 on the Philadelphia Stock Exchange, and

over 75 on the Chicago Board of Options Exchange ("CBOE")." *Id*. at

14. Reading these statements together, the most likely conclusion

is that the statement, because it references the NYSE and AMEX, is

directed at equity specialists. Plaintiffs have failed to provide

sufficient evidence that this statement concerns options

specialists at SLK. Without this evidence, plaintiffs have not put

18

forward any evidence of a misrepresentation by Goldman Sachs and/or SLK.

### 2. Puffery and Other Non-Actionable Statements

I reject as too vague and attenuated the statements in Exhibit 3A made by Goldman Sachs' parent company, in an annual report and on its website, that the company is dedicated to complying with the "laws, rules and ethical principles that govern us." These statements, general as they are, and especially in light of the fact that they were not directly made by the defendants in this case, are not actionable. I reject the statements in Exhibit 3B and 3D because they are directed at equity specialists or are too vague to be considered material statements of fact. Exhibit 3C mentions the "duty of best execution" but the document is clearly directed to SLK's Nasdaq equity market making activities, and not at options specialists. Plaintiffs have failed to provide any reason the court should consider this statement as being directed toward options specialists.

Therefore, plaintiffs' claims, based on express misrepresentations against Goldman Sachs and SLK, fail.

### d. Defendant SIG

#### 1. Statements Directed to "Best Execution"

Plaintiffs put forward evidence[7] that SIG made the following statements during the relevant period:

- "We also fully understand that the broker/dealers who send us orders need to seek best execution for the orders given to them by their retail and institutional clients. Therefore, *SIG has institutionalized the pursuit of best execution.* Through the creation of a comprehensive suite of services and products, we have established an environment that brokerages can rely on to help them meet their obligation to 'rigorously and regularly' seek best execution. Our industry leading trade policies, monitoring facilities, discussion forums, and a profound willingness to commit our own capital all reflect *a desire to not simply meet regulatory requirements, but rather to establish a standard for execution quality.*" Friedman Ex. 4A (emphasis added).

- "We also recognize the need to gather input from and respond to the needs of our order flow providers more frequently *so that we may be better able to deliver best execution.*" Friedman Ex. 4B (emphasis added).

Based on these statements, plaintiffs have put forward evidence that SIG asserted publicly that: (1) SIG "has institutionalized the pursuit of best execution"; (2) SIG desired to meet and exceed regulatory requirements for "execution quality"; and (3) SIG "deliver[s] best execution." Based on these

---

[7]    In the Friedman Affidavit's description of Exhibit 4C, plaintiffs do not point to any specific statement and instead state that "Exhibit 4C, submitted herewith, are copies of SIG's webpages from 2006 on which SIG explains the role of specialists." Friedman Aff. at 13. Because plaintiffs failed to point me to any specific statement in that exhibit, I will not consider Exhibit 4C.

statements, a reasonable jury could conclude that SIG stated that it would provide "best execution" when handling orders.

## 2. Puffery and Other Non-Actionable Statements

I conclude that the following are not actionable: SIG's statements regarding the Options Trade Policy in Exhibit 4B; and SIG's statements that it "offers liquid markets to retail and institutional investors" in Exhibit 4D. I see no statements in Exhibit 4B's "Options Trade Policy" that are relevant and actionable here, and I have already determined that Exhibit 4D's statement regarding "liquid markets" is not actionable. *Last Atlantis II*, 455 F. Supp. 2d at 801. Finally, plaintiff Bryan Rule's attempt to rely on an August 1, 2001 letter from the Managing Director of SIG to the SEC is rejected. There is no evidence that this letter was publicly available, and Rule's affidavit does not explain how he came to be in possession of this letter. Plaintiffs' counsel's assertion that the letter was posted on the SEC website is unsupported by evidence. Further, I do not read the letter as containing a statement in which SIG made assurances with regard to how orders would be handled.

## 3. Reliance

Both Last Atlantis and Martin have provided evidence that their expectations that SIG would provide "best execution" were based on these statements. This is sufficient to survive summary judgment. The other two plaintiffs, River North and Rule, have not

21

provided any evidence of reliance.  Finally, Speed Trading has provided no evidence at all.  Thus, claims by River North, Rule and Speed Trading, based on express misrepresentations against SIG, fail.

### e.  Defendant TD Options

#### 1.  Statements Directed to "Best Execution"

Plaintiffs put forward evidence that defendant TD Options, and its predecessor LETCO, made the following statements during the relevant time period:

- "To LETCO customers, electronic trading means even more timely, efficient option price information, and faster execution in a frictionless trading environment.  These benefits, combined with the outstanding customer service LETCO has always provided, will allow *LETCO to continue to maintain its stellar ratings in terms of transaction volume and quality of market performance, i.e. "best execution," on the major U.S. stock option exchanges*."  Friedman Ex. 5A (emphasis added).

- "*At LETCO, we built our reputation on giving best execution years before it became the watchword of the industry*. . . . *These [order handling] procedures work toward assuring that LETCO execution is 'best execution.'* . . . Each customer order is entitled to interact with the market on a timely basis, with 'best execution' ascertained only when the order impacts the market as quickly as possible. . . .*[O]ur electronic execution also provides the best execution available given the market conditions at any given time*. . . . We at LETCO hope to instill confidence in our customers that they will continue to receive extraordinary customer service as well as the *best execution* possible from their LETCO specialists.  *LETCO not only delivers this execution – we stand behind it*.  The quality and integrity of our markets are our biggest asset.  In order to maintain our market position, we want our customers to know that this is both a promise and a commitment to the way we run our business."  Friedman Ex. 5B (emphasis added).

Clearly, TD Options, through its predecessor, LETCO, made many statements that it would provide "best execution" in its role as options specialists. A reasonable jury could certainly conclude that TD Option promised "best execution" through these statements.

### 2. Puffery and Other Non-Actionable Statements

I reject as puffery the statement in Exhibit 5C that the LETCO traders kept the options markets as "liquid, fair, and competitive as possible." *See Last Atlantis II*, 455 F. Supp. 2d at 801. Plaintiffs have pointed to nothing in Exhibit 5D which is actionable. Finally, I will not consider the statements contained in Exhibit 5E, which is a letter from the President of TD Options to the Secretary of the SEC. Plaintiffs do not provide any evidence that this letter was a public document to which members of the public would have had access.

### 3. Reliance

Both Last Atlantis and Martin have provided evidence that their expectations that TD Options would provide "best execution" were based on these statements. This is sufficient to survive summary judgment. The other two plaintiffs, River North and Rule, have not provided any evidence of reliance. Finally, Speed Trading has provided no evidence at all. Thus, claims by River North, Rule and Speed Trading, based on express misrepresentations against TD Options, fail.

### 6. Reliance Generally

### 1. Fraud-on-the-market theory

I conclude that plaintiffs have failed to present and develop a fraud-on-the-market theory. There is no mention of the fraud-on-the-market theory in their memorandum, except in a footnote, which specifically states that plaintiffs intended to raise this issue in their motion to reconsider my March 26, 2010 order. I do not read this footnote as raising the issue in response to the current summary judgment motion. The appropriate time to raise this argument was in discussing reliance in plaintiff's response to defendants' summary judgment motion. It is therefore waived. *See Clay*, 253 F.3d at 1002 n.1.

### 2. Defendants' Additional Arguments[8]

Defendants argue that "Not only do the statements cited by Plaintiffs' counsel provide no guaranteed execution of Plaintiffs' orders, but reliance on such hypothetical promises would be unjustifiable in all events given Plaintiffs' admitted actual experience to the contrary." Cert. Defs.' Reply at 8. Defendants then go on to cite to affidavits submitted by plaintiffs in which they describe that, after experiencing initial success with their arbitrage strategy, they began experiencing an increasing number of

---

[8] I conclude that the two arguments raised by defendants (discussed in this section) are not improper "new" arguments, but rather are proper rebuttal to arguments raised by plaintiffs in their response.

instances where orders were not executed promptly.  They further point me to my earlier dismissal of the claims against the Exchanges in which I concluded that plaintiffs could not have relied on statements which "guaranteed" execution when the Exchanges also made clear that there were certain circumstances under which orders would not be executed.

First, I reject defendants' attempt to draw parallels to my earlier ruling.  Unlike the statements made by the Exchanges, the specialist defendants are not alleged to have "guaranteed" execution.  Rather, as explained more fully above, the allegations against the specialist defendants concern their promise of "best execution."  Further, unlike the exchange defendants in moving to dismiss, defendants have not pointed to any statements made by the specialists themselves which directly contradict their respective promises of "best execution."

Second, defendants fail to develop this argument adequately. Plaintiffs' theory is that they relied on the promises of "best execution" in forming expectations of how orders would be handled, and then, as their arbitrage strategy became less and less profitable, surmised that the specialist defendants were not always providing them with best execution.  According to defendants, this means that no reasonable investor would have, at any time during the relevant period, relied on defendants' website statements concerning "best execution."  Defendants point to an affidavit

submitted by Garry Less, on behalf of River North, in which he avers that "beginning some time in mid-2000, we began to notice that River North's arbitrage trading strategy had started to become less and less profitable, then eventually became unprofitable, and thereafter, its arbitrage trading began to actually generate increasing losses for River North." Less Aff. ¶ 13. This statement does not go far enough to support defendants' argument.[9] Less gives no information regarding when the arbitrage trading strategy actually generated losses for River North, and does not allow me to conclude that there was a specific date after which River North must have been on notice that defendants were not providing "best execution." I reject defendants' argument because defendants jump to their conclusion without providing any explanation. When exactly should a reasonable investor have understood that he was not always receiving "best execution"? Defendants make no attempt to parse out this argument in a meaningful way. As a result, it is waived.

Likewise, I reject defendants' argument that the nature of plaintiffs' arbitrage trading strategy would make it impossible for plaintiffs to have relied on any statements by defendants.

---

[9] Defendants also cite to their response to plaintiffs' SOF ¶2 for their assertion that the deposition testimony of Anthony Zangrilli supports their argument. However, their response to SOF ¶2 does not reference any deposition testimony of Zangrilli's, but rather provides the citation "Zangrilli I Aff." Because there is no such affidavit in the record currently before me, defendants' reliance on Zangrilli is rejected as unsupported by evidence.

Defendants argue that "the split-second decision to press the button on their trading screens was not influenced by vague statements on any of the Defendants's web sites, but soley by the published quotes of the Exchanges." Cert. Defs.' Reply at 9. I am not persuaded by this argument. Defendants provided no authority for their assertion that each plaintiff must have had a particular statement in mind each and every time he presses the button on his trading screen. Despite the fact that the pace of trading is extremely quick, it is certainly possible for plaintiffs to have read the statements made by defendants, formed their expectations concerning best execution, and then formulated their trading strategy accordingly. As described in more detail above, certain plaintiffs provided evidence that they relied on the specialists' statements in forming their expectations concerning best execution, and that is sufficient to survive summary judgment.

## 2. Subsection (b)

To prove a claim under Rule 10b-5(b), plaintiffs must show that (1) the defendant made a misstatement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which plaintiff justifiably relied, and (6) that the false statement or omission proximately caused the plaintiff's damages. *Last Atlantis II*, 455 F. Supp. 2d at 793. Defendants argue that because plaintiffs cannot come forward with evidence of misrepresentations by each

defendant, they have failed to meet the first requirement of a claim under Rule 10b-5(b).

As explained above, Last Atlantis has put forward evidence of misrepresentations (as well as reliance on such misrepresentations) by AGS, SIG, Bear Wagner, and TD Options. Likewise, Martin has put forward evidence of misrepresentations (as well as reliance on such misrepresentations) by SIG, Bear Wagner, and TD Options. Therefore, Last Atlantis and Martin have provided evidence of a "misstatement" actionable under Rule 10b-5(b) against the defendants identified above. Because I concluded that Goldman Sachs and SLK-Hull did not make any actionable statements, the Rule 10b-5(b) claims against them are dismissed. Because he failed to show reliance, Martin's Rule 10b-5(b) claim against AGS is dismissed. Similarly, claims by River North, Rule and Speed Trading brought under Rule 10b-5(b) fail.

**B. Fiduciary Duty As Basis For Plaintiffs' Rule 10b-5 Claims**

Defendants urge me to adopt my earlier conclusion in the March 26, 2010 order that plaintiffs have failed to present evidence that the defendants in this case, as specialists, owed fiduciary duties to plaintiffs. I once again conclude that plaintiffs have failed to put forward evidence from which a reasonable jury could conclude that defendants were fiduciaries. I address, and ultimately reject as unpersuasive, the arguments raised by plaintiffs below.

Other district courts[10] addressing this question have concluded that no fiduciary duty exists between a specialist and an investor, mainly due to the impersonal nature of the relationship between the two. In *United States v. Hunt*, No. 05 Cr. 395(DAB), 2006 WL 2613754, at *6 (S.D.N.Y. Sept. 6, 2006), the court held that "[w]hile specialists may have an obligation to maintain the market economy, they do not owe the public a fiduciary duty, and therefore an alleged breach of fiduciary duty cannot serve as a basis for security fraud." Because specialists serve two masters, both the buyer and seller, they "have no loyalty to buyers or sellers, as they execute orders for both." *Id.; see also United States v. Finnerty*, 474 F. Supp. 2d 530, 544 (S.D.N.Y. 2007) (noting that the case law supports the argument that there is no fiduciary duty between a specialist and his public customers). In *Spicer v. Chicago Bd. Options Exch., Inc.*, No. 88 C 2139, 1990 WL 172712, at *15 (N.D. Ill. Oct. 30, 1990), a case from this district dealing

---

[10]     Plaintiffs cite to a single case, *Market Street Ltd. Partners v. Englander Capital Corp.*, No. 92 CIV. 7434 (LMM), 1993 WL 212817 (S.D.N.Y. July 14, 1993), to support their argument that specialists are fiduciaries. As did the court in *Hunt*, 2006 WL 2613754, at *6, I conclude that *Market Street* is distinguishable from this case. In *Market Street*, the court found that specialists have similar fiduciary obligations to brokers, because "[a]s broker, the specialist holds and executes orders for the public on a commission basis." 1993 WL 212817, at * 9 (quoting Note, *The Downstairs Insider: The Specialist and Rule 10b-5*, 42 N.Y.U. L. Rev. 695, 697 (1967)). There is no evidence here that defendants received compensation from plaintiffs. *Market Street* is also distinguishable from this case because, unlike here, the defendant specialist in *Market Street* had direct communication with the plaintiff.

with market makers at the CBOE,[11] the court found that plaintiff failed to put forward evidence which would support his argument that the market makers owed a fiduciary duty to investors. Contrasting market makers to brokers who act as agents of their clients when they are determining which investments to make on behalf of their clients, the court concluded that "market makers are not fiduciaries for investors even in the sense that brokers may be – nothing in the complaint alleges that market makers advise or influence investors or hold or spend money for them." *Id.*

As they did with Knight, plaintiffs attempt to argue that the remaining defendants had the type of "special relationship" with plaintiffs which would allow for a finding of a fiduciary duty. First, plaintiffs submitted evidence that Speed Trading, Martin, Rule and River North all maintained clearing and execution brokerage accounts with defendant Goldman Sachs and had numerous "direct" communications with Goldman Sachs representatives. While true, this piece of evidence does not support a finding that plaintiffs were customers of the specialists at Goldman Sachs. There is no evidence of direct communications between plaintiffs and the specialists themselves that might create a "special trust"

---

[11] The function of CBOE "market-makers," who are "individual traders appointed to maintain a fair, orderly and liquid market in one or more classes of option contracts," is similar, although not identical, to that of specialists. *Spicer v. Chicago Bd. Options Exch., Inc.*, 977 F.2d 255, 256 (7th Cir. 1992) (affirming district court opinion, although issue of market makers as fiduciaries not raised before the appellate court).

between plaintiffs and the specialists. Plaintiffs' evidence that certain plaintiffs maintained accounts at a separate part of Goldman Sachs (the brokerage section) does not convince me that plaintiffs and defendants were fiduciaries.

In addition, plaintiffs argue that defendants "actively solicited" orders from plaintiffs by generating quotes which plaintiffs could access via the Exchanges' order routing and execution system ("ORS"). Pls.' Mem. at 5. Providing quotes is a basic part of the specialists' job, and the quotes are disseminated by the Exchanges through their systems. I do not view the generation of quotes as "actively solicit[ing]" customers, but rather simply part of the role played by the specialists in making markets.

Plaintiffs also argue that defendants received "financial remuneration in the form of specialist guarantees and brokerage commissions in exchange for handling public orders as an agent, and for accepting greater risks and responsibilities than ordinary market makers." Pls.' Mem. at 6 (citing SOAF ¶¶ 15-16). Exhibit A, relied on as evidentiary support by plaintiffs, is an order issued by the SEC granting approval of a proposed rule change in the CBOE which allowed designated primary market makers the ability to charge a brokerage commission. There is no evidence presented here that any defendant in this case ever charged such a brokerage

commission.[12] Further, any compensation the defendant specialists received was not from plaintiffs.

Lastly, plaintiffs argue that defendants are fiduciaries because certain defendants stated on their websites that they were fiduciaries. Further, plaintiffs claim that each plaintiff believed defendants were fiduciaries (and Last Atlantis and Martin relied on the express statements by defendants in forming their beliefs). But the question of whether or not these defendants were fiduciaries does not rest on whether or not they believed themselves to be (or whether plaintiffs believed them to be).[13] "A

---

[12] Plaintiffs also argue that "[a]ll defendants solicited public customer orders by participating in Exchange-sponsored Payment For Order Flow ("PFOF") programs pursuant to which each defendant received the proceeds from 'marketing' fees collected by the Exchanges that were then used to pay certain broker-dealer firms (referred to as order entry firms) that were selected by the defendants in exchange for their agreement to route public customer orders to the defendants at their respective Exchanges." Pls.' Mem. at 6. Defendants admit that they participated in the Payment For Order Flow programs. Plaintiffs devote *one* sentence, quoted above, to presenting this argument. Given the complexity of this case, one sentence on this topic is severely insufficient. In light of this, plaintiffs' argument on this point is waived as undeveloped. *See Clay*, 253 F.3d at 1002 n.1. In any event, I question how such a program indicates a connection or relationship between defendants and plaintiffs, as plaintiffs' too-brief description of it shows a connection, at most, between defendants and the order entry firms.

[13] Plaintiffs also argue that I should find that the defendants are fiduciaries because the SEC has indicated that specialists are fiduciaries when they are acting as agents. In support of this argument, plaintiffs submitted SEC Orders, related to the SEC's approval of proposed amendments to the Exchange Rules of CBOE and the American Stock Exchange ("AMEX"). Once again, plaintiffs have failed to provide me with any analysis concerning the effect of such Orders on this court. Plaintiffs make no

fiduciary duty does not arise out of mere admission, where, as here, the case law points to the contrary." *Finnerty*, 474 F. Supp. 2d at 543-44.

In the end, I again follow the district court cases cited above to find that plaintiffs have failed to put forward sufficient evidence of a "special trust or confidence" which would allow a reasonable jury to find that defendants had a fiduciary relationship with plaintiffs. *See Cong. of the Passion, Holy Cross Province v. Kidder Peabody & Co., Inc.*, 800 F.2d 177, 182 (7th Cir. 1986) ("Under some circumstances, a broker or dealer will have a fiduciary duty to a particular customer. That duty, however, is not based on one's status as a dealer. A fiduciary relationship arises only when the dealing between the customer and the dealer presuppose a special trust or confidence."). Once again, the record does not support a finding that the defendant specialists were more like traditional broker-dealers, than typical specialists who do not have direct communications[14] or contacts with the public.

---

attempt to provide a legal argument which would explain how the opinions expressed in these Orders impact this case, and why I should follow them. Because it is not clear how such Orders, which dealt with proposed amendments to the Exchange Rules of CBOE and AMEX, apply to this case, the plaintiffs' failure to provide the necessary explanation means they have waived this argument. *See Clay*, 253 F.3d at 1002 n.1.

[14] To clarify what might seem inconsistent at first glance, but ultimately is not, I note the following: In the context of considering whether or not defendants were fiduciaries of plaintiffs, one of the factors I looked at was whether there was evidence of direct communications between the defendant specialists

Further, plaintiffs have not shown that they directly communicated with the defendant specialists themselves, or that they maintained accounts with the specialist defendants. Finally, I find that plaintiffs failed to provide evidence that defendants actively solicited plaintiffs as clients.[15]

### C. "Control Person" Claims

Goldman Sachs and SLK argue that, without a predicate Rule 10b-5 claim remaining against them, plaintiffs' "control person" claims against them under Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), also must be dismissed. I agree. *Krieger v. Gast*, No. 98 C 3182, 1998 WL 677161, at *11 (N.D. Ill. Sept. 22, 1998). Defendants' motion for summary judgment on these claims is granted.

---

and plaintiffs. It is this type of evidence which would support a finding that these two groups had a "special relationship of trust" necessary to conclude that a fiduciary duty is possible. However, in discussing whether defendants made misrepresentations to plaintiffs concerning "best execution," I concluded that evidence of "direct" communications is not necessary; it was enough that defendants made public statements on their respective websites because it was reasonable to assume that members of the public who traded in options would read and rely on those statements.

[15] Contrary to plaintiffs' assertion, I do not conclude that the statements made by defendants on their respective websites constituted active solicitation of plaintiffs as clients. Had plaintiffs put forward evidence of a more direct solicitation, perhaps through letters or telephone calls, I would be more inclined to agree with them that defendants "actively solicit[ed]" them as clients.

### D. Waiver Found on Additional Bases for Plaintiffs' Claims under Rule 10b-5

Just as Knight did, the remaining defendants moved for summary judgment on *all* federal claims. Plaintiffs have not argued that defendants' motion is actually a motion for partial summary judgment, or that they have additional bases for their claims under Rule 10b-5(a) and (c), or (b). The complaint in this case is over two hundred pages long, and it is not the job of the court to scour that complaint to determine if there are any other bases which would support plaintiffs' claims. It is plaintiffs' job to inform the court of those facts. Because defendants moved for summary judgment on all claims, and because plaintiffs have not argued anywhere in their response memorandum that they have additional bases for any of their claims, I conclude that plaintiffs have waived their right to rely on any other bases for their claims not raised in the briefing of this motion. *See Clay*, 253 F.3d at 1002 n.1.

### III. Conclusion

For all the foregoing reasons, Certain Defendant's motion for summary judgment [764] is granted in part and denied in part. As explained above, Last Atlantis' claims under Rule 10b-5(a), (b), and (c) survive against AGS, SIG, Bear Wagner, and TD Options. Martin's claims under Rule 10b-5(a), (b), and (c) survive against SIG, Bear Wagner and TD Options. Martin's claims against AGS are dismissed. All claims brought by River North, Rule and Speed

Trading are dismissed. All claims brought against Goldman Sachs and SLK are dismissed.

Last Atlantis' state law claims against AGS, SIG, Bear Wagner and TD Options remain in the case, and Martin's state law claims against SIG, Bear Wagner and TD Options remain in the case. Because all federal claims against Goldman Sachs and SLK have been dismissed, I decline to exercise jurisdiction over plaintiffs' state law claims against them. State claims against Goldman Sachs and SLK are therefore dismissed. Likewise, Martin's state law claims against AGS are dismissed. Finally, because all of the federal claims brought by River North, Rule and Speed Trading are dismissed, I decline to exercise jurisdiction over these plaintiffs' state law claims.

**ENTER ORDER:**

_____

**Elaine E. Bucklo**
United States District Judge

Dated: November 4, 2010