IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


LAST ATLANTIS CAPITAL, LLC,      )
et al.,                          )        Nos. 04 C 0397
                                 )             05 C 5600
          Plaintiffs,            )             05 C 5671
                                 )
vs.                              )        JUDGE ELAINE BUCKLO
                                 )        MAGISTRATE JUDGE ARLANDER KEYS
AGS SPECIALIST PARTNERS,         )
et al.,                          )
                                 )
          Defendants.            )

## MEMORANDUM OPINION AND ORDER

Plaintiffs Last Atlantis, Lola, Lulu, Goodbuddy, Friendly,
Speed Trading, Bryan Rule, Brad Martin, and River North filed
this action, alleging violations of §10b of the Exchange Act and
SEC Rule 10b-5 (a), (b) and (c), as well as state law claims,
including breach of contract, common law fraud, breach of
fiduciary duty, tortuous interference, and violations of the
Illinois Consumer Fraud and Deceptive Practices Act.

From the outset of this case, the Plaintiffs have claimed
that the Specialist Defendants intentionally discriminated
against them, as direct access customers. The Court previously
summarized the claims as follows:

> At the heart of Plaintiffs' claim is an inherent
> tension between direct access customers and
> specialists, stemming from their competing efforts to
> profit from market anomalies. The Specialist
> Defendants are dealer/brokers charged with establishing
> the bid and offer prices for every option in a
> designated option class; this price is known as "the
> quote." Specialists fill orders by matching buyers'

orders to purchase options with contra-side customer orders to sell options at the same price. In the event that there are no existing contra-side customer orders, specialists execute orders by buying or selling the designated option from their own proprietary account.

Direct access customers, like Plaintiffs, utilize arbitrage trading strategies in an attempt to take advantage of price discrepancies in the options markets. For example, if a specialist's buy bid on one exchange is $5.00 and a specialist's sell bid on a different exchange for that same option is $4.90 on another exchange, Plaintiffs attempt to execute simultaneous orders to sell on the first exchange and buy on the second exchange to achieve a 10 cent profit per option, while incurring minimal risk.

Plaintiffs claim that, like the direct access customers, specialists also profit from capitalizing on market anomalies. Specialists are able to realize significant profits from such "spreads," if and when they are able to fill orders from their own proprietary accounts. However, because direct access customers purportedly have access to better information and technology than typical customers, they have cut substantially into the specialists' profits. Plaintiffs claim that Defendants intentionally discriminated against orders placed by direct access customers since April 1, 2001, in favor of more lucrative orders placed by less sophisticated customers. Specifically, Plaintiffs charge that the Specialist Defendants have:

> [I]dentified the origin, and then knowingly mishandled the execution of thousands of orders to buy and sell options that were sent to defendants by engaging in various illegal trading practices such as refusing to automatically, or promptly, execute the orders or send confirmations upon the execution of orders, changing (or "fading") the quoted prices after receiving the orders, delaying the execution of orders, refusing to honor requests to cancel orders, and unilaterally terminating or adjusting the prices on orders that were previously executed and confirmed, and conducting thousands of proprietary trades for the

> Specialists' own accounts that were executed
> in advance of, or instead of, executing
> Plaintiffs' marketable limit orders (i.e.
> orders to purchase or sell a set amount of
> options at a specific price equal to the bid
> or offer price actually disseminated by a
> Specialist on a particular exchange).

The defendants have consistently denied discriminating against orders placed by direct access customers in general, and against those placed by the Plaintiffs in particular. Defendants have acknowledged that a higher-than-average percentage of direct access customers' orders go unexecuted, but have offered non-discriminatory reasons to explain the phenomenon.[1]

In January of 2006, Defendants moved to dismiss the consolidated complaints, arguing, largely, that Plaintiffs failed to plead fraud and scienter with sufficient particularity. *See*

---

[1]The defendants have explained that direct access customers rely upon the same kinds of computer programs to identify market anomalies, and that, because these computer programs instruct direct access customers to place virtually identical orders at the same time, direct access customers flood specialists with multiple orders for the same options, making it impossible to fill them all. Defendants contend that, additionally, orders may not be executed because 1) another marketable order is received and executed prior to the receipt of the order in question; 2) the order is received when the specialist is in the process of updating its quote; 3) computer problems or human limitations may cause dissemination of an inaccurate market, or delays in reporting executions and/or quote updates; 4) the Exchange or the Specialist experience equipment malfunctions; 5)a"fast markets" has been declared on the floor but is not reported to the market when the order arrives; 6) a cancellation is entered prior to the specialist's attempt to execute the order; 7) the specialist properly awaits reports of executions or other market action on away markets; 8) the customer bid or offer responsible for the quoted price is cancelled before the order can be executed; 9) the specialist consummates a trade with the market makers in the pit prior to receiving the order; 10) conflicting demands on the specialists' time; and 11) human error.

Defs' 1/6/06 Mot. To Dismiss.  On September 13, 2006, Judge
Bucklo granted the Defendants' Motion, dismissing all of
Plaintiffs' federal claims, and declining to exercise
jurisdiction over Plaintiffs' state law claims.  Judge Bucklo
concluded that the Plaintiffs had failed to plead facts giving
rise to an inference of scienter against the specialist
defendants, and failed to plead facts giving rise to an inference
of scienter and justifiable reliance with respect to the Exchange
Defendants.  *Last Atlantis, et al. v. Chicago Board of Options
Exchange,* 455 F. Supp.2d 788 (N.D. Ill. 2006).

Ten days after the district court dismissed the case, the
AMEX and Defendants disclosed that certain specialists, including
some of the named Specialist Defendants, had agreed to the entry
of orders imposing disciplinary sanctions and fines against them
for having mishandled thousands of Orders to trade options
between June 1, 2002 and January 31, 2005 (the "AMEX Consent
Order").  Plaintiffs filed a Motion for Reconsideration, which
the district court ultimately granted, permitting Plaintiffs to
file an amended consolidated complaint, and directing the parties
to submit proposed discovery schedules.  *See, e.g.,* Memorandum
Opinion and Order of 3/22/2007.  On July 6, 2007, Judge Bucklo
entered an Initial Discovery Order, directing Plaintiffs to
identify and explain the orders that they claim were fraudulently
mishandled.

Just prior to the Court's issuance of its Initial Discovery
Order, the United States Supreme Court issued its decision in
*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127
S. Ct. 2499 (2007), wherein the Court reviewed the Seventh
Circuit's holding that a plaintiff could satisfy the heightened
standards for pleading scienter under the federal securities laws
by alleging facts that permitted a merely plausible inference of
scienter.  The Supreme Court rejected the Seventh Circuit's
"merely plausible" standard, and instead determined that, in
order to survive a motion to dismiss, a federal securities law
plaintiff must plead facts that are both cogent and at least as
compelling as any competing inferences that a reasonable person
could draw from the facts alleged.

The Defendants again moved to dismiss[2] the Amended
Complaint, relying heavily upon the more stringent pleading
standard adopted in *Tellabs*.  On February 7, 2008, Judge Bucklo
granted the Motion with respect to the Exchange Defendants,
finding that Plaintiffs had not made the requisite scienter
showing. She determined, however, that evidence that some of the
Specialist Defendants were sanctioned in the AMEX Consent Order
for conduct similar to that alleged in the Amended Complaint
rendered Plaintiffs' proposed inference of fraud and scienter at

---

[2] On November 27, 2007, the Specialist Defendants filed a
Renewed Motion for Reconsideration and for Dismissal of the
Amended Consolidated Complaint

least as compelling as any innocent explanation, with regard to the Specialist Defendants identified in the Consent Order. Accordingly, the district court denied the Motion with respect to Defendants AGS Specialist Partners ("AGS"), Bear Hunter, CDM, Goldman Sachs Execution and Clearing LLP ("GSEC"), SLK-Hull Derivatives Specialists ("SLK-Hull"), Susquehanna International Group ("SIG"), TD Options, LCC ("TDO"), Wolverine, and Knight Financial Products ("Knight"). With regard to the Defendant Specialists not named in the AMEX Consent Order, the district court found that the evidence did not raise a cogent and compelling inference of scienter, and the court granted the Motion to Dismiss with respect to those Specialist Defendants.

Almost four years ago, on March 13, 2009, this Court ordered Plaintiffs to identify 500 orders that formed the basis for their allegations that the Defendants fraudulently mishandled their orders in violation of state and federal securities laws, with each Plaintiff to identify at least 50 orders. Some of the plaintiffs – Last Atlantis and Speed Trading – submitted charts identifying orders that they allege were fraudulently mishandled, along with explanatory affidavits. Others – River North, Brad Martin, and Bryan Rule – initially conceded that they could identify only unexecuted orders, but subsequently submitted charts and lists of purportedly fraudulently mishandled orders. And still others – Lulu, Lola, Friendly Trading and Goodbuddy –

failed to respond at all.  Since that time, the parties have engaged in protracted discovery disputes.  They continue today; the case is before the Court on various discovery-related motions, all fully-briefed.

The plaintiffs have filed several motions: one motion seeks to enforce the Court's June 18, 2012 and July 12, 2012 discovery orders by compelling defendant GSEC to provide answers to River North's First Set of Interrogatories; another motion seeks to enforce the Court's June 18 and July 12 orders by compelling defendant AGS to produce documents and by determining the sufficiency of AGS' answers to the plaintiffs' requests for admissions; and another, related to the latter, seeks an order deeming defendant AGS' improper responses to requests for admission to be admitted and compelling AGS to produce documents and serve answers to interrogatories.  Additionally, defendant GSEC has moved to compel answers to its first set of interrogatories to plaintiffs, and defendant Susquehanna Investment Group has moved to compel the plaintiffs to produce documents.  Finally, defendant AGS has filed a motion to dismiss for failure to comply with court orders to obtain AMEX audit trail data, but this last motion is not yet fully briefed.

<u>Discussion</u>

The federal discovery rules permit broad discovery in an effort to facilitate trial preparation and settlement of legal

disputes. *See Bond v. Utreras*, 585 F.3d 1061, 1075 (7th Cir.
2009). Indeed, parties may "obtain discovery regarding any
nonprivileged matter that is relevant to any party's claim or
defense" even if the relevant information is not admissible at
trial. Fed.R.Civ.P. 26(b)(1). But the discovery must "appear [ ]
reasonably calculated to lead to the discovery of admissible
evidence." *Id.* And "the burden is upon the objecting party to
show why a discovery request is improper." *Rubin v. Islamic
Republic of Iran*, 349 F.Supp.2d 1108, 1111 (N.D. Ill.
2004)(citing *Meyer v. S. Pac. Lines*, 199 F.R.D. 610, 611 (N.D.
Ill. 2001)). If the party fails to make the requisite showing,
Federal Rule of Civil Procedure 37 allows the Court to enter an
order compelling the party to comply with discovery requests.

At the outset, the Court notes that the bulk of the parties'
disputes involve the Relevant Orders, including the underlying
data and methodology the plaintiffs used to identify these
particular orders as being "relevant." The defendants' motions
make similar arguments as to why such information should be
produced, and the plaintiffs motions seek to protect such
information from disclosure. Thus, many of the motions really
involve two sides to the same coin.

1. <u>GSEC's Motion to Compel</u>

Defendant Goldman Sachs Execution & Clearing, LLC ("GSEC")
has moved, pursuant to Rule 37(a), to compel the plaintiffs to

respond to its First Set of Interrogatories [see docket #1093]. In particular, GSEC seeks responses to interrogatories 1-5, 9 and 13, which it claims deal with the more than 300,000 orders the plaintiffs claim were mishandled (these orders have been referred to by the parties as the "relevant orders"); the interrogatories they propounded seek information about the factual bases for the mishandling claim, as well as information concerning damages claimed by the plaintiffs. GSEC argues that the information is relevant and not protected by any privilege.

The Interrogatories for which GSEC seeks to compel answers provide as follows:

1. Identify all persons who provided information used to prepare the answers to the Interrogatories.

2. Provide the methodology Plaintiffs used to determine and identify the Relevant Orders listed in each of the Microsoft Excel spreadsheets denominated Executable Orders Not Executed.xlsx, Orders Executed After Requests to Cancel.xlsx, Orders Handled in Violation of Due Diligence and Priority Rules CBOE.xlsx, Orders Handled in Violation of Due Diligence and Priority Rules AMEX.xlsx, and Orders Handled in Violation of Due Diligence and Priority Rules PHLX.xlsx that your counsel sent to Defendants' counsel with the attached letter ("Exhibit A") dated June 14, 2012 from A. Friedman to S. Cohen, et al. (Collectively, the "June 2012 Spreadsheets").

3. For each Relevant Order listed in the June 2012 Spreadsheets, describe the precise reason(s) Plaintiffs believe such order did not receive "best execution" and was "not properly handled and/or executed" by the respective Defendant.

4. For each Relevant Order listed in the June 2012 Spreadsheets, identify (a) the time and date when it was entered, (b) the time(s)xecuted or cancelled,

(c ) the terms of the order (including price, quantity, period (e.g., immediate-or-cancel, fill-or-kil, day, or good-til-cancelled), and whether it could be executed partially or only on an all-or-none basis), (d) the exchange on which it was entered, (e) the quotations for the option series on the Exchange immediately before and contemporaneous with when it was entered and during all times while it was in force, (f) the other orders entered that day with the same Exchange for the same option series during the period preceding or contemporaneous with when the Relevant Order was entered and while it was in force, (g) the executions that day in the same option series or class during the period preceding or contemporaneous with when the Relevant Order was entered and while it was in force, and (h) the market conditions during the period preceding or contemporaneous with when the Relevant Order was entered and while it was in force.

   5.   For each Relevant Order listed in the June 2012 Spreadsheets, identify where it appears among the data produced by any of the Exchanges in connection with this litigation ("Exchange Data") and how you know the identified order is the same as the applicable Relevant Order.

* * *

   9.   For each Relevant Order listed in any of the three Orders Handled in Violation of Due Diligence and Priority Rules June 2012 Spreadsheets, identify the order(s) Plaintiffs believe the respective Defendant improperly executed prior to or ahead of the Relevant Order, including the time at which such order(s) was or were received by the respective Defendant.

* * *

   13.   Identify the individuals who determined, or participated in the decisions by which it was determined, which orders to include on the June 2012 Spreadsheets.

Plaintiffs objected to each of these, on various grounds.  Of

particular import here, they objected to having to produce any

information about how the Spreadsheets were created and by whom.

10

Information concerning the relevant orders is plainly relevant – indeed, that evidence is at the crux of the claims at issue in this lawsuit. To be sure, all of the defendants question the plaintiffs' ability to identify specific orders that they claim were handled improperly and for which they seek millions of dollars from defendants. Indeed, this has been the primary focus of the defendants' discovery over the past several years. The plaintiffs are claiming that the defendants failed to properly execute these orders; the defendants are entitled to discovery concerning how the plaintiffs arrived at those claims and what evidence they have to substantiate those claims.

Nor is the discovery sought privileged. Although the spreadsheets may have been prepared in anticipation of trial, the basis for the plaintiffs' claims should have preceded the filing of the suit (to satisfy Rule 11). And, to the extent the information requested concerning the spreadsheets reflects mental impressions, they would seem to be those of the plaintiffs' experts, not their attorneys. Discovery concerning how certain orders were singled out as being improperly executed, again, would seem to go to the crux of the plaintiffs' case; the Court fails to understand why the plaintiffs continue to want to hide the ball on the issues. GSEC's motion to compel is granted.

2. <u>SIG's Motion to Compel</u>

Defendant Susquehanna Investment Group ("SIG") has moved

under Rules 36 and 37 for an order compelling the plaintiffs to
compel the production of documents in response to request numbers
1-7, 91 and 92 (see docket #1074); the plaintiffs have declined
to produce responsive documents, arguing that they are work
product and therefore protected from disclosure.

Request number 1 seeks "[a]ll documents relating to each
Relevant Order."  Number 2 seeks "[a]ll documents relied upon in
identifying each Relevant Order."  Number three seeks "[a]ll
documents relating to each computer model utilized in the
identification of each Relevant Order."  Number four seeks "[a]ll
documents relied upon or related to Plaintiffs' bases for
alleging that each Relevant Order was mishandled including each
algorithm developed to make such determination."  Number 5 seeks
"[a]ll documents supporting your contention that each Relevant
Order was intentionally mishandled."  Number six seeks "[a]ll
documents supporting your contention that each Relevant Order was
recklessly mishandled."  And number seven seeks "[a]ll documents
supporting your contention that each Relevant Order was
negligently mishandled."  These requests seek discovery that goes
to the heart of the plaintiffs' claims; it is relevant, not
privileged, and must be produced.

SIG's Request number 91 seeks "[a]ll documents which
demonstrate that on average a total of 25 to 35 percent of Your
orders and the orders of the other Plaintiffs to buy and sell

options that were submitted to the Exchanges from 2002 through 2005 were filled and executed by the Defendants."  And number 92 seeks "[a]ll historical data for the number of orders sent by You and the number of such orders that were filled which demonstrate that You experienced, throughout the relevant period, far lower fill rates than the fill rates for all public customers including but not limited to documents which reflect that in 2002 and 2003 You received a fill rate of 25%, that You received a fill rate of 18% in 2004 and a fill rate of 35% in 2005 for orders sent to each Exchange during each of those years."  Again, the requested discovery goes to the heart of the plaintiffs' claims; the defendants are entitled to understand the evidence upon which the plaintiffs are basing their allegations.

As the Court understands it, the plaintiffs took underlying data – audit trail data – ran searches and programs on it and came up with a list of "relevant orders," i.e., the orders they claim were either mishandled by the defendants or not executed. The defendants claim they need to be able to see what the plaintiffs did with the data, to see how they came up with the lists, in order to test the validity of their allegations of mishandling and/or non-execution.  The plaintiffs claim that the searches and the programs run to create the lists from the audit trail data amounts to work product.  But the list of relevant orders was not simply prepared in anticipation of trial, it was

prepared because the Court ordered the plaintiffs to prepare it;
the plaintiffs are claiming that the defendants mishandled these
orders or fraudulently failed to execute them in accordance with
established rules and protocols.  The defendants have the right
to test those claims, and the requested discovery is the easiest
and most efficient way to get at the issue; forcing the
defendants to re-create the underlying data, figure out the
specific methodology employed by the plaintiffs and take the
necessary steps to determine exactly how the plaintiffs arrived
at the orders they did, would, indeed, cause undue hardship.
Accordingly, the Court rejects the plaintiffs' work product
claim.  *See* Fed. R. Civ. P. 26(b)(3)(A).

SIG also seeks to compel the plaintiffs to produce documents
in response to request numbers 8-15, 50, 51, 54 and 72; the
plaintiffs have declined to produce responsive documents, arguing
that the requests are unduly burdensome.  The plaintiffs agreed
to produce non-privileged responsive documents in response to
requests 8, 9, 10, 12, 13, 14, 15, 50, 51, 54 and 72; to the
extent they withheld documents in reliance on a claim of
privilege that is inconsistent with the Court's ruling above
concerning work product, those additional documents must be
produced.  Although the plaintiffs limited their response in
request 50 to misconduct by SIG, the Court agrees that
information relating to misconduct by other defendants is not

relevant to SIG's defense of this lawsuit, and will not compel the plaintiffs to produce to SIG documents relating to misconduct that does not specifically involve SIG.

Plaintiffs objected to request 11, and declined to produce any documents in response. Request number 11 seeks "[a]ll documents reflecting the trading strategy You utilized in making the decision to transmit [each] Relevant Order for execution." This discovery is relevant to the defendants' claims concerning the placement of orders by direct access customers and must be produced; the relevance objection is therefore overruled.

After SIG's motion to compel was fully briefed, the plaintiffs filed a motion seeking to introduce new evidence demonstrating that SIG could – and indeed did – readily obtain this information from other sources. To support this claim, the plaintiffs submitted exhibits from the deposition of Bryan Rule, one of the plaintiffs in this case. The plaintiffs argue that these exhibits, offered by SIG at Mr. Rule's deposition and containing "detailed market information regarding Relevant Orders sent by Mr. Rule to the Philadelphia Stock Exchange in 2001, demonstrate that the defendants already possess the discovery they seek regarding audit trail data.

In response, SIG concedes that, in the rare instances where the plaintiffs have supplied the Exchange identifier for a Relevant Order and where the audit trail data in its possession

is not corrupt, it is able to locate a particular Relevant Order. SIG argues, however, that this is the exception, not the rule, and that, with respect to the vast majority of the orders put at issue in the case, the data is corrupt. Additionally and more fundamentally, SIG argues that locating a particular order does not shed any meaningful light on why or how plaintiffs concluded that the order was mishandled. To understand and defend against the plaintiffs' claims, SIG argues, it needs to understand how the plaintiffs identified certain orders as "relevant" and why they claim such orders were mishandled.

Unless the plaintiffs are willing to try their case based upon the ten orders that are the subject of their latest motion, as representative "Relevant Orders," they must produce the information requested.

Reduced to their essence, the plaintiffs' claims allege that certain orders were mishandled by the Specialist defendants in violation of Exchange policies and in violation of the securities laws; fundamentally, the Court accepts that the defendants would need to know how the plaintiffs determined which orders were "Relevant Orders" and the bases for their claims that those orders were mishandled. The plaintiffs must have the information that allowed them to discern from the universe of all orders which were "Relevant" and why; it is only fair that the defendants – who are being hauled into court to defend themselves

against these claims – are allowed discovery on the issue.  The
information is not work product, it is the factual basis of the
plaintiffs' claims and it should be disclosed.  This has
consistently been the Court's view of this case; yet years have
passed without this information ever coming to light. It is time
for the plaintiffs to stop resisting the disclosure of this
information, to provide the requested discovery and to move this
case forward to resolution.

    3.   <u>The Plaintiffs' Motions</u>

The plaintiffs first seek an order compelling GSEC to
respond to interrogatories served by River North.  River North
served a set of four interrogatories on GSEC.  Interrogatory
number 1 asks GSEC to "[i]dentify each and every transaction or
Order identified in the Microsoft Access and Microsoft Excel
files contained on the computer disks produced by several
Defendants in the Action on or about June 15, 2009 with
identifying Bates Nos. Of Knight 01899-001905; SIG-LA 002956-
002964; GS 022681-022684; and TD 0-0004077 (collectively, the
"SEC Orders Lists") that are transactions concerning, or Orders
submitted by or on behalf of: (a) Plaintiff Rule and/or any
accounts maintained by or for Rule (including Spear Leeds &
Kellogg, L.P. Account Number 739L0409, Trader Number 0409); (b)
Plaintiff RN (Tax Id. No. 36-4362891) and/or any accounts
maintained by or for RN (including Spear Leeds & Kellogg, L.P.

Account Numbers #7XE10409, #72910409, #73811209, #7T991209,
#7T990409, #73821209, #72920409, #73821209, #72920409, #72930409,
#72940409); and ( c) Plaintiff Brad Martin (Social Security No.
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) and/or Electronic Trading Consultants (Tax Id. No.
36-4240957) and/or any accounts maintained by or for Martin
(including Spears Leeds & Kellogg, L.P. Account Numbers
#76N31209, #76N31409 and #76N31509).

Interrogatory Number 2 asks that, if GSEC is unable to
provide an answer to all or part of interrogatory number 1, it
explain why and identify what additional information it might
need to answer the interrogatory completely.  Interrogatory
number 3 asks GSEC to state whether it or any of its affiliates
"were requested to, and/or did, identify any Injured Customers
(as defined in the document attached hereto as Exhibit A) in
response to the request made by the Fund Administrator in
connection with the Distribution Plan attached as Exhibit A."
And, in interrogatory number 4, River North asked that, if the
answer to number 3 was yes, GSEC "explain the process [it] used
to identify Injured Customers and how that process would differ
(if in fact it would differ) from the process that would be
required to be followed to identify transactions and/or Orders in
response to Interrogatory 1."  GSEC objected to all four
interrogatories, arguing that each was "unduly burdensome" and
sought non-relevant information.

The motion to compel is denied; by their own admission, the plaintiffs have the information they request in interrogatory number 1, and there is no reason to compel the defendants to provide it in some other format to them. Additionally, the plaintiffs have not explained why the information requested in interrogatory number 3, which deals with an unrelated SEC settlement, is relevant to these proceedings. The relevance of interrogatory number 4 is similarly unexplained and not apparent.

The plaintiffs next seek an order enforcing the Court's June 18 and July 12 orders by compelling AGS to produce documents and to determine the sufficiency of AGS's answers to the plaintiffs' requests for admissions (*see* docket # 1070). AGS has represented that, as of the date it filed its response to the plaintiffs' motion, it had produced all non-objectionable documents responsive to plaintiffs' first and second requests to produce; the plaintiffs do not appear to contend otherwise.

With respect to the requests for admissions, AGS argues that the requests that are the subject of the plaintiffs' motion were improper. Specifically, the plaintiffs ask the Court to determine the sufficiency of AGS' answers to request numbers 2, 4-6, 9, 10, 12, 18, 20, 23, 24 and 27. As explained in letters back and forth between counsel, the plaintiffs contend that AGS' initial responses to 12 of the Requests for Admission failed to comply with Rule 36(a)(4) because they fail to address the

substance of the requested admissions.  Attached to the plaintiffs' motion as Exhibit A is an "[a]lternatively worded version" of the 25 Requests for Admissions" that the plaintiffs argue AGS should be directed to admit or deny.  AGS responds by arguing that the requests themselves are improper, whether because of sloppy drafting or because of the specific information requested and the manner in which it is requested.

The Court has considered the parties' arguments with respect to each request for admission, and has determined that AGS's responses are proper, in light of the requests.  The Court will not compel further responses. The plaintiffs could have served AGS with more precise requests to admit such as those offered in the "alternatively worded" version of its discovery requests; it opted not to do so.  No further response will be compelled.  The plaintiffs may not be happy with the answers they received, but the answers are not improper, given the language of the requests. The parties are free to make of those admissions what they will at trial.

In a separate motion, the plaintiffs ask the Court to determine the sufficiency of AGS's responses to the last 25 requests for admissions; to compel AGS to produce documents responsive to plaintiffs' third request to produce (dated September 7, 2012); and to compel AGS to serve answers to River North's First Set of Interrogatories (dated September 11,

2012)(*see* docket # 1102).

Turning to the document requests, in response to the plaintiffs' third request for the production of documents, AGS filed two objections: first, AGS objected to the discovery as being "unnecessarily duplicative in that the Request duplicates prior document requests and discovery requests from Plaintiffs"; AGS also objected to the document requests as being "unduly burdensome and harassing," seeking "the disclosure of documents that are irrelevant and immaterial and not reasonably calculated to lead to the discovery of admissible evidence . . . ." AGS' Objections to Plaintiffs' Third Request to all Defendants for the Production of Documents (attached to Plaintiffs' Motion as Exhibit C). The plaintiffs argue that these objections are improper.

In its response, AGS has represented that it produced all responsive documents in its possession (more than two thousand pages) in response to the first and second requests to produce, that the third request is duplicative and that, having produced all responsive documents already, it has nothing further to produce. For example, AGS argues that request number 6 in the third request for production of documents is duplicative of requests 2, 9 and 10 from the first set of requests. Request number 6 seeks

> [a]ll documents concerning the use of Auto-Ex systems
> by any person that has been provided access to, or the

> ability to use, the automatic execution features of any
> Exchange's order routing and execution systems,
> including all communications to order entry firms and
> other persons regarding their compliance with
> applicable Exchange Rules.

Although it is true that the referenced requests mention and involve the Auto-Ex systems, request number 6 would seem to be much broader than what was requested in the first set of requests involving that information. And, to the extent AGS has responsive documents that it has not yet produced, it must produce them.

Requests 2 and 3 seek documents that are potentially relevant to the parties' claims and defenses, and, to the extent AGS has not already produced responsive documents, it must do so.

The remainder of the requests in the plaintiffs' third set of requests are, indeed problematic for the reasons raised in AGS' objections. Some of the requests are irrelevant. For example, request number 1 seeks the same documents sought in earlier requests but for the time period beginning September 2007 and ending September 2012; the earlier requests covered the time period from April 1, 2001 through date of response (the requests were served December 31, 2007). The plaintiffs would be hard pressed to show how AGS' business practices in 2007 are relevant to the alleged fraud they claim occurred prior to 2004.

The remainder of the requests either seek the same documents already covered in the first and second requests to produce, or

seek information and documents that has no possible relevance to the parties' claims. The Court, therefore, denies the motion to compel as to those requests. The situation is similar to the plaintiffs' attempt to obtain answers to alternatively worded requests for admission; although discovery is liberal, litigants don't get to keep asking for the same things until they get an answer they like.

Next, the Court considers AGS' responses to the requests for admission. Looking specifically at the last 25 requests, the Court will not compel further responses. The Court would be inclined to compel responses to requests 81 through 85, which are arguably relevant. But AGS responded to these requests, notwithstanding its objections, and those responses are adequate and appropriate. The remainder deal with the AMEX proceedings, and, as explained above, the Court is not persuaded that discovery relating to those proceedings is relevant here. Whether or nor AGS had the ability to obtain audit trail data from sources other than the plaintiffs is, in the Court's view, beside the point. The plaintiffs have claimed that certain Relevant Orders were mishandled, and they will have the burden of proving the point at trial. The defendants, including AGS, are entitled to understand the proof upon which those claims will be based. To the extent the plaintiffs are seeking the discovery, not to aid in their case, but simply to bolster their response to

the pending motion to dismiss, their energies are misplaced.

The plaintiffs contend that they need better answers to the requests for admission so that they can respond to AGS' motion to dismiss. Although that motion is not fully briefed, based upon its review of the initial brief, the Court is unlikely to recommend the relief AGS seeks. Although both this Court and the district court are frustrated by the lack of progress in this case, the Court is not inclined to recommend that the harsh sanction of dismissal is warranted at this time. But the parties should stop fighting the same discovery battles over and over again, produce the relevant information and prepare for a trial that is long overdue (if, in fact, they genuinely wish to proceed to trial, an assumption that would seem to be undermined considerably by the parties' conduct in the case to date).

Turning to the interrogatories served by River North, there are just two and they seek information relating to how AGs answered the request for admissions. Having determined that AGS' responses to those requests pass muster, the Court will deny the motion to compel further responses to these interrogatories. Additionally, the parties and the Court are entitled to presume that officers of the court will comply with the dictates of Rule 11; unless the plaintiffs have a legitimate reason to believe that the lawyers involved here failed to comply with Rule 11 (and they have offered nothing but speculation and unsubstantiated

claims of obstruction to date), the Court will not compel further action on the issue.

## Conclusion

For the reasons explained above, the Court grants GSEC's motion to compel [#1093]; grants in part and denies in part SIG's motion to compel [#1074]; grants in part and denies in part the plaintiffs' motion to compel AGS to produce documents [#1102]; denies the plaintiffs' motion to compel GSEC to answer River North's interrogatories [#1076] and denies the plaintiffs' motion for an order enforcing discovery orders as to AGS [#1070].


DATED: March 4, 2013

                              ENTERED:

                              _____
                              ARLANDER KEYS
                              United States Magistrate Judge