# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LAST ATLANTIS CAPITAL LLC, et al.,  )
    )
        Plaintiffs,  )    Case No. 04 C 397
    )
    v.  )
    )    Judge John Robert Blakey
AGS SPECIALIST PARTNERS, et al.  )
    )
        Defendants.  )

## MEMORANDUM OPINION AND ORDER

In this 13-year old case, Plaintiffs Last Atlantis Capital LLC, Speed Trading LLC, River North Investors LLC, Bryan Rule and Brad Martin have sued various Defendants including Susquehanna Investment Group and Susquehanna International Group, LLP, alleging violation of the federal securities laws and various state law claims. More specifically, Plaintiffs claim that Defendants failed to provide best execution in the handling of trade orders Plaintiffs submitted to them. The case is currently before the Court on various motions, many of which involve (directly or indirectly) certain exhibits Plaintiffs planned to offer at trial. For the reasons explained below, the Court finds that those exhibits – which consist of lists of orders that Plaintiffs claim were mishandled by Defendants – are not admissible at trial. What's more, because Plaintiffs have conceded (and indeed the record confirms) that they cannot prove their claims without these exhibits, the Court finds that Defendants are entitled to judgment as a matter of law on all remaining claims.

Factual Background

A.    <u>Procedural History</u>

This case had a tough time getting off the ground. Plaintiffs filed their initial complaint on January 20, 2004 [1], and Judge Bucklo, to whom the case was initially assigned, dismissed it on March 30, 2005 [102]. Plaintiffs filed an amended complaint June 1, 2005 [113]; a Second Amended Complaint on October 4, 2005 [147]; and a Consolidated Complaint on November 7, 2005 [164]. The Court dismissed the Consolidated Complaint on September 13, 2006 [238]. Plaintiffs moved for reconsideration, and Judge Bucklo granted the motion as to certain named defendants and gave Plaintiffs two weeks to amend their complaint naming only those defendants [284].

On April 5, 2007, Plaintiffs filed their Consolidated Amended Complaint [286], which is still the operative complaint today, though Judge Bucklo later dismissed numerous defendants for lack of service. The operative complaint – proceeding against AGS Specialists, Bear Wagner, Knight Financial Products, SLK-Hull Derivatives, Goldman Sachs Execution and Clearing, TD Options, Citigroup Derivatives Market, Inc., and Group One − alleged eight counts, including violation of §10(b) and Rule 10b-5, breach of contract, common law fraud, and breach of fiduciary duty, among other claims. When Judge Bucklo allowed the complaint to proceed, she denied Plaintiffs' untimely request to file yet another amended complaint based upon the record, including the length of the litigation (four years), the number of previously filed complaints (five) and the numerous motions to

dismiss or for reconsideration that had already been filed and resolved (at least 15 by that time). *See* [408], p. 15, n.6.

In addition to all of the motions regarding the many attempts to amend the complaint, the Court considered and resolved a series of motions for summary judgment before discovery got underway in earnest.

On March 10, 2008, CDMI[1] moved to dismiss the operative complaint [428]; Judge Bucklo converted the motion to a motion for summary judgment and, after briefing, granted the motion [548, 549]. On May 21, 2009, Knight Financial filed a motion for summary judgment [584]; Judge Bucklo granted that motion on March 26, 2010 [758], finding that Plaintiffs failed to put forward any evidence connecting their expectations that Knight would provide "best execution" to statements made by Knight. Thereafter, on April 12, 2010, Defendants SLK-Hull and Goldman Sachs also filed a motion for summary judgment [764], arguing that the Court's decision resolving Knight's summary judgment motion would apply with equal force to the other Defendants. On November 4, 2010, Judge Bucklo granted in part and denied in part Defendants' motion for summary judgment [833, 834]. Specifically, the Court ruled that Last Atlantis' claims and Brad Martin's claims under Rule 10b-5(a), (b) and (c) would survive against the Susquehanna Defendants and certain other Defendants, and it dismissed Martin's claims against AGS, all claims (including state law claims) brought by River North, Bryan Rule and Speed Trading, and all claims (including state law claims) brought against Goldman Sachs

---

[1] CDMI, though not named as a defendant in the operative complaint, acquired the options business of Knight Financial Products and Knight Trading Group.

and SLK. Judge Bucklo, however, declined to dismiss Last Atlantis' state law claims against the Susquehanna Defendants, AGS, SIG, Bear Wagner and TDO, or Martin's state law claims against the Susquehanna Defendants, Bear Wagner and TDO.

With regard to the Susquehanna Defendants,[2] Judge Bucklo similarly found that two alleged statements on SIG's website were actionable because they ostensibly showed that Defendants had publicly asserted: (1) they had institutionalized the pursuit of best execution; (2) they desired to meet and exceed regulatory requirements for "execution quality"; and (3) they deliver "best execution." From these statements, the Court determined that, at that preliminary stage of the proceedings, a reasonable jury could conclude that Defendants promised to provide "best execution" when handling orders. Judge Bucklo determined that Last Atlantis and Martin proffered evidence that their expectations that Defendants would provide "best execution" were based upon these statements.

All of these motions, however, were filed and decided without the benefit of any significant discovery. Indeed, on April 15, 2010, Magistrate Judge Keys, who had the case for discovery supervision, stayed discovery pending Judge Bucklo's ruling on Defendants SLK-Hull and Goldman Sachs' summary judgment motion. *See* [767]. Following Judge Bucklo's ruling, on December 13, 2010, Judge Keys

---

[2] In its decision today, this Court emphasizes the Susquehanna Defendants, because they are the only Defendants still in the case as of this writing. The preliminary motions to dismiss and for summary judgment eliminated many of the Defendants originally named in the complaint. Additionally, on September 30, 2016, Plaintiffs voluntarily dismissed all claims against TDO with prejudice [1571]; on October 6, 2016, Plaintiffs voluntarily dismissed all claims against AGS with prejudice [1574]; and, on December 13, 2016, Plaintiffs voluntarily dismissed all claims against Bear Wagner with prejudice [1631].

directed Plaintiffs to obtain discovery regarding audit trail data from the Exchanges; he indicated that, once the audit trail data was turned over, he would determine how discovery would proceed in order to meet the discovery deadline, then set for June 1, 2011. *See* [839].

On January 21, 2011, Judge Bucklo issued an order inviting additional summary judgment briefing on Plaintiffs' state law claims. *See* [856]. Consistent with that invitation, Knight [869], Susquehanna/Bear Wagner/TDO [871], and SLK-Hull/GS [874] all filed motions for summary judgment on Plaintiffs' state law claims. On June 6, 2011, Judge Bucklo ruled on all three motions, granting each in part and denying each in part. [965, 966]. As a result, Judge Keys lifted the discovery stay on June 18, 2012 [1037]. Thereafter, on July 12, 2012, Judge Keys adopted Plaintiffs' scheduling order, which contemplated full discovery by all parties [1042].

B.   Reassignment and Post-reassignment Procedural History

On October 6, 2015, the case was reassigned from Judge Bucklo to this Court [1393]. At the initial status before this Court, Defendants advised that they planned to file dispositive motions; Plaintiffs' counsel objected, noting that Defendants had already filed their summary judgment motions and should not be permitted to file another. At the same time, Plaintiffs indicated that they planned to file a motion for partial summary judgment.

The Court advised Plaintiffs that, if they intended to assert a waiver argument in response to Defendants' renewed summary judgment motions, they

could do so, but would also need to respond on substantive grounds as well. Specifically, the Court advised "if you have an argument on forfeiture or waiver, law of the case, make sure that that's part of your calculation." Transcript of Proceedings of 10/21/15 [1402], p. 25. This Court then set a briefing schedule on any further dispositive motions, in an effort to bring this case to final resolution either by way of motion or subsequent trial. *See* [1405]. This Court then had to extend that schedule for the Plaintiffs at least 14 times. *See* [1407], [1408], [1432], [1434], [1441], [1465], [1478], [1488], [1489], [1492], [1493], [1498], [1508], [1519].

On January 22, 2016, Defendants AGS, Bear Wagner, SIG and TDO filed their motion, seeking summary judgment on Plaintiffs' Amended Consolidated Complaint in its entirety [1409]. On February 1, 2016, Plaintiffs filed their motion, seeking partial summary judgment on certain state law claims against SIG and TDO, and against all Defendants on their affirmative defenses [1442].

On February 11, 2016, while the motion practice remained pending, this Court also set the case for trial on November 14, 2016 – giving the parties a full nine months' notice. That same day, the Court set the case for a final pretrial conference on October 31, 2016, and ordered the parties to file their proposed final pretrial order by October 17, 2016. *See* [1478]. By April 7, 2016, after consideration of the record, this Court determined that the parties were unable to work cooperatively in good faith, and, after a status and motion hearing, set the case for regular status hearings on April 28, 2016, June 7, 2016, July 28, 2016, and September 13, 2016 [1540]. The Court advised the parties that they should be

prepared to report at each status hearing on their trial preparation efforts, and that they should, absent an emergency, notice any and all motions for presentment at the status hearing dates set by the Court [1540]. At each such status hearing, the Court asked the parties about their trial preparation and warned the parties, again and again, that they must be prepared to go to trial on the scheduled date. *See* Transcript of Proceedings of 4/28/16 [1554], p. 6 ("I'm not going to move the trial date"; "we have to work toward meeting that trial deadline."); [1557] ("All previously set dates and deadlines to stand"); [1576] ("All other deadlines to stand").

Despite these clear admonishments, at the status hearing on October 13, 2016, the parties advised the Court that they were not able to meet the Court's deadline for the filing of the proposed final pretrial order, and Plaintiffs requested additional time. The Court, after noting that the schedule for filing the order had been set months ago, initially denied the motion; but after considering the prejudice to Defendants and recognizing that the proposed pretrial order should be filed jointly, the Court ultimately allowed the parties to file their proposed final pretrial order on October 19, 2016. *See* [1576]. The Court declined to extend the date for filing motions *in limine*, however, and required the parties to file those, as previously ordered, on October 17, 2016. *Id.*

C.  Procedural History Relating to Plaintiffs' Lists of "Relevant Orders"

Having by this time reviewed and analyzed the parties' summary judgment submissions, the Court advised Plaintiffs that it had grave concerns about the admissibility of the exhibits Plaintiffs referred to as the lists of relevant orders. The

Court advised Andrew Friedman, counsel for Plaintiffs, that he would have to show that the orders included on the lists were mishandled or they likely would not be relevant to any issue left in the case; and counsel agreed. Transcript of Proceedings of 10/13/16 [1578], pp. 9-10. In an attempt to address the Court's concerns, attorney Friedman represented that Plaintiffs' experts, Robert Lowry and Dr. Roy Freedman, would testify that the orders included on the list were, in fact, mishandled; and counsel further represented that the experts would testify and establish the analysis of the underlying data showing whether any orders were mishandled. *Id.*, pp. 11-12.

After review of the record and hearing counsel's evidentiary proffer, this Court advised:

> Based on my review of what you've submitted, I don't see how you're going to be able to show that any specific order was mishandled. And simply having an expert opine, based on what you just said, is not going to be sufficient based on what orders were mishandled or not mishandled because there's more factors involved that simply what you've articulated. And there would also be other predicate determinations which the expert would not be able to address including who exactly received it, who exactly sent it. You've got some serious issues, Counsel.

[1578], p. 12. The Court further advised that under the law a mere three- or five-second delay could not, standing alone, establish that an order was unlawfully "mishandled" and that other determinative factors would also need to be shown. In no uncertain terms, this Court warned counsel that the Plaintiffs, like all litigants, needed to adhere to the rules of evidence as to the proposed exhibit:

> The Court: You're the plaintiff. You bear the burden of proof. And you're the proponent of the exhibit, which means you have to show -

Friedman [counsel for Plaintiffs]: Yes.

The Court: − you have to show the admissibility of the exhibit. The burden does not shift to the other side simply because you proffer some window of delay and then say, all right, go ahead and try to prove that this is, in fact, inadmissible by some burden-shifting. There's no burden-shifting here. It's not like you make a prima facie case and then there's a response. This is your exhibit. You have to show that it's authentic, that it is relevant, that it satisfies 403, that it is non-hearsay or an exception to hearsay, et cetera, et cetera, et cetera. All they have to do is, "Objection, your Honor," and if you haven't laid the foundation, it doesn't come in.

*Id.*, p. 16.

This Court's serious misgivings about Plaintiffs' proposed proof did not come as a surprise to counsel. Indeed, long ago, Magistrate Judge Keys issued an order on March 13, 2009, stating that, before he would order Defendants "to engage in further time-consuming and expensive discovery, the Court needs to assure itself that Plaintiffs' allegations are not based on suspicions and hunches, but on real evidence." [554]. Judge Keys, therefore, ordered Plaintiffs to identify and produce "a listing of at least 500 specific orders that they claim were mishandled (at least 50 from each plaintiff and 25 for each defendant), along with an explanation as to how they concluded that the orders were fraudulently mishandled as opposed to having been merely not executed." *Id.* Plaintiffs requested and received an extension of time to produce the requisite orders [561]; they were due by April 17, 2009.

Four years later, Judge Keys was still dealing with the issue. In a decision issued March 4, 2013, in connection with various discovery disputes and motions – the "bulk of which involve[d] the Relevant Orders, including the underlying data

and methodology the plaintiffs used to identify these particular orders as being 'relevant'" – Judge Keys summarized the discovery that occurred in the wake of his 2009 Order requiring Plaintiffs to come up with some actual proof of their claims. Judge Keys indicated that some plaintiffs (Last Atlantis and Speed Trading) had submitted charts identifying orders, along with explanatory affidavits; others (River North, Brad Martin and Bryan Rule) initially conceded that they could identify only unexecuted orders, but subsequently submitted charts and lists of purportedly fraudulently mishandled orders; and still others (Lulu, Lola, Friendly Trading and Goodbuddy) failed to respond at all. *See* [1164], p. 6.

Furthermore, he noted, as the discovery disputes continued, that Plaintiffs were taking an untenable position:

> [i]nformation concerning the relevant orders is plainly relevant – indeed, that evidence is at the crux of the claims at issue in this lawsuit. To be sure, all of the defendants question the plaintiffs' ability to identify specific orders that they claim were handled improperly and for which they seek millions of dollars from defendants. Indeed, this has been the primary focus of the defendants' discovery over the past several years. The plaintiffs are claiming that the defendants failed to properly execute these orders; the defendants are entitled to discovery concerning how the plaintiffs arrived at those claims and what evidence they have to substantiate those claims.

[1164], p. 11. Ultimately, Judge Keys rejected Plaintiffs' attempt to withhold information relating to the lists of orders on the basis of privilege:

> Nor is the discovery sought privileged. Although the spreadsheets may have been prepared in anticipation of trial, the basis for the plaintiffs' claims should have preceded the filing of the suit (to satisfy Rule 11). And, to the extent the information requested concerning the spreadsheets reflects mental impressions, they would seem to be those of the plaintiffs' experts, not their attorneys. Discovery concerning how certain orders were singled out as being improperly executed,

again, would seem to go to the crux of the plaintiffs' case; the Court fails to understand why the plaintiffs continue to want to hide the ball on the issues.

*Id.* Specifically concerning the Susquehanna Defendants' motion to compel, Judge Keys again addressed the question of whether the Defendants were entitled to discovery concerning Plaintiffs' lists of orders:

> As the Court understands it, the plaintiffs took underlying data – audit trail data – ran searches and programs on it and came up with a list of "relevant orders," i.e., the orders they claim were either mishandled by the defendants or not executed. The defendants claim they need to be able to see what the plaintiffs did with the data, to see how they came up with the lists, in order to test the validity of their allegations of mishandling and/or non-execution. The plaintiffs claim that the searches and the programs run to create the lists from the audit trail data amounts to work product. But the list of relevant orders was not simply prepared in anticipation of trial, it was prepared because the Court ordered the plaintiffs to prepare it; the plaintiffs are claiming that the defendants mishandled these orders or fraudulently failed to execute them in accordance with established rules and protocols. The defendants have the right to test those claims, and the requested discovery is the easiest and most efficient way to get at the issue; forcing the defendants to re-create the underlying data, figure out the specific methodology employed by the plaintiffs and take the necessary steps to determine exactly how the plaintiffs arrived at the orders they did, would, indeed, cause undue hardship.

[1164], p. 14. Judge Keys' frustration with Plaintiffs' improper discovery tactics was clear:

> Reduced to their essence, the plaintiffs' claims allege that certain orders were mishandled by the Specialist defendants in violation of Exchange policies and in violation of the securities laws; fundamentally, the Court accepts that the defendants would need to know how the plaintiffs determined which orders were "Relevant Orders" and the basis for their claims that those orders were mishandled. The plaintiffs must have the information that allowed them to discern from the universe of all orders which were "Relevant" and why; it is only fair that the defendants – who are being hauled into court to defend themselves against these claims – are allowed

11

discovery on the issue. *The information* is not work product, it *is the factual basis of the plaintiffs' claims* and it should be disclosed. *This has consistently been the Court's view of this case; yet years have passed without this information ever coming to light.* It is time for the plaintiffs to stop resisting the disclosure of this information, to provide the requested discovery and to move this case forward to resolution.

*Id.*, p. 17 (emphasis added).

A year and a half later, Magistrate Judge Cole, who had by then inherited the case from Judge Keys when he retired, remained equally frustrated by Plaintiffs' failure to move the case forward with real evidence to support their claims. On September 29, 2014, Magistrate Judge Cole held a hearing on Defendants' motion to compel the deposition of Robert DeMeritt, the Last Atlantis partner and designated expert who had created the infamous lists of orders. Plaintiffs had taken the position that DeMeritt was not relevant and should not be deposed, despite the fact that DeMeritt was the individual who had run the critical spreadsheets and maintained the underlying data. Judge Cole observed:

> [t]here is a difference between running an analysis of underlying data and the validity of the underlying data. Nobody is going to dispute – or they will dispute. But obviously you can test somebody who says, well, I have this piece of paper and that piece of paper and this and that, and I added up all the invoices, and we sold a million dollars worth of stuff to GMAC, and that's our damages. . . . That's easy. But the underlying – the validity of the underlying data the experts cannot opine on in this case obviously requires, even for admissibility purposes, that whoever didn't just gather this up, but apparently created the mechanism for obtaining it and − well, the valid – the underlying validity, that person has to testify.

Transcript of Proceedings of 9/29/14 [1559-15], pp. 11-12. In Judge Cole's view, Friedman had not been forthcoming with Plaintiffs' expert disclosures, initially disclosing DeMeritt as an expert, then advising the parties that DeMeritt was no

longer available to serve as an expert, then deciding that DeMeritt would serve as an expert. Judge Cole admonished Friedman that "[y]ou can't make it this labyrinthian and this hard for opponents in a case," and he observed, being relatively new to the case, "I was struck with how difficult you made it and how it was easy to see why these delays occurred." *Id.*, pp. 29, 30. Judge Cole found that DeMeritt "is really critical to this case," "[a]nd I'm not going to take – nobody needs to take your word for it that he's not." *Id.*, pp. 31, 32. He granted the motion to compel.[3]

Two years later, in the final stages of trial preparation before this Court, the parties were still fighting over the lists of orders. Defendants were still claiming that Plaintiffs had no evidence to support their claims, and Plaintiffs still had not produced a single witness to testify as to the validity of the underlying data and the resulting lists of orders, and still had not produced any witness to testify concerning the methodology used to create the lists of orders. In response to this Court's inquiry just a month before trial, Plaintiffs were still unable to reassure the Court that they were prepared to lay a sufficient evidentiary foundation for the lists of orders. Without the orders, as Plaintiffs conceded in open court, Plaintiffs could not legally succeed on any of their claims, making a trial unnecessary. *See* Transcript of Proceedings of 10/13/16 [1578], pp. 7-8 (Counsel for Plaintiffs indicating that "the specific spreadsheets with the specific – identifying the specific orders, that's critical

---

[3] Plaintiffs' counsel's position at the hearing before Judge Cole seems incredible today, given that DeMeritt was the one and only fact witness Plaintiffs presented at the evidentiary hearing held to confirm the admissibility of the lists of orders. *See infra* pp. 21-27, 35-49.

to the case" and conceding that, without the spreadsheet exhibits, none of Plaintiffs' claims would survive.).

As a result, before committing to empaneling a jury and forcing the litigants to incur any further expenses, this Court directed Plaintiffs' counsel to file a certification under Rule 11 laying out the purported evidentiary basis for Plaintiffs' critical exhibits [1576]. Counsel submitted a certification, [1587], but it missed the mark and failed to address the fatal concerns raised by this Court at the October 13, 2016 status hearing. In his certification, counsel represented in conclusory fashion:

> [P]laintiffs will present the testimony of Mr. DeMeritt to establish a foundation for the spreadsheets setting forth detailed information regarding the times the Orders were sent to each exchange and routed to defendant Bear or SIG for execution, the prevailing Exchange and National Best Bid and Offer price, the length of time the orders were pending prior to execution or cancellation and other material information under F.R.E. 901(b)(1), and (7)-(9), R. 1005, R. 1006 and/or R.1007. . . . With respect to objections raised by defendants to the admissibility of this evidence, plaintiffs will establish that the information in the spreadsheets are not barred under the hearsay rules under exceptions in F.R.E. 803 (6), (8) and (17).

[1587]. Despite this Court's explicit instructions, Plaintiffs' counsel did not explain specifically how he would lay a foundation for the underlying data from which the spreadsheets were derived. Among other short-comings, counsel failed to explain what he meant by "other material information"; failed to provide any information to substantiate his bare assertion that the orders would survive a hearsay challenge; and failed to provide any factual support for his suggestion that the lists of orders constitute "records of a regularly conducted activity," public records or market

reports such that they would fall within the hearsay exceptions referenced. *See* [1594].

In light of the above, this Court set the matter for an evidentiary hearing, seeking to give Plaintiffs' counsel one last opportunity to reassure the Court that empaneling a jury would not be a complete waste of everyone's time.[4] At the evidentiary hearing, the Court noted that "there's been a systemic failure of plaintiff to comply with routine deadlines and to give a straight answer to a simple question, so proceeding by way of proffer and even requested Rule 11 certifications has been ineffectual." Transcript of Proceedings of 10/27/16 [1610], p. 6. Thus, the Court noted, the point of the evidentiary hearing was to ascertain exactly what evidence Plaintiffs planned to offer at trial concerning the critical spreadsheets and to determine whether counsel could actually lay an evidentiary foundation for those exhibits and otherwise establish their admissibility:

---

[4] As noted above, this Court's concerns regarding what Plaintiffs characterize as the "relevant orders" certainly did not come as any surprise to Plaintiffs. As the record make clear, Defendants have challenged Plaintiffs' proof relating to the alleged mishandled orders throughout these proceedings, and the question of whether Plaintiffs had anything more than a hunch to support their claims has been on the table for almost a decade. *See* [343] (6/19/07 Order requiring Plaintiffs to produce lists containing information to identify relevant orders); [554] (3/13/09 Order requiring Plaintiffs to demonstrate that their claims were based on real evidence, and not based on suspicions and hunches); [1164], p. 11 (3/4/13 Order holding that Plaintiffs were required to demonstrate what evidence they have to substantiate their claims; "[d]iscovery concerning how certain orders were singled out as being improperly executed, again, would seem to go to the crux of the plaintiffs' case; the Court fails to understand why the plaintiffs continue to want to hide the ball on the issues."); [1559-15], pp. 11-12 (9/29/14 ruling that Defendants had an absolute right to depose the witness who created the mechanism for obtaining the evidence relating to relevant orders); [1378] (Defendants' 10/2/15 motion to strike relevant orders); [1381] (Defendants' motion to disqualify expert Robert Lowry); [1402], pp. 5, 13-14 (Transcript of proceedings of 10/21/15 discussing potential summary judgment arguments, including Plaintiffs' proof problems and their failure to produce evidence demonstrating that any orders were mishandled); [1406] (Transcript of proceedings of 11/17/15 discussing forthcoming summary judgment motion raising Plaintiffs' proof problems and failure to offer any proof of elements of their claims); [1410], pp. 11-23 (Defendants' 1/22/16 memorandum in support of summary judgment, arguing that Plaintiffs offered no evidence that any order was mishandled); [1580], pp. 1-9 (Defendants' 10/17/16 motion in limine to preclude relevant orders).

Right now I want to know what the evidence is because I can't get a straight answer.  So let's get a straight answer.  Let's figure out what the exhibit is and what the testimony is, and then I can apply the rules of evidence.  Because right now I can't do it with a hypothetical.

*Id.*, p. 7.

Unfortunately, Plaintiffs made this Court's task even more difficult when they failed to bring copies of their actual exhibits to the hearing.  The following exchange illustrates the Court's many attempts to address Plaintiffs' ongoing inability to support claims with actual evidence:

THE COURT: Let me − hang on a second, hang on a second. Let me interrupt. This is your main exhibit. You don't − do you have a copy of what the exhibit is?

MR. FRIEDMAN: Yes.

THE COURT: Okay. Can you get it to me and opposing counsel, the version you're going to use at trial. Not a draft, not a version that's going to change between now and trial, but the version, the [whole] version, can you get it to me by the end of business today?

MR. FRIEDMAN: I probably cannot. They have the copies of that, but−

THE COURT [to defense counsel]: Do you have a copy of it?

MR. STERN: We have what he has sent us, yes, your Honor.

THE COURT: All right. We're going to take a little break. You're going to show him the copy that he's given you. You're going to confirm that that's your exhibit.

MR. FRIEDMAN: Okay.

THE COURT: Because I want a copy of the exhibit. Because once you hand it to me, that's going to be the exhibit whose admissibility is going to be tested in this hearing.

MR. FRIEDMAN: Okay. These are big spreadsheets.

THE COURT: I don't care how big it is. This is your evidence. You can bring in 20 bankers boxes, if that's what your evidence is.

MR. FRIEDMAN: Okay.

THE COURT: Whatever your evidence is, testimony and exhibits. I don't know how clear − I don't know how I can be more clear. I need to know what your exhibit is because I don't know if it's coming into evidence, and I can't make an assessment under the rules of evidence if you don't bring the exhibit to the hearing. . . . Okay. And do you have any summary exhibits to − because obviously it will be normally not the routine practice to publish 20,000 pages to the jury. So normally it happens all the time, like in a wiretap case, they've got all these phone records. They move the phone records in, and then there's a summary exhibit which basically breaks down the larger exhibit, and that's what the person would testify to in terms of authentication of both the underlying exhibit and the summary exhibit. And then once both of those are in, which there's independent foundation for each, that's what the experts would use in aid of their testimony. So it would be both not just a demonstrative, but a summary exhibit. So every version of every exhibit that you want to admit with respect to this area of evidence, I want to have it, and I want to have *the* version. Because I don't want to have another version come up two weeks from now on the 14th of November, oh, Judge, I've changed the exhibit, and now it's this, because that's going to be excluded as untimely. Because this might be excluded as untimely. At this point I don't know what it is. So can the parties meet and confer right now. Do you have the other exhibits? It sounds like they have the spreadsheets, but it doesn't sound like that's all the pieces of evidence you're going to try to seek to admit, right?

MR. FRIEDMAN: The spreadsheets [are] what I thought we were dealing with today.

THE COURT: Well, the spreadsheets [are] the beginning of it, but if you get the spreadsheets into evidence and you can't get your summaries or any other exhibit in, then you're also going to have a problem. And you're going to have a problem with your experts and you're going to have a problem with directed verdict. So this is why we're doing it now because I want to have it tied down, and I don't want to have a discovery dispute or a late disclosure dispute while I got 14 people in the box who are waiting back there. Because I have a grave concern − and it's been predicated by the track record in this case − that there will not be an efficient trial. And we will have the

jury waiting hours at a time while we're arguing about something, about whether or not it was disclosed or whether or not it's the same thing, which is why we're doing this on a pretrial basis. Let me ask the question again. Other than the spreadsheet, do you have the other exhibits – exhibits with an S – that you intend to admit into evidence?

MR. FRIEDMAN: No, I do not.

THE COURT: Okay. When can you get that composite exhibit, which would be the summaries, anything else you want to use, any demonstratives you want to use, the underlying exhibits, the dataset, whatever, *all* of your evidence. Because I am tying you down, because I need to, because I have a responsibility to the jury. That entire universe, how long would it take you to submit it? Now, obviously if it's going to be 20,000 pages, some of it's going to be electronic, and some of it could be hard copy. But how long would it take you to actually give me the main evidence in your case?

MR. FRIEDMAN: Probably about a week or so.

THE COURT: Do you not have this now? This is the reason I set the trial out, and I set multiple statuses on trial preparation. How do you not have your exhibits?

MR. FRIEDMAN: I'm preparing. Your Honor, I'm preparing them, okay? I'm one person. I'm doing – they're filing motion after motion after motion. I'm responding to them. I'm getting – I'm working very diligently pretty much round the clock on this case. We prepared the spreadsheets. We're going to prepare the summaries, and then I would imagine that your Honor wanted to continue this hearing as well to get other experts before the Court, and I would think that we would have that before then, but –

THE COURT: Well, here's another deadline. One of the deadlines as part of the pretrial conference – which is Monday, right?

MR. STERN: Yes, your Honor.

THE COURT: Which is not a week from now. And you have to exchange your exhibits.

MR. FRIEDMAN: Yes.

THE COURT: So you're telling me that your main exhibit in the entire case, you're not going to have for a week, which would put it multiple days past the pretrial conference, which at that point would be excluded. If you can't exchange the exhibits in time for the pretrial conference, your exhibit's gone because you failed a deadline. So I mean –

MR. FRIEDMAN: It sounds to me like you're telling me I have to have it on Monday, so I guess I'll have it on Monday.

THE COURT: Well, Counsel, this is not a question of – I'm bending over backwards to give you your day in court, I really am. And I don't mean to be short with you. I don't. But there's a reason there's deadlines, and I have to be fair to the other side, too. And it's not fair to them to have the lead exhibit in the case handed to them while they're picking a jury. That's not fair to them.

MR. FRIEDMAN: Well, the summary is just going to be a subset of the spreadsheet.

THE COURT: A summary is everything because you're not going to publish or inquire on the stand about 20,000 pages. You have to get the admissibility of that because a summary won't come in without it. But that spreadsheet or the derivative samples or summaries or however you want to call it, they're entitled to get that because that's the exhibit that's actually going to be published.

MR. FRIEDMAN: Okay.

THE COURT: Right?

MR. FRIEDMAN: Right.

THE COURT: Right?

MR. FRIEDMAN: Sure.

THE COURT: Okay. I'm not moving the trial date, okay? All right. So you're going to have to exchange it and get it to me and the other side by the pretrial conference.

MR. FRIEDMAN: Okay.

THE COURT: Which is − and that's a deadline that was set a long time ago [on February 11, 2016]. So if you're not able to do that − and even with the certification I asked for and some other pleadings, even as of last week and the week before, there was one version and then there was another version and a corrected version. I'm really trying to give you your day in court. And I − I really am, okay?

MR. FRIEDMAN: I appreciate that.

THE COURT: I really am. But I have to be fair to them, too. And allowing you to not make the deadlines is just not fair to them.

MR. FRIEDMAN: I will prepare the summary spreadsheet and get it to them by Monday.

THE COURT: No. The order is comply with the order setting the pretrial conference. That's what the order is.

MR. FRIEDMAN: Okay.

THE COURT: So this is nothing new or special.

MR. FRIEDMAN: They have all my exhibits except for the summary exhibits.

THE COURT: Well, any exhibit you don't give them, consistent with my order for the pretrial conference, is not going to be timely.

MR. FRIEDMAN: Understood.

THE COURT: All right. Now, I want you to bring on Monday − because you will as part of it − all the exhibits that you intend to admit in this area, whether they're summary samples, underlying exhibits. And if it's the digital stuff, then I want it on a flash drive. Because it's really important that the ball [will] not move anymore −

MR. FRIEDMAN: Okay.

THE COURT: − with respect to that. And that will at least give counsel, as of the date of the pretrial conference, an idea to articulate objections.

MR. FRIEDMAN: Okay.

THE COURT: Because this is one of the reasons there's prejudice to them. . . . One of the prejudices to them is to the degree the exhibit's changing or opinions or portions of expert opinions are changing, that's prejudicial to them because it's outside of discovery. And they would have done different things, whether it's a Rule 26 disclosure or questions they would have asked to an expert in a deposition or rebuttal experts. And moving the ball late in the game is devastating to the defendants and unfair because you're correct when you call it a standard of care. This is like a medical malpractice case. And you need to have an expert to explain the standard of care because the jury doesn't know what best execution is. But you need both the factual predicate and the expert opinion. So you can't change the ball on them and expect them to be able to have a chance to defend them[selves]. So I'm trying to give you your day in court. I'm trying to give them their day in court.

MR. FRIEDMAN: We're not changing the ball, your Honor.

THE COURT: Well, that remains to be seen. We'll find out. I hope what you're saying is correct. I really do. So I want copies for the Court of whatever the exhibits are, plural. I also want to know the names of the witnesses who are not available today but that you intend to call to support the admissibility under all of the rules of evidence, not just 403 or relevance, but every single rule of evidence. Because I'm going to expect objections on multiple grounds. All of the witnesses that you intend to call. Can you put on a record right now − I know what you've put in your pleadings, but I want to get it on the record. Can you name I believe it's four witnesses total.

MR. FRIEDMAN: Yes.

THE COURT: Can you put their names on the record.

MR. FRIEDMAN: Yes. Paul Picchietti, Robert Lowry, Dr. Roy Freedman and Robert DeMeritt.

THE COURT: All right. And you have here today which one?

MR. FRIEDMAN: Mr. DeMeritt.

THE COURT: Okay. When are the other three available?

MR. FRIEDMAN: Mr. Lowry is the one who is the most busy, and he would be available the week of the 7th, if we could do it that time. He'd like that Wednesday, which I guess is what, the 9th?

THE COURT: All right. What about the availability of the other ones?

MR. FRIEDMAN: I have to coordinate with them. I just found out this morning that Mr. Lowry was available on the 9th.

THE COURT: All right. Obviously since I set the trial on the 14th, all of the witnesses will be available on the 14th, correct?

MR. FRIEDMAN: Yes.

THE COURT: All right. We are going to pick the jury on the 15th, and we're going to have the evidentiary hearing on the 14th. Well, actually we're going to complete the evidentiary hearing. We're going to take as much testimony as we can today.

*Id.*, pp. 8-9, 11-19.

With that, Plaintiffs called to the stand Robert DeMeritt, a partner at Last Atlantis Capital who has served as records custodian for the Plaintiffs in this case. Plaintiffs indicated that they planned to use DeMeritt to lay a foundation for the spreadsheets of what they referred to as "traded ahead orders" – that is, orders where Defendants traded their own interests over Plaintiffs'. For purposes of the evidentiary hearing, those spreadsheets were marked as Exhibits 1, 2, and 3, with Exhibit 1 relating to traded ahead orders placed with the Philadelphia Stock Exchange (PHLX), Exhibit 2 relating to traded ahead orders placed with the Chicago Board Options Exchange (CBOE), and Exhibit 3 relating to traded ahead orders placed with the American Stock Exchange (AMEX).

With regard to the first spreadsheet, identified for purposes of the evidentiary hearing as Exhibit 1, DeMeritt testified that he received "a list of orders

that were traded ahead at the PHLX by Susquehanna that I believe it came from an exchange surveillance. And I matched up our orders with that and that produced the spreadsheet." Transcript of Proceedings of 10/27/16 [1610], p. 27. DeMeritt testified that he received the initial list of orders from Plaintiffs' counsel and that counsel told him the information "came from the SEC investigation." *Id.*, p. 31. DeMeritt testified that he then wrote an algorithm to extract, from that broader list of orders, orders that were placed by Plaintiffs. *Id.*, p. 33. When creating Exhibit 1, DeMeritt testified, he manually entered certain columns and information that was not produced by the algorithm using Last Atlantis' records in addition to whatever data was available from the PHLX data. *Id.*, pp. 35-36. He testified that he used information from Last Atlantis' own trading platform. *Id.*, p. 36. DeMeritt then made the following point in response to questions from the Court:

> THE COURT: I'm trying to figure out what the basis − underlying basis of the entries are in Plaintiffs' Exhibit 1 for the evidentiary hearing. And you're saying you looked at your own records, and I'm trying to figure out exactly what that is. When you say your own records, what are you referring to? Because you're matching that. You're not just pulling information and creating a spreadsheet based on the trade data. You're using additional sources, correct?
>
> THE WITNESS: Correct. Our FIX [Financial Information Exchange] engine created logs, and that's where this data is coming from, from our FIX engine logs.

*Id.*, p. 38.

DeMeritt then confirmed that the data he used to match orders came from Last Atlantis' own internal dataset. *Id.*, p. 42. Counsel did not seek to introduce that dataset (or any other underlying dataset) at the hearing, and it became clear

that DeMeritt could not even identify what some of the information on Exhibit 1 was. For example, when asked what the symbol C meant in Column AO on Exhibit 1, he testified, "that's not my data . . . I do not know that." *Id.*, p. 60.

DeMeritt similarly testified that he created the spreadsheets marked as Exhibits 2 and 3. When asked about the particular underlying data sets he used to create the exhibit spreadsheets, he testified:

> THE WITNESS: For the plaintiffs' data, there are three types of data. There was Last Atlantis data which came from Last Atlantis FIX logs. There was Speed. There was order tracking data from their order engine, whatever they called that.
>
> THE COURT: Do you have any knowledge of what kind of order engine they have?
>
> THE WITNESS: It was something −
>
> THE COURT: Do you know? I'm not asking you to guess. That's why we're having this hearing, not guessing.
>
> THE WITNESS: No, I do not. . . . The other three plaintiffs, River North, Brad Martin and Bryan Rule that came − that order tracking data came from their broker which was REDI.
>
> THE COURT: You're familiar with that system that those plaintiffs used or not? It's okay. If you don't, that's okay. I just want to know what you know.
>
> THE WITNESS: I'm familiar with the trading application, the REDI trading platform that would have created that data. *Where they pulled the data from, I don't know.*
>
> THE COURT: Okay. And then what else? What other types of data?
>
> THE WITNESS: That was the plaintiffs' data.
>
> THE COURT: Okay. Let's go into the other areas with respect to the SEC, et cetera, et cetera.

BY MR. FRIEDMAN: That COATS [Consolidated Options Audit Trail System] data from the SEC, what was that − what was that specifically?

A: COATS data from the SEC.

Q: Yes.

A: There was an analysis done by Mayhew and somebody else, and they had roughly three weeks of consolidated audit trail data from the three exchanges, the AMEX, the Philly and the CBOE.

Q: And that was produced to you from the SEC; is that correct?

A: That was produced from the SEC to me, yes.

Q: Okay.

THE COURT: That was produced to you from the SEC. Do you have any knowledge how they produced that information, what process they used or where it came from, what the source data was?

THE WITNESS: I do have some knowledge. I've read − read some of the – I've read the information on how it was created I guess would be the way to say it, but I don't know the specifics.

THE COURT: *You don't know the answer − you read somewhere that you think you know?*

THE WITNESS: *That is correct.*

*Id.*, pp. 87-90 (emphasis added).

Similarly, it became clear that DeMeritt did not know how the underlying data from the SEC was actually created or the sources it came from.

THE COURT: When you say "that data," what is that data, where does it come from, how is it compiled? How do you know any of that?

THE WITNESS: The data was − came from the SEC. It was created for the SEC by the exchanges.

THE COURT: How do you know that?

THE WITNESS: I've seen documentation that states that.

THE COURT: What documents did you review to understand where and how that information is what it reports to be?

THE WITNESS: It was an SEC report that came with − that came with the data.

THE COURT: You saw a report?

THE WITNESS: Yes.

THE COURT: Okay. And it was a report from who to whom? What kind of report are you talking about?

THE WITNESS: I − it was ...

THE COURT: If you know. I don't want you to guess.

THE WITNESS: I don't know.

*Id.*, pp. 91-92. Further, with regard to the SEC data:

Q: Okay. So what specifically − how was it created? Who created it?

A: The exchanges created it for the SEC, for the SEC investigation.

Q: Okay. And what did − how did they create? What data did they use?

A: Pardon me?

Q: What data did they use to create that spreadsheet? What data did they use to create that spreadsheet?

A: They used their orders data from the exchanges.

Q: Okay. And what is it that they were trying to show in those spreadsheets? What was being portrayed in the spreadsheets that you were matching it to?

A: They were demonstrating orders that the specialist had in the book that they traded ahead on a new customer order that would have − that would have taken the one out of the book.

* * *

THE COURT: *You don't have personal knowledge about what they [the SEC] were thinking and how they were responding. You're just doing that based on what you read in a transcript?*

THE WITNESS: *Correct.*

*Id.*, pp. 96-97 (emphasis added). Similarly,

BY MR. FRIEDMAN: Do you know how the three exchanges, where their data came from and how they prepared it?

A: Their data came from their orders systems.

Q: Okay. And how did they extract that data?

A: By an algorithm that they worked out with the SEC.

Q: Okay.

THE COURT: How do you know any of that?

THE WITNESS: I believe I read it − I read it in a document. I'm not sure which one.

*Id.*, pp. 110-11.

DeMeritt also testified that he did not know what parameters the CBOE used to generate any of the underlying spreadsheets, and he did not know what criteria the SEC used to generate any list of orders, *id.*, p. 128; nor did he know whether the SEC modified or edited any of the spreadsheets it may have received from the Exchanges. *Id.*, p. 141. He did not know what the SEC did with the data it received from the Exchanges. *Id.*, p. 141. DeMeritt further testified that he did not know how the documents reflecting the underlying data from the exchanges' files were actually generated. *Id.*, p. 165. DeMeritt testified that, in creating his own

spreadsheets, he did not look to determine whether another order met all the same specifications as the order Plaintiffs submitted. *Id.*, p. 146. Incredibly, DeMeritt conceded that it was possible that portions of the orders Plaintiffs have characterized as their orders may not even be Plaintiffs' orders. *Id.*, p. 146.

DeMeritt also testified that the length of time it takes an order to get from Last Atlantis to the exchange varies over the course of the day, depending on the type of order, how busy the market is at the time, and "a lot" of other "variables." *Id.*, pp. 160-161. Thus, DeMeritt conceded, assessing best execution using just one time window, without regard to market conditions, could result in a misleading exhibit. *Id.*, p. 161.

After Plaintiffs' counsel indicated that he was done for the day, Defendants asked the Court to resume the hearing the next day, rather than waiting until the day trial was set to begin. Defendants argued that waiting until November 14th would require Defendants to prepare for trial without the benefit of any rulings from the Court. Though not unsympathetic to Defendants' predicament, the Court declined their request:

> [A]s I indicated at the beginning of the hearing, there's been a systemic failure of the plaintiff to meet routine court deadlines and an inability to answer a straight question or give a straight answer to a simple question, but that is what it is. He's entitled to his day in court, and I'm going to give it to him. . . . [R]ight now we don't know what his evidence is because some of it, we don't know whether it's coming in or not, which is why I need to do that before I finish out what you want. There's been multiple opportunities for parties to file summary judgment, and most of that happened before I got on the case. Right now, we're at the eve of trial and a pretrial conference. So that's how we're going to handle it.

*Id.*, p. 247.

Accordingly, the Court held the final pretrial conference, as scheduled, on October 31, 2016.  At that time, Plaintiffs' counsel initially failed to appear, then appeared another 20 minutes late after being given a 90-minute continuance, and arrived still without all of his trial exhibits.  *See* Transcript of Proceedings of 10/21/16 [1613], pp. 3-4.  After another delay, counsel was able to promise the Court that the exhibits would be ready by the end of the day.  *Id.*, pp. 4-6.  Thus, even by the final pretrial conference, the Court had yet to see a complete list of Plaintiffs' trial exhibits.  What's more, during the conference, it became clear that Plaintiffs had again changed the spreadsheet exhibits from the time they were marked as final at the evidentiary hearing as Exhibits 1, 2, and 3.

> THE COURT: Now, with respect to Exhibits 1, 2 and 3, it's your position that that's not the same thing. Well, there's a version − let me ask the defense first, and then I'll give you an opportunity to respond. There's a difference between the − an initial, I think, version of these spreadsheets that was earlier in the litigation. I'll call that version 1. And then there was another version in response to the partial summary judgment motion, and I believe it was described in the 2009 affidavit. I'll call that version 2. And then there was one with changed parameters October of this year. Is that fair to say?

> MR. STERN: Yes. Here, I'll −

> MS. WHEELER: Yeah. I mean, there were two sets of changed parameters in October. If you think of it as − I tend to think of it as the traded ahead, the filled after cancels and the unexecuted orders. The traded aheads were changed with the summary judgment motion.

> THE COURT: And that was the same that was described in the 2009 affidavit or subsequent?

> MS. WHEELER: Oh, they're entirely different than what was in the 2009 affidavit. It's a completely different set.

29

THE COURT: Okay. And what was in the 2009 affidavit is one version, and that was totally changed for response to summary judgment motion. Is that fair to say?

MS. WHEELER: There was a set of orders produced in 2009 in response to an order from Magistrate Keys. Those were found to be inadequate. A second set was produced in 2012. That's what reopened discovery. And then –

THE COURT: And that was used in the litigation on the partial summary judgment motion, that version, version 2?

MS. WHEELER: No, no.

THE COURT: Which version was used for that?

MS. WHEELER: Well, so then there was a third version when they produced their expert reports in I think June of 2014. And then when they filed their motion for summary judgment, a − what are we at − fourth version was produced with a different damages methodology.

THE COURT: And then after the fourth version was the fifth version which changed parameters in October of this year?

MS. WHEELER: Right. That changed parameters to the filled after canceled orders and the unexecuted orders. And those were all changed in those series, too.

THE COURT: And what we have is Exhibits 1, 2 and 3 from the hearing. That's the most up-to-date version, right, the October version?

MS. WHEELER: As far as we know. We got some spreadsheets around 1:30 in the morning last night from Mr. DeMeritt. I assume they're the same, but I haven't had an opportunity to compare.

THE COURT: Have the exhibits changed since the hearing, Exhibits 1, 2 and 3?

MR. FRIEDMAN: No, your Honor.

THE COURT: So what you got − you sent something to them last night?

MR. FRIEDMAN: Just copies of the various spreadsheets. That's all.

THE COURT: And that's the same thing that I have, that I wrote down as 1, 2 and 3?

MR. FRIEDMAN: It's a more demonstrative, nicer version of it with, you know –

THE COURT: So it's changed? It's changed?

MR. FRIEDMAN: The orders haven't changed. The orders that are in the spreadsheets are the same.

THE COURT: That's not my question, Counsel. My question is I marked and wrote down Exhibit 1, 2 and 3. Is that the same exhibit as what you intend to use at trial and what you gave co-counsel last night?

MR. FRIEDMAN: No. We gave those to co-counsel a little while ago. What we gave co-counsel last night was an updated version of the spreadsheets that were used in the summary judgment motion.

THE COURT: Do you have copies of that for me?

MR. FRIEDMAN: Yes.

THE COURT: Can I have them now, please?

MR. FRIEDMAN: They're on a hard drive.

THE COURT: All right. Well, I'll take what you have. It's totally inappropriate based on what happened at the hearing, but at this point I'm trying to bring conclusion to what your evidence is supposed to be. So go ahead and hand whatever you got to my clerk.

MR. FRIEDMAN: I was going to update this when we get the other stuff back from Kinko's.

THE COURT: I'm sorry, are you going to change this again?

MR. FRIEDMAN: No, I was just going to put all – put it all together because there might be some stuff on there that I would take off but...

THE COURT: All right. I'll give it back to you. So you're going to commit to the fact that Exhibits 1, 2 and 3, which we already had an evidentiary hearing on, were already admitted for the purposes of the evidence, that evidentiary hearing, by the way, you're going to commit and hand me like today your version of the Exhibits 1, 2 and 3, whatever the most up-to-date version is, correct?

MR. FRIEDMAN: Yes.

THE COURT: That's the version you seek to admit at trial, right?

MR. FRIEDMAN: Well, they're the same – it's the same orders underlying. It's just ones –

THE COURT: That's not my question. Please.

MR. FRIEDMAN: Okay.

THE COURT: I'm talking about an exhibit, not your underlying data because that's where you keep moving the ball. I want to know what exhibit you intend to admit into evidence. If that's not clear, I don't know how to make that clearer.

MR. FRIEDMAN: Okay.

THE COURT: Will you give me a final version of your exhibit, yes or no?

MR. FRIEDMAN: Yes.

THE COURT: There will be no changes to the exhibit. You won't change the font. You won't change the borders. You won't change anything. I need your exhibit in its final form.

MR. FRIEDMAN: Yes.

THE COURT: Are you able to do that?

MR. FRIEDMAN: Yes.

THE COURT: All right. Now, question. When I get that, that aspirational exhibit, what version is that? Is that the most up-to-date version –

MR. FRIEDMAN: Yes.

THE COURT: – with the parameters from October of this year?

MR. FRIEDMAN: Yes.

THE COURT: Okay.

Transcript of Final Pretrial Conference [1613], pp. 36-41.

Despite not having Plaintiffs' actual exhibits, the Court attempted to move forward with the final pretrial conference to the degree possible. With regard to the parties' motions *in limine*, after Plaintiffs withdrew their motion *in limine* number 1, the Court denied it as moot. The Court took under advisement Plaintiffs' motion *in limine* number 2 (which sought to exclude the testimony of Dr. Stewart Mayhew concerning certain Exchange rules and the calculation of damages), and Defendants' motion *in limine* number 1 (which sought to bar the spreadsheets of relevant orders and would be resolved at the close of the evidentiary hearing scheduled to resume on November 14th). The Court also took under advisement Defendants' motion *in limine* number 2 (which sought to bar Plaintiffs' expert Robert Lowry from testifying). Although the Court declined to rule at the time, it noted that Lowry's opinion was based upon prior outdated versions of the spreadsheets and had nothing to do with the actual exhibits for trial, *i.e.*, Exhibits 1, 2 and 3, or the later versions prepared in the days between the evidentiary hearing on October 27th and the final pretrial conference on October 31st.

THE COURT: Mr. Lowry's opinion is based on the spreadsheets that he looked at the time, correct?

MR. FRIEDMAN: Some of it is, yes.

THE COURT: Well, expert discovery's closed. You're not going to be able to change his opinion. So when did he issue his report?

MR. FRIEDMAN: June of 2014, I believe it is.

THE COURT: Is that your understanding?

MS. WHEELER: Yes, your Honor.

THE COURT: Okay. So his opinion is based on the spreadsheets that were submitted to him June of 2014. Is that fair to say?

MR. FRIEDMAN: Yes.

Transcript of Final Pretrial Conference [1613], p. 72.

Defendants' third, fourth, fifth and sixth motions *in limine* were also taken under advisement (seeking, respectively, to bar evidence about regulatory settlements; to bar use of a draft non-public AMEX report; to preclude certain opinion testimony of Plaintiffs' damages expert; and to bar reinstatement of Plaintiffs' breach of contract claim). The Court granted as agreed Defendants' seventh motion *in limine* (which sought to bar evidence of orders submitted to the Pacific Stock Exchange or to the CBOE in 2006 or thereafter).

At the close of the final pretrial conference, the Court instructed the parties as follows:

THE COURT: All right. I indicated this before, but let me make it really clear. All parties must submit any and all exhibits including demonstrative or summary by 4:00 p.m. today, and there will be no supplements or alterations to the exhibits. If it needs to be a hard copy or a flash drive, that's up to you. But it's got to be at chambers at 4:00 p.m., not 4:01. If it's 4:01, it's excluded at trial.

MR. FRIEDMAN: Your Honor, I was just going to ask could we have till 5:00? Because I have to go to Kinko's and get the rest of the stuff.

THE COURT: All right. I'll give you till 5:00.

MR. FRIEDMAN: Thank you.

THE COURT: Another continuance, there you go. All right. And that goes for both sides. 5:00 p.m. today, get it to me. So I know you guys had some demonstrative exhibits and some other ones. So to the degree you have exhibits that are different than pretrial order, just go ahead and put everything on your flash drive, whatever you're going to send. If it's an exhibit you want to use at trial, put it on the flash drive, okay?

MS. WHEELER: So you're talking all exhibits –

THE COURT: Everything.

MS. WHEELER: – including the ones that we've provided hard copies of?

THE COURT: Yes, everything. If you've got it – if it's this, you can make reference to it, say if it's the actual exhibit as opposed to some version of it. I want to have a closed universe of what's going to be an exhibit, whether it's a regular exhibit or demonstrative exhibit or summary exhibit. Whatever it is, I got to have a closed universe. And I want it on both sides. And it's mainly because the exhibits keep changing, and it's creating issues in terms of people being able to articulate objections to things. . . . The binders you submitted are part of your universe. Don't worry about resubmitting any of those binders that you've just put on the record. That's part of it. And just what you've articulated is fine. If you could submit the additions to what I'll call the post-binder exhibits, go ahead and do that, and then that will be in compliance with what my request was. And then counsel's going to – I have one binder, Counsel, from you. It says plaintiffs' trial exhibits and it's written in hand 121-199.

MR. FRIEDMAN: That was just the one we filed recently, but there were other ones with the pretrial order.

THE COURT: So I'm going to assume I have – anything I've gotten from you is a prior draft, and you're going to give me a flash drive or a hard copy of everything by 5:00 p.m. today, right?

MR. FRIEDMAN: Okay. Can I have those back then?

THE COURT: Yes, you can have this back.

MR. FRIEDMAN: So I can see what's what?

THE COURT: Yeah, go ahead.

MR. FRIEDMAN: There was another couple binders as well.

THE COURT: No, there's only one. But it doesn't matter because what you're going to do is resubmit everything. Because right now I have no idea what your exhibits are. So, Counsel, please listen to me. By close of business today 5:00 p.m., you will submit a hard copy or a flash copy of each and every exhibit you intend to admit, whether you've given it to me before. And do not incorporate by reference anything else you've submitted. It must be the actual hard copy or the flash drive of everything you want as an exhibit. Anything you don't submit will be summarily excluded from evidence, okay?

MR. FRIEDMAN: That's fine.

THE COURT: All right. Yes.

MR. RETTBERG: Your Honor, will we be provided a copy of anything that he submits to the Court?

THE COURT: You need to also provide a copy of whatever you provided the Court to opposing counsel, all right, so he knows the universe it is, to the degree it's changed from anything you've given him before.

*Id.*, p. 142-146. Despite this clear admonition, Plaintiffs failed to provide copies of all exhibits to Defendants. *See* [1614]. And some of the exhibits provided to the Court were not marked, making it difficult, even at this late juncture, to pin down exactly what exhibits Plaintiff planned to use at trial.

On November 14, 2016, this Court reconvened the evidentiary hearing. At that time, Plaintiffs' counsel indicated that he would offer the testimony of Robert Lowry and Roy Freedman, as well as additional testimony from Robert DeMeritt.

36

Transcript of Proceedings of 11/14/16 [1624], pp. 261-62. Although counsel previously indicated that he also wanted to call Paul Picchietti as a witness, [1610], p. 19, he later chose not to do so at the hearing.

Before calling Lowry to the stand, Plaintiffs' counsel suggested that he would lay the foundation for the underlying spreadsheets as public records. Counsel showed Lowry exhibits marked as 11A, 11B, and 11C; Lowry initially testified that these spreadsheets constituted "data that was produced in a proceeding, an investigation. And these were matched with – this is a subset of that data that only includes plaintiffs' transactions." Transcript of Proceedings of 11/14/16 [1624], p. 274. Counsel then showed the witness Exhibit 12, which consisted of three separate spreadsheets; Lowry testified that these were "data that was provided to the SEC by the exchanges pursuant to an investigation." *Id.* Ostensibly, these exhibits would constitute at least part of the datasets from which DeMeritt's spreadsheets (Exhibits 1, 2 and 3) were derived, yet Lowry could not later lay a sufficient foundation for any of Plaintiffs' exhibits.

Lowry testified that any information he had concerning the spreadsheets DeMeritt created was based on what other people told him; he did not actually create or test any of the information or data in the spreadsheets, and he was not a participant when the spreadsheets were created or tested. *Id.*, pp. 281-282. With regard to the underlying datasets, Lowry similarly had no personal knowledge. He testified that Exhibit 14 was "a report that was part of a – was provided to the SEC

as part of a review of Susquehanna transactions and – starting in January 2003 and going through the end of the year." *Id.*, at 292.

Q: Are these orders at a particular exchange?

A: Yes, sir. They're at the PHLX, Philadelphia Stock Exchange.

Q: Okay. And do you know whether they were prepared by members of the regulation staff at the Philadelphia Stock Exchange?

A: I can't − I don't know who provided it, but it would be under the normal course of business when the SEC would ask for documents that the Philadelphia Stock Exchange would provide the documents to the SEC.

THE COURT: *But you don't have personal knowledge, correct?*

THE WITNESS: *No, not for this particular document.*

THE COURT: All right. Thank you.

BY MR. FRIEDMAN: And do you know whether this spreadsheet, though, was produced in the litigation?

\* \* \*

A: Yes, it was produced.

Q: Okay. And do you know whether it was produced pursuant to a request or a Court order?

THE COURT: Do you have any personal knowledge of how it was produced in the litigation or did someone tell you?

THE WITNESS: Other than somebody told me.

THE COURT: Okay. Someone told you. Ask your next question.

*Id.* at 292-93 (emphasis added).

On cross examination, Lowry further admitted that he did not actually know how the SEC prepared the schedule of orders relating to Susquehanna. *Id.*, p. 298.

Nor did he know how the exchanges prepared the data they provided to the SEC in connection with the traded ahead investigation. *Id.* at 299. He testified that he was told how the information was screened and conceded that he did not even look at underlying data – meaning the information that was in the spreadsheets. *Id.*, p. 301. Lowry also admitted he had no idea how Exhibit 12 was prepared; he testified that it was his understanding that Exhibit 12 constituted data from the SEC, but he did not believe it was an SEC document. *Id.*, p. 309. Lowry specifically testified that he did not know how Exhibit 15 was prepared, and conceded that he never reviewed any of the data underlying Exhibit 15. *Id.*, p. 311. Similarly, Lowry testified that he did not create Exhibit 14 and did not know how it was created. *Id.* at 312. Lowry testified that he "understood" Exhibits 11, 12, 13 and 14 to be summary exhibits that were created from some underlying data somewhere else; that Exhibit 15 was not a summary but was the underlying data in an excel format; and that he thought Exhibit 15 constituted exchange data because that is what DeMeritt told him. *Id.*, pp. 215-16. Lowry further testified that he could not attest to the accuracy of Exhibits 11, 12, 14 or 15. *Id.*, p. 318.

When discussing how Plaintiffs created their exhibits, Lowry testified "I know they used − I know they relied on the OPRA [Options Price Reporting Authority] data. They did use the exchange data to validate or verify their − their methodology, but they did not use it as the primary source." *Id.*, p. 321-22. The Court followed up on the issue:

> THE COURT: And when you say you know, that's what they told you? You think they used OPRA or specific pieces of audit trail data based

on what someone told you that they relied on. You didn't look at the underlying OPRA or audit trail data, did you, in its raw form?

THE WITNESS: That would be the only way that – OPRA would be the only way you could tell whether there was –

THE COURT: My question to you, did you look at the raw OPRA and/or audit trail data, yes or no?

THE WITNESS: No.

THE COURT: Okay. Ask your next question.

*Id.* at 322.

Plaintiffs' counsel then called Roy Freedman to the stand, explaining that, although Freedman was designated as a rebuttal expert for trial, Plaintiffs planned to call him at the evidentiary hearing "to essentially authenticate the underlying – the underlying data that was used in terms of the way we identified the orders and his familiarity with the orders, his knowledge of the manner that they're kept, the use of the orders, the use of the orders data, how it's maintained, the OPRA data, that sort of thing." *Id* at 381. Given the purpose of the evidentiary hearing, this Court sought to clarify counsel's proffer:

THE COURT: So at a trial, for example tomorrow, you would not be calling him as a rebuttal expert, but as a witness that would lay the foundation for the critical orders?

MR. FRIEDMAN: He would also be testifying later on as a rebuttal expert to their challenges to the methodology that were used.

THE COURT: That wasn't my question. Listen to my question. Answer my question. Would he or would he not be the evidentiary basis for the foundation for the admissibility of Plaintiffs' Exhibit 1 through 15? Because I understand there's a whole host of exhibits that you've proposed as trial exhibits, but I've identified an issue with the case and have asked you to present for the purposes of this hearing the

necessary information regarding the foundation for the orders, which is the predicate for the entire case. And you've already rightfully so acknowledged previously in front of the Court that in the absence of the exhibits that are the subject of this hearing that there is no case as to any of those claims that have been brought in the complaint. The entire case depends on the admissibility of the exhibits that have been identified and will be identified in this evidentiary hearing. So −

MR. FRIEDMAN: We've also −

THE COURT: I'm asking you, is this person − for the purposes of trial, do you anticipate this person laying the foundation, the necessary foundation for any of the exhibits that are the subject of this hearing, or is he simply a rebuttal expert, which is a different issue? It might be a very important issue, but it's not the same issue.

MR. FRIEDMAN: No, he will be involved in the foundation as well.

* * *

THE COURT: Does he have any non-expert testimony to give, or is it all 702?

MR. FRIEDMAN: Well, his personal experience with the knowledge of the data, working with the data.

THE COURT: He has personal knowledge and can lay the foundation for the exhibits not as a 702 witness?

MR. FRIEDMAN: Yeah. He understands how − he understands how the data was created, the systems − he's a qualified person to testify with respect to how the exchanges recorded their data −

THE COURT: Let me ask the question again. Is he going to give lay testimony − not expert testimony, lay testimony − regarding facts of personal knowledge and lay opinions appropriately admitted under 701 as to the exhibits that you intend to admit in this hearing, yes or no?

MR. FRIEDMAN: I think it would be more expert testimony.

THE COURT: He's going to give expert testimony.

MR. FRIEDMAN: Because he understands − he has the knowledge of how the exchanges record their data, how it's − how it's − and he works with the data.

THE COURT: Is he going to − so let me pin you down because it's very difficult to do so, and it's important that you talk with precision. Your proposal is that his testimony for the purposes of this hearing − which I've articulated ad nauseum what the purposes are here. Your proposal is that he's not giving any opinion beyond 702 opinions. It's all going to be expert testimony, correct? Yes or no?

MR. FRIEDMAN: Well, he works – it's hard for me to say. He works with the data.

THE COURT: Counsel, it's not difficult. Is he going to give only expert testimony or is he going to give fact testimony and expert testimony? That's not a complicated question, and I want an answer to it.

MR. FRIEDMAN: Fact and expert testimony.

THE COURT: Okay. As to the expert testimony of his opinion, do you anticipate him going beyond anything that you've already disclosed? Because that wouldn't be admissible at trial and would be irrelevant in this hearing. So if he's going to give, as to the expert testimony, something other than what['s] . . . been previously disclosed, that wouldn't be useful in the hearing. So what I don't want is non-disclosed expert testimony that would be excludable at trial because then it would not really be relevant here, because it's not anything you could use at trial. So if you want to give his 702 opinions, which would only be rebuttal, that also wouldn't be useful here, or I'm happy to hear if you can proffer a basis why that would be useful. Or simply having him testify as to expert − or excuse me, fact testimony, that would be something different.

MR. FRIEDMAN: No, there will be expert, but it was disclosed in terms of defendants did, in fact – they petitioned the Court because he did wear two hats throughout the litigation. And so −

THE COURT: All right. Well, let me propose this then. Why don't you do his fact testimony first and only his fact testimony, and then we can loop back and get in whatever 702 opinions you want to.

MR. FRIEDMAN: It's kind of merged together, but okay.

* * *

THE COURT: I know, and that's one of the reasons you've got difficulties with your evidentiary foundations because you're not identifying the difference between what the appropriate testimony is to lay the appropriate foundations for things. But at this point all I want to hear is what his factual testimony is regarding any and all exhibits that you think are necessary for this evidentiary hearing. So when we're done with the fact part, you let me know, and then I'm happy to have you present whatever expert testimony you think is appropriate. And if it's disclosed or not disclosed, I'll hear whatever arguments the other side has to say. But at this point let's do the fact stuff first and then you can get into the other stuff. Okay. Go ahead.

MR. FRIEDMAN: I'll try to keep it to the facts, but like I said, it might be a little bit merged together.

THE COURT: Well, I won't let it. Because for the purposes of an evidentiary hearing, it's a lot like trial, you have to get an exhibit in before you can start publishing it to the jury. And if you're going to have an expert opinion, it has to be disclosed. And you can't get the admissibility of the exhibits with solely expert testimony. You need more than that for these exhibits. So you can – you're professional enough to know the difference between a fact question and an expert question. So you go ahead and do the fact ones first.

*Id.*, pp. 331-36.

At the hearing, Dr. Freedman testified that he is employed by Inductive Solutions and serves as an adjunct professor in NYU's department of finance and risk engineering; he testified that Plaintiffs retained him in this case "to help the plaintiff acquire different datasets, in particular order audit trail data from different options exchanges and try to advise on how some of the data would be analyzed consistent with surveillance, market surveillance methods." *Id.*, pp. 337-38. Freedman testified that, in conjunction with his work on this case, he reviewed audit trail data, which he described as "an attempt to identify the who, the what,

43

the where, the when, the why and the how associated with a particular order that is sent to a financial exchange." *Id.*, p. 340. Concerning the relevant underlying data, Freedman testified as follows:

> Q: And what − can you just set for the Court the various forms of audit trail data that you reviewed, the types.
>
> A: The various forms of audit trail data for this – for this −
>
> Q: That you reviewed in conjunction with Mr. DeMeritt''s preparation of the spreadsheets that we were referring −
>
> A: Oh, okay. The forms of audit data would consist of actual orders maintained by exchanges, by exchange systems and archived in data warehouses as well as order audit trail data available by law from the consolidated order audit trail system. That's COATS for short. . . . .
> In addition to COATS, there were other − other files of orders that were sent by different exchanges.
>
> Q: And in addition to the COATS data, was there − did you review any internal exchange orders audit trail data?
>
> A: Yes, that's what I meant.
>
> Q: Okay. And from what exchanges did you look at that orders data?
>
> A: The particular exchanges, Chicago CBOE, Philadelphia, Pacific and AMEX.
>
> Q: Okay. So you're confident then that the data that you reviewed is, in fact, the audit trail data that was produced by the exchanges pursuant to the subpoenas?
>
> A: Yes.

Transcript of Proceedings of 11/14/16 [1624], pp. 340-42, 345. The "fact questioning" continued:

> Q: And so is it your − having reviewed the data, would it be your opinion then that this was the data that is regularly generated by the exchanges?

44

A: Yes.

Q: Okay. And did you perform any specific tests or analyses on the methodology that – I think I might be veering into expert stuff now.

THE COURT: He hasn't talked about a single exhibit. So do you have any fact testimony about any exhibit that plaintiff can mark as anywhere between Plaintiffs' 1 through 15 or a different number?

MR. FRIEDMAN: Okay. I guess –

THE COURT: You talked generically about data, which is not useful either, because we're talking about the admission of exhibits.

MR. FRIEDMAN: Okay.

THE COURT: And you didn't show or ask him any questions about exhibits. And whether or not he's referring to data that's reflected in the spreadsheet or in some raw computer printout is totally unclear and insufficient to lay the foundation for anything.

MR. FRIEDMAN: Okay.

THE COURT: So right now if you want to say you're done with the fact testimony, I'm happy to go on to expert testimony, but that's going to be your choice. What do you want to do?

MR. FRIEDMAN: Let's go to the exhibits then. Let me show you the spreadsheet exhibits that we've produced in the litigation and ask you some factual questions with respect to that. So are those them over there?

THE COURT: You have the exhibit, Counsel. I have my exhibits.

BY MR. FRIEDMAN: I'm going to show you what's been previously marked I believe it's 12A, B and C, which are the spreadsheet exhibits. At the bottom it says 3A Susquehanna SIG-PHLX. Exhibit 3B, Susquehanna SIG-CBOE, and then the last one is at AMEX. (Exhibits tendered to the witness.) Did you review and take a look at the actual algorithms by which the plaintiffs matched their orders to the spreadsheets that were produced by the – by defendant Susquehanna with respect to the spreadsheets that were prepared by the PHLX, the CBOE and the AMEX?

A: The plaintiffs' algorithms?

Q: The algorithms that matched the orders.

A: Yeah, yes.

Q: Okay. And is it your understanding of − can you just explain for the Court your understanding of how the orders were matched?

A: Basically the way orders are matched is you look − you try to − you establish certain identifiers, certain field names in the database that would provide a unique identification for a particular order in two files. So since you – again, it's matching the who, what, where and most crucially, the when the order was sent in.

Q: Okay. And did you perform any tests using the orders audit trail data to determine how long it was taking between the time that the – in the plaintiffs' records between the time that the orders were sent and the times that the orders were being received at the exchanges?

A: Yes, an analysis like that was done.

*Id.*, pp. 345-348. Despite this Court's admonishment to make a specific inquiry regarding the foundation of the actual exhibits he intended to offer at trial, counsel tendered copies of exhibits to Freedman, but then failed to actually question him about the individual foundation for any marked exhibit.

Q: What's your understanding of what's being shown in these spreadsheets? Take a look at them.

A: Again, it's specialist – it's a list of the specialist − specialist traded ahead priority-violated order. I'm just reading that − reading the headings.

Q: Okay. But are there categories that were taken from the plaintiffs' audit trail data that were not in the spreadsheets that were produced by the exchanges?

A: Well, I guess there's the impact, you know, some fields like that.

\* \* \*

Q: Have you reviewed the data that was produced by plaintiff, Last Atlantis?

A: Yes.

Q: Okay. And did you also review −

THE COURT: When you say "the data" −

MR. FRIEDMAN: The −

THE COURT: − you have to explain what that is and maybe show it to him, at least identify it for the record. Because it's totally unclear whether that refers to a spreadsheet, a summary, raw data that's produced from any party in this case or a non-party. And it's utterly insufficient to lay the foundation for the necessary exhibits for your trial, which may or may not occur. So I don't know how [much] clearer I can be. You need to ask a question that lays the foundation for the exhibits. And I've given you more than a day and a half now, and I'm waiting, still waiting.

*Id.*, pp. 352-53. When counsel still failed to ask the necessary foundational questions, the Court attempted to facilitate the process:

Q: Did you review the spreadsheets that came from the defendant Susquehanna in litigation from the Philadelphia Stock Exchange, the AMEX and the CBOE?

THE COURT: All right. That was asked before, and again, you're not showing him anything that he can identify –

MR. FRIEDMAN: Because they're underlying data compilations. I don't have it in front of me here, your Honor, but it's summaries of a very large amount of data that came forward. And so we don't have a copy of it, but he's reviewed it, and it was produced by the defendant and they have copies of it and it's –

THE COURT: Well, I'm going to give you an opportunity to confer with opposing counsel, and if you guys can determine some manner in which we can properly identify whatever you're referring to, then I'll allow the question. But simply referring to "spreadsheet" is insufficient

in light of what's in front of me. So go ahead and I'll give you an opportunity to discuss with opposing counsel if there can be some − if there is − and I don't know that there is −

MR. FRIEDMAN: And I have a list −

THE COURT: − some agreement about what you're referring to, that's great. But asking a question about, hey, did you look at a spreadsheet, that's a meaningless question, certainly as we are now in I believe hour nine or ten of the evidentiary hearing.  Let me ask opposing counsel do you know what he's  referring to?

MR. STERN: No, I do not, your Honor.

THE COURT: Okay. I didn't think so.

* * *

MR. FRIEDMAN: I have the list of it somewhere. I've just got to find it here.

[long break occurred while counsel searched his files in court]

THE COURT: The record should reflect counsel is going through his papers again. Counsel, do you want to finish the fact testimony as to anything else and then come back to this? Us sitting here watching you go through papers again is a waste of the Court's time and opposing counsel's time.  The fact that you're not prepared for the hearing is telling, and I'm glad it's not happening in front of a jury of 14 people. Do you want to ask the rest of your factual Q&A −

MR. FRIEDMAN: Yes, your Honor.

THE COURT: − and then come back to this and then you can locate your exhibit? Go ahead.

MR. FRIEDMAN: I've actually located it.

THE COURT: Oh, great.

MR. FRIEDMAN: Okay. That's not it, never mind.

THE COURT: Why don't you ask whatever other areas of inquiry you have with respect to the factual testimony of this witness, and then

we'll loop back and we can address whatever additional questions you need in this area, unless you're done with his factual questions and this is the last one.

MR. FRIEDMAN: I think I have just one more.

THE COURT: Are you ready to proceed, Counsel?

MR. FRIEDMAN: Yes, I am.

THE COURT: Okay. Please do. Ask a question.

BY MR. FRIEDMAN: And so when you reviewed the patents, okay, of the various exchanges' order systems, order retrieval and execution systems, okay, the data that was produced from those − those − in this litigation, did that − well, never mind. Actually I'm done with the fact questions.

THE COURT: Okay. Now, do you want to spend some time trying to find the exhibit you were looking for?

MR. FRIEDMAN: Yes, I would.

THE COURT: Go ahead. Start looking for it.

*Id.*, pp. 362-65. Later, counsel then attempted to question the witness about Exhibit 17, which was a list of file names. Because Plaintiffs' counsel failed to offer or otherwise explain the source of the underlying files, however, the Court sought to clarify the testimony:

THE COURT: Do you have a specific recollection as to any of the data sources listed in Plaintiffs' Exhibit 17?

THE WITNESS: I remember reviewing a lot of data, but again, particular file − file names, again it's −

THE COURT: Okay. So as you sit here today, are you able to say that any of the particular files listed in Plaintiffs' Exhibit 17 was something that you actually looked at and compared it to Plaintiffs' Exhibit 12, yes or no?

MR. FRIEDMAN: So take a careful look at the –

THE COURT: I already posed the question, Counsel. My question is pending now, so be silent.

THE WITNESS: Table definitions for sure I would look at.

THE COURT: Okay. Anything other than that that you have a memory to say as you sit here under oath Plaintiffs' Exhibit 17 has this particular database or this particular database that I actually looked at and compared to Plaintiffs' Exhibit 12?

THE WITNESS: Yes.

THE COURT: Which ones?

THE WITNESS: Oh, no. I'm saying I looked at a sample of these. I mean, I may not have looked at every single spreadsheet.

THE COURT: Do you know which portions of the data that's listed in 17, Plaintiffs' Exhibit 17 that you reviewed?

THE WITNESS: I don't – I don't recall the names of – the file names exactly.

THE COURT: All right. What do you recall?

THE WITNESS: As a part of any review, I recall looking at – looking at a sample.

THE COURT: Sample of what?

THE WITNESS: Looking at a sample of the – of files. Again, if I'm asked –

THE COURT: See, this is my question. I need to know what you looked at, and I don't have any sense from what you're telling me that you remember what you looked at and then compared to Plaintiffs' Exhibit 12.  There's a bunch of files listed on 17, but I need to know what you looked at. And if you don't remember the file name, that's fine. But I have no sense of what you looked at that's listed or not listed in 17 and compared to Plaintiffs' Exhibit 12.  And if you don't remember, that's okay. I just need to know what you remember. Do you remember what you looked at and compared it to Plaintiffs' Exhibit 12?

THE WITNESS: I'm getting confused with all the numbers here. It's, again, some of these are compressed .ZIP files. I don't remember the exact file names.

THE COURT: And I already addressed that. I don't care if you remember exact file name. I want to know if you can tell me under oath what files you looked at to compare to Plaintiffs' Exhibit 12.

THE WITNESS: I remember − I remember looking at files from − or data from the SEC investigations with the − with SIG.

THE COURT: All right. Do you have any other information to make that more specific, or is that the level of specificity that you have sitting here today?

THE WITNESS: I remember looking at the − looking at data and yeah and probably, yes.

THE COURT: All right. So the answer to the question is yes, that's the level of specificity that you have in terms of what you looked at, right?

THE WITNESS: At this point, yeah.

THE COURT: Okay.

*Id.*, pp. 372-75.

Following Dr. Freedman, Plaintiffs' counsel recalled Robert DeMeritt to the stand. This time, DeMeritt testified that he received certain data directly from the CBOE's counsel, *id.*, p. 410, and personally received certain data from the PHLX. *Id.*, pp. 413, 451. He also testified that certain SEC data was produced pursuant to court order. *Id.*, p. 421. On cross-examination, however, he testified that he had no idea how the data was compiled or generated, except that he had read some "document" supposedly explaining the reasoning behind such compilations.

DeMeritt also admitted that he had no idea whether the unidentified document was actually generated in connection with the specific data at issue. *Id.*, pp. 459-460.

With that, Plaintiffs' counsel indicated that he had no further evidence concerning the admissibility of the spreadsheet exhibits. The Court indicated that it would not proceed with the trial until after it ruled on the admissibility of these exhibits, which Plaintiffs admitted were the sine qua non of their claims. Accordingly, the Court vacated the trial date and indicated that it would set additional dates as needed after issuing this decision.

Discussion

Although the case has been pared down substantially from its inception 13 years ago, numerous motions remain pending, most notably, the pretrial motions relating to the admissibility of Plaintiffs' key trial exhibits. The question concerning the admissibility of Plaintiffs' proposed trial exhibits was also raised by the Court *sua sponte,* consistent with its obligations under Federal Rule of Evidence 104(a). The parties' summary judgment motions also remain pending, as do the parties' motions *in limine* and several other trial-related motions. Because the question of the admissibility of Plaintiffs' trial exhibits is dispositive, the Court considers it first.

A.    The "Relevant Orders" Spreadsheet Exhibits

The lists of orders are really the crux of Plaintiffs' case. Not surprisingly then, the question of their admissibility and their import comes up in several of the pending motions, including the parties' summary judgment motions and the parties'

motions *in limine*. The Court, on its own, raised the issue with Plaintiffs as part of its obligation under Rule 104(a) to ensure the admissibility of all proposed evidence. The lists of orders are also the subject of several other motions filed by the parties. Given the extent of motion practice concerning the lists of orders, and given Plaintiffs' repeated concession that they cannot prove any of their asserted claims without these exhibits, the Court found it troubling that, just weeks before the case was set to be tried, Plaintiffs still did not have a clear path for admitting those exhibits at trial. Indeed, as should be clear from the above chronology, the Court has had a devil of a time even determining which exact documents Plaintiffs planned to offer at trial to prove their claims, a necessary predicate to assessing the admissibility of those exhibits. After taking time to fully consider the issue, and after giving Plaintiffs every opportunity to establish an evidentiary foundation for the lists of orders, the Court finds that Plaintiffs lack a sufficient foundation for the admission at trial of the spreadsheet exhibits introduced at the evidentiary hearing – notably, Exhibits 1, 2, and 3 (which were created by DeMeritt and purport to represent orders that were submitted by Plaintiffs and mishandled by Defendants), and Exhibits 11 and 12 (which purportedly consist of at least some of the data underlying DeMeritt's spreadsheets).

Federal Rule of Evidence 104 requires this Court to decide any preliminary questions about whether a witness is qualified to testify or whether evidence is admissible. Unless otherwise precluded by rule or law, relevant evidence is generally admissible; irrelevant evidence is not admissible. Fed. R. Evid. 402.

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.  Even relevant evidence may be excluded, however, "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

Within the context of Rule 403, "unfair prejudice" is "an undue tendency" to suggest a decision on an "improper" basis. *Thompson v. City of Chicago*, 722 F.3d 963, 971 (7th Cir. 2013) (citing Fed. R. Evid. 403 advisory committee's notes on 1972 Proposed Rules; *Old Chief v. United States*, 519 U.S. 172, 184-85 (1997)).  The amount of prejudice that is "acceptable varies according to the amount of probative value the evidence possesses. '[T]he more probative the evidence, the more the court will tolerate some risk of prejudice, while less probative evidence will be received only if the risk of prejudice is more remote.'" *Thompson*, 722 F.3d at 971 (quoting *United States v. Boros*, 668 F.3d 901, 909 (7th Cir. 2012); *United States v. Vargas*, 552 F.3d 550, 557 (7th Cir. 2008)).

To be sure, producing an admissible list of relevant orders remains crucial to Plaintiffs' case, and Plaintiffs conceded on numerous occasions that they could not prove their claims without doing so.[5]  That need by itself, however, is not enough.

---

[5] In conducting the requisite Rule 403 analysis, this Court, of course, has considered the proponent's need for the proffered evidence.  *See* Fed. R. Evid. 403 (Advisory Committee Notes stating that situations "in this area call for balancing the probative value of and need for the evidence against the harm likely to result from its admission."); *United States v. Jackson*, 886 F.2d 838, 847 (7th Cir.

Plaintiffs are still required to demonstrate that the actual evidence they do produce possesses probative value not substantially outweighed by a danger of unfair prejudice. And here, Plaintiffs have simply failed to make the requisite showing.

The probative value (and indeed relevance) of DeMeritt's spreadsheets (Ehibits 1, 2, and 3), depends upon the extent to which these exhibits actually demonstrate or tend to prove the mishandling of orders. Yet no witness was able to say that the spreadsheets actually showed mishandled orders. Likewise, no one testified about any factor relevant to the analysis implicated by a claim that orders were mishandled, other than time, which by itself would not be enough to show mishandling. *See Kurz v. Fid. Mgmt. & Research Co.*, 556 F.3d 639, 640 (7th Cir. 2009) ("best execution" means "getting the optimal combination of price, speed, and liquidity for a securities trade") (citing Jonathan R. Macey & Maureen O'Hara, The Law and Economics of Best Execution, 6 J. Financial Intermediation 188 (1997)); *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 135 F.3d 266, 270 n.2 (3d Cir. 1998) ( "[o]ther terms in addition to price are also relevant to best execution": account order size, trading characteristics of the security, speed of execution, clearing costs, and the cost and difficult of executing an order in a particular

---

1989) ("[I]n the absence of the handwriting exemplars, the admission of the evidence of refusal is critical because there appears to be no alternative means of proof with regard to an essential element of the government's case. While prosecutorial need alone does not mean probative value outweighs prejudice, the more essential the evidence, the greater its probative value, and the less likely that a trial court should order the evidence excluded."); *United States v. Patrick*, 513 F. App'x 882, 887 (11th Cir. 2013); *United States v. Stout*, 509 F.3d 796, 804 (6th Cir. 2007); *United States v. King*, 713 F.2d 627, 632 (11th Cir. 1983) ("The government has no case without [the disputed evidence]. In this instance the probative value is as high as it possibility could be."). Nevertheless, bare assertions of need alone do not trump the rest of the inquiry under Rule 403. In the end, the proffered evidence must, in fact, show what the proponent said it would, and here, among other defects, the Plaintiffs unfulfilled promises about what evidence they have, and what that evidence can show, fail to clear the Rule 403 hurdle.

market"); Payment for Order Flow, S.E.C. Release No. 33026 (Oct. 6, 1993) (brokers' duty to obtain the best execution requires consideration of factors including, among other things, the size of the order, the trading characteristics of the security involved, the availability of accurate information affecting choices as to the most favorable market in which execution might be sought, the availability of technological aids to process such data, the availability of economic access to the various market centers and the costs and difficulty associated with achieving an execution in a particular market center).

The Court devoted two days and more than 15 hours to allowing Plaintiffs to lay a foundation for the lists of orders, and yet no witness ever competently testified that the lists of orders demonstrated any failure on the part of any Defendant to provide "best execution" – indeed, no witness was ever able to say that the orders were actually mishandled. DeMeritt testified concerning the time parameters he used to match his orders to the allegedly mishandled orders. But even he conceded that factors other than time had to be considered before an order could be said to be mishandled. Raising additional dangers of unfair prejudice and misleading of the jury under Rule 402, DeMeritt also admitted that the lists likely included orders that were not actually mishandled and likely included orders that were not even initiated by any Plaintiff in this case. Similarly, his testimony makes clear that the criteria he used to supposedly match orders did not address requisite factors regarding any alleged failure of best execution.

Moreover, even if Plaintiffs could establish the relevance or Rule 403 admissibility of the spreadsheets (Exhibits 1, 2 and 3), which they have failed to do, the Plaintiffs further failed to lay an evidentiary foundation for the underlying data from which those summary spreadsheet exhibits were purportedly created. Federal Rule of Evidence 901 provides that, "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Plaintiffs failed to present any witness with any first-hand knowledge of the source of underlying data. Plaintiffs consistently failed to recognize the distinction between the underlying data sources and the derivative spreadsheets created by DeMeritt, and never offered a witness to testify concerning the authenticity or non-hearsay predicates of that underlying data itself. Plaintiffs apparently believed they could publish to the jury unauthenticated documents full of hearsay purportedly suggesting the mishandling of orders, and then hope that the jury would find, without a sound factual basis, that those orders were actually submitted by Plaintiffs and indeed mishandled by Defendants. The Rules of Evidence preclude such a trial-by-conjecture strategy.

After 13 years of litigation, this Court can indulge Plaintiffs no longer. At the outset, Magistrate Judge Keys almost dismissed this case when it appeared that Plaintiffs had no real proof of their allegations and were attempting to litigate based on hunches and conjecture. Plaintiffs survived numerous challenges before discovery concluded, mostly by making promises of what they "could show" and

what they "would produce" in the future. At this point, however, there is no future, and Plaintiffs' proof problems are fatal.

On October 13, 2016, the Court warned Plaintiffs' counsel that, based upon his inadequate certification and the purported evidence proffered to date, the Court would sustain an evidentiary objection to the admissibility of Plaintiffs' "relevant orders" lists in the absence of a proper foundation. The Court further advised that "Plaintiffs' persistent attempts to characterize these orders as 'relevant' despite the lack of evidence demonstrating such relevance (or indeed their admissibility under 403)," warranted further attention on a pretrial basis. The Court set the matter for the evidentiary hearing discussed above. In the interim, Plaintiffs could have attempted to obtain certifications from exchange witnesses, designated deposition testimony from such witnesses or simply subpoenaed a proper witness to potentially lay a foundation for any requisite lists and data, i.e., the alleged proof that they have been promising to produce for more than a decade. They did none of those things.

It is undisputed that DeMeritt was solely responsible for creating the spreadsheets identified as Exhibits 1, 2, and 3. As is clear from his testimony, however, DeMeritt knew little or nothing about the underlying data from which his spreadsheets were created. In essence, he was handed some underlying data and told that it reflected orders that were "traded ahead" or otherwise mishandled, and then he devised a method to determine which of those orders on those spreadsheets might (and this Court emphasizes *might*) have been submitted by Plaintiffs. As a

result, DeMeritt's spreadsheets are only as good as the underlying data – and Plaintiffs did not offer a single witness to establish the authenticity, reliability or admissibility of that data. Neither DeMeritt, nor Lowry, nor Freedman knew anything about how the underlying data was compiled or generated. In short, no witness has ever testified in this case as to the authenticity or reliability of the data upon which DeMeritt's spreadsheets are purportedly based.

Additionally, DeMeritt's testimony makes clear that the algorithm or methodology he used to create his spreadsheets undermines their reliability and admissibility under Rule 403. He testified that his algorithm did not account for crossed markets or fast markets and may not have excluded orders that, by all accounts, likely received best execution. The spreadsheets, which Plaintiffs consistently attempt to characterize as summaries, are based upon data and information that Plaintiffs cannot, in turn, authenticate or explain. The Court crystallized the issue for counsel at the evidentiary hearing:

> THE COURT: None of these exhibits are going to be admissible unless the underlying data has a basis of admissibility, or the source of where this information comes from is going to be otherwise admissible under the rules of evidence. Right now, you've got multiple sources of data, and I'm trying to see if you can lay the foundation for it. So I want you to go through each type of plaintiffs' data and ask this witness, if he knows, the questions that would lay the foundation for the source data.

> MR. FRIEDMAN: I was just going to say, your Honor, there's no objection to the admission of the underlying source data. The defendants have identified it as an exhibit and so have we, the underlying.

> THE COURT: At this point none of that's in evidence which is the whole purpose –

MR. FRIEDMAN: It will be, though.

THE COURT: Well, this is what I want you to get at. Right now, none of this is in evidence. We've been sitting here for a long time, and it's still not in evidence.

MR. FRIEDMAN: Well, because it's a humongous amount of data, your Honor.

THE COURT: I know.

MR. FRIEDMAN: It's 13 terabytes of data.

THE COURT: I know. But you have someone identify it, someone who understands what it is and someone who explains what it is and lays a foundation for it, and then you draw whatever other demonstrative exhibits you have or summary exhibits that you have.

MR. FRIEDMAN: Okay.

THE COURT: It's not unusual. There are rules that govern it and case law that governs it, and I'm waiting for the foundational questions. So before you start publishing the exhibits that you're trying to explain, I want this − I want you to ask questions about foundation.

MR. FRIEDMAN: Okay.

THE COURT: Not publishing, I want questions about foundation.

MR. FRIEDMAN: Okay.

THE COURT: I've been as patient as I can. It's now − this hearing started at what time? What time did the hearing start? . . . 10:30. It is now 4:30, and I'm still waiting for what I asked for.

MR. FRIEDMAN: Okay.

THE COURT: So I've been very patient, and I'm going to continue to be patient. But I need you to ask questions about foundation, not publishing exhibits.

MR. FRIEDMAN: Okay. I assume that you wanted me to do that once we've actually admitted that into evidence, but I will go through it even though it has not yet been admitted into evidence.

THE COURT: This is the hearing about whether or not any of it's getting into evidence.

MR. FRIEDMAN: I know, but −

THE COURT: I don't know how clear, how I can be more clear. You need to lay the foundation for these exhibits.

Transcript of Proceedings of 10/27/16 [1610], pp. 207-209.

DeMeritt was not able to authenticate any of the underlying data, except possibly some of the internal orders data captured by Last Atlantis itself. His testimony demonstrated that he had no personal knowledge concerning the foundational questions for the underlying audit trail data, the exchange data or any of the data purportedly coming from the SEC. He had no idea how it was captured, compiled or generated and no idea what it showed; he simply assumed that it captured the universe of mishandled orders and set about trying to match Last Atlantis' orders to those displayed in that underlying data. In his testimony, he conceded that he believed portions of the data were corrupted or could be missing, but he did not personally know how to ascertain the extent of such reliability problems.

THE COURT: Do you have any personal knowledge about any of those underlying data, some of which you believe are corrupted?

THE WITNESS: Do I have personal knowledge that they were corrupted or −

THE COURT: Do you have any personal knowledge about how they were actually created or how it was inputted into a system, how it was extracted from a system? You just got it . . . on a disc, right?

THE WITNESS: Correct.

THE COURT: So you don't know how exactly the system works or how it produces any data, which is why you don't really know why portions were corrupted or not, right?

THE WITNESS: They were − for instance, the CBOE was Oracle − was an Oracle backup file. So I know how the data was created and it came from the system, the Oracle database server, and it was backed up in these files. The cover letter for the data said that there were missing days. That's all I know, there were missing days.

THE COURT: So the reliability of the information is based on a letter that you read?

THE WITNESS: Correct.

* * *

THE COURT: Who wrote the letter?

THE WITNESS: I think it was the CBOE counsel.

THE COURT: All right. So if there were other problems with the data, you wouldn't know that unless you got a letter? You're just going off what you see, right?

THE WITNESS: That is correct.

* * *

THE COURT: You would know if it was a problem if you compared it to something else if there was one specific thing that was missing. But if entire categories of things were missing, you wouldn't be able to tell?

THE WITNESS: Entire category, I . . . it depends on how you define category.

THE COURT: It depends. That's what I thought. That's because you didn't pull this data from the system, somebody else did and then put a cover letter on it, right?

THE WITNESS: That is correct.

*Id.*, pp. 213-215.

DeMeritt conceded that he has no expertise to identify orders that may have been mishandled; that he has never worked for an exchange, never worked as a securities regulator, never done any surveillance of market activities, never traded on the floor of an exchange; that he has no idea how the exchange systems actually function, no idea how long it takes for an order once it reaches an exchange to get to a specialist, and no idea about the computer systems the exchanges used in the relevant time period. Transcript of Proceedings of 11/14/16 [1624]. pp. 495-97. DeMeritt also testified that he had no idea how the exchanges pulled the data reflected in Exhibits 11, 12, 14, and 15; no idea whether or how the data was manipulated; and no idea what the exchanges did with the data to create those spreadsheets. *Id.*, pp. 498-99. He testified that he did not even know whether the document generated using COATS data was actually generated for the SEC. *Id.*, p. 498.

Thus, although DeMeritt could testify as to how Exhibits 1, 2, and 3 were created (because he created them and had personal knowledge of what he did), he could not authenticate or lay a foundation for any of the underlying data from which these exhibits were created, and his testimony makes clear that he did not know anything about the underlying data source from which his summary spreadsheets were created. Quite simply, no witness was ever able to authenticate the underlying data from which Plaintiffs' exhibits were pulled, and Plaintiffs did not present any witness from the SEC or any of the exchanges to authenticate the underlying data.

Just as problematic, DeMeritt testified that his summary spreadsheets likely included orders that did not even come from Plaintiffs and likely included orders that were not mishandled. *See* Transcript of Proceedings of 10/27/16 [1610], p. 146 (where DeMeritt conceded that it was possible that some of the orders Plaintiffs have characterized as their orders may not even be Plaintiffs' orders); *id.*, pp. 160-161 (where DeMeritt conceded that assessing best execution using just one time window, without regard to market conditions, may be misleading). This calls into question both the relevance under Rule 401 and 402, and the reliability and admissibility of these exhibits under Rule 403. Plaintiffs failed to adequately address these issues at the evidentiary hearing.

Although the Court has focused largely on DeMeritt, the other witnesses Plaintiffs presented – experts Robert Lowry and Roy Freedman – similarly fell far short of establishing the admissibility of the lists of orders. Initially, it is undisputed that the versions of the spreadsheets marked as Exhibits 1, 2 and 3 at the evidentiary hearing were created in connection with Plaintiffs' motion for partial summary judgment, which Plaintiffs filed in January of 2016; they are different from the versions of the spreadsheets that were produced in discovery. Exhibits 1, 2 and 3 were created and provided to Defendants *after* DeMeritt was deposed, *after* he prepared his expert report, *after* Plaintiffs' other experts prepared their reports, and *after* discovery closed. Neither Lowry nor Freedman reviewed the version of the actual spreadsheets marked for trial, and none of their expert opinions relate to these versions of the spreadsheets. Indeed, DeMeritt testified

that Freedman had nothing to do with Exhibits 1, 2, and 3, and he conceded that whatever analysis or testing Freedman did was not an analysis of Exhibits 1, 2, and 3. *Id.,* p. 185. By refusing to finalize their own key exhibits and ascertain their admissibility in a timely fashion, Plaintiffs presented experts at the evidentiary hearing whose opinions were based on outdated exhibits. Given the disconnect between the exhibits about which Lowry and Freedman opined and upon which they based their analysis and opinions, and the exhibits Plaintiffs actually marked for admission at trial, Lowry and Freedman are of little help to Plaintiffs. Certainly, these witnesses would not be permitted to offer untimely or undisclosed expert opinions concerning these exhibits at trial, and they possess no useful factual testimony.

As an alternative, Plaintiffs have suggested that their exhibits are self-authenticating, such that no witness is required to establish their admissibility. To be sure, the Rules of Evidence provide that certain types of documents can be self-authenticating – public documents, certified copies of public records, official publications, newspapers and periodicals, trade inscriptions, acknowledged documents, commercial paper and related documents, and certified records of regularly conducted activities. Fed. R. Evid. 902. Despite ample opportunities to do so, however, Plaintiffs never sought to introduce any of the necessary certifications for the underlying datasets, if in fact they could be obtained.

Moreover, for exhibits to be self-authenticating as "certified domestic records of a regularly conducted activity" under Rule 902(11), the documents must also

satisfy the requirements of Rule 803(6)((A)-(C). That is, the following must be established:

> (A) the record was made at or near the time by–or from information transmitted by–someone with knowledge;
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
> (C) making the record was a regular practice of that activity . . . .

Fed. R. Evid. 803(6). Exhibits 1, 2 and 3 were created by DeMeritt years after the transactions ostensibly recorded therein occurred and solely for the purpose of litigation. More fundamentally, the question of whether any underlying audit trail data could satisfy the first three criteria is irrelevant, because Plaintiffs did not offer the underlying data itself or otherwise lay a foundation for it. For example, they failed to offer, as required by Rule 902(11), "a certification of the custodian or another qualified person that complies with a federal statute or a rule prescribed by the Supreme Court"; nor did they provide "reasonable written notice of the intent to offer the record" or make the record and certification "available for inspection."

In this same vein, Plaintiffs also suggest that their exhibits are admissible as public records. To the extent they seek to argue that their exhibits are self-authenticating public records under Rule 902(2), (4), or (5), the records themselves undermine such a claim. None of the specific exhibits offered by Plaintiffs at the evidentiary hearing meet the criteria spelled out in the rule (for instance, none bore the requisite signatures, certifications, or indicia). Likewise, to the extent Plaintiffs are suggesting that any of their exhibits would be admissible under Federal Rule of Evidence 803(8) as a "record or statement of a public office," that suggestion would

similarly fail. Such a statement may be admissible if it sets out: "(i) the public office's activities; (ii) a matter observed while under a legal duty to report; or (iii) factual findings from a legally authorized investigation . . . ." Fed. R. Evid. 803(8)(A). What's more, an exhibit satisfying these criteria is only admissible if "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(B). Plaintiffs cannot reasonably claim that Exhibits 1, 2, and 3 satisfy these criteria: they were created by DeMeritt, not any public officer. To the extent Plaintiffs are suggesting that the data they purportedly received from the SEC might satisfy these criteria, again, they never offered the specific SEC data itself, and never otherwise laid any foundation for the admission of the list of orders that they claim came from the SEC. Instead, they sought to admit the spreadsheets created by DeMeritt. In short, the public records exception does not make DeMeritt's homemade lists admissible.

In their efforts to establish admissibility, Plaintiffs have also argued that the lists of orders are market reports or similar commercial publications. "Market quotations, lists, directories, or other compilations that are generally relied on by the public or by persons in particular occupations" may be admissible even if they otherwise constitute hearsay evidence. Fed. R. Evid. 803(17). Here again, however, Plaintiffs have failed to show how their exhibits could satisfy the requisite criteria. Nothing in the record shows that DeMeritt's lists of orders are generally relied upon

by the public or by persons in particular occupations. Indeed, they were created solely and exclusively for this litigation.

Finally, the Court rejects any attempt to characterize the lists of orders as proper "summaries" under the Federal Rules of Evidence  A summary or chart may be used "to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. But for the summary to be admissible, the party offering it "must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court." *Id.* Despite the Court's numerous attempts to get Plaintiffs to admit the underlying data and documents often referred to at the evidentiary hearing, Plaintiffs never actually produced the voluminous records upon which they claimed their spreadsheets were based, and never presented any witness to competently testify concerning the foundation for those records and exhibits. Moreover, DeMeritt's testimony soundly contradicts any notion that the spreadsheets were mere summaries of the underlying data. DeMeritt testified that he took the underlying datasets and added information from Plaintiffs' datasets, then manipulated the information by applying certain parameters and assumptions to come up with new lists that, in his view, likely reflected Plaintiffs' orders. He did not simply extract or summarize information from those underlying datasets.

In light of the above, the Court finds that Plaintiffs' lists of orders – marked for purposes of the evidentiary hearing as Exhibits 1, 2 and 3 – are inadmissible for

a host of reasons, including but not limited to an utter failure to satisfy the requirements of Rule 403. To the extent Plaintiffs created new versions of those exhibits between the first and second day of the evidentiary hearing,[6] those versions are also inadmissible – for all of the reasons explained above, and for the additional reason that they were untimely submitted after the fair and final deadline set by the Court.

Consequently, this Court grants both Defendants' motion to strike the revised lists of relevant orders that were disclosed October 19 and October 21, 2016 [1595] and Defendants' motion to bar introduction of exhibits not produced to the Court or to Defendants by October 31, 2016 [1614].

Finally, on the issue of the admissibility of the relevant orders, the Court takes up Plaintiffs' motion for leave to file a pretrial memorandum establishing the admissibility of certain lists of orders [1626] (and, relatedly, Defendants' motion to strike that memorandum [1627]). In their motion, Plaintiffs attempt to suggest that they were somehow rushed into the evidentiary hearing, with no time to prepare, insinuating that, with more time, they could have established all of the evidentiary prerequisites for admissibility. The Court categorically rejects that suggestion. Throughout these proceedings, Plaintiffs' counsel has consistently failed to meet the Court's reasonable deadlines, failed to follow the Court's simple instructions, and otherwise behaved in a manner that made this case far more

---

[6] Remarkably, Plaintiffs created yet another set of exhibits *after* the first day of the evidentiary hearing set to determine the admissibility of those very exhibits. In fact, Plaintiffs continued to try to revise the exhibits after the final pretrial conference, despite the Court's clear instructions not to do so.

protracted than it needed to be.  When questioned about his unprofessional conduct, counsel routinely blamed others or claimed that, as a sole practitioner, he was somehow prejudiced and disadvantaged by this Court's clear pretrial deadlines.  But the law applies to all litigants.  As is clear from the 13-plus year chronology noted above, this Court gave counsel ample time to prepare his case for trial and clear warning that the Rules of Evidence would not, and could not, be overlooked.  Counsel chose excuses over diligence and failed to heed the Court's frequent and clear warnings.

Plaintiffs had more than a decade to prepare their case for trial – a case they were ethically bound to investigate even before filing suit.  They had a firm trial date set nine months in advance.  The Court set the evidentiary hearing and advised counsel that he could take all the time he needed to provide the Court with the evidence and testimony necessary to establish that his trial exhibits were admissible.  After two full days of testimony, the Court closed the hearing only when Plaintiffs' counsel advised the Court that he was finished, that he had no more evidence and no further witnesses.  The Court bent over backwards to give Plaintiffs their day in court, and any suggestion to the contrary is belied by the record.

What's more, there is nothing new in Plaintiffs' proposed memorandum – and, worse yet, even in this brief Plaintiffs continue to suggest that they *will be* able to authenticate their exhibits, still refusing to acknowledge that the time to do so has come and gone.  Plaintiffs still insist, for example, that the underlying audit

trail data constitutes admissible business records under Rule 803(6). Yet they never sought to admit the audit trail data, and they never bothered to explain how DeMeritt's spreadsheets – the exhibits they *did* seek to offer at trial – could possibly qualify as business records. Quite simply, Plaintiffs had years to come up with competent evidence to prove their claims and years to find competent witnesses to lay a foundation for that evidence. They failed to do so. The Court declines to prejudice Defendants by wasting any more time or resources waiting for Plaintiffs to prove their case. Plaintiffs' motion [1626] is denied, and Defendants' motion to strike [1627] is granted.

B.    Motions for Summary Judgment

As noted above, Plaintiffs and Defendants both moved for summary judgment. Plaintiffs filed a motion seeking partial summary judgment [1442] on four of Plaintiffs' state law claims, and Defendants filed a motion for summary judgment [1409] on all of the claims asserted in the operative complaint. These motions also turn on the lists of orders. Plaintiffs argue that they are entitled to judgment as a matter of law because the lists of orders conclusively establish that Defendants mishandled Plaintiffs' orders. And Defendants argue that they are entitled to judgment as a matter of law because the lists of orders – Plaintiffs' only proposed proof – would be insufficient to show that Defendants ever mishandled any order submitted by any Plaintiff.

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *See CTL ex rel. Trebatoski v. Ashland School District*, 743 F.3d 524, 528 (7th Cir. 2014). Despite such inferences, however, the "party seeking to defeat a motion for summary judgment is required to wheel out all its artillery to defeat it." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996) (internal quotation omitted). Indeed, the Seventh Circuit has frequently reiterated that at "the summary judgment stage of a proceeding, a plaintiff must put up or shut up and show what evidence he has that would convince a trier of fact to accept his version of events." *Olendzki v. Rossi*, 765 F.3d 742, 749 (7th Cir. 2014) (internal quotations omitted).

In this case, Plaintiffs have conceded that they cannot prove their claims without the lists of orders and that summary judgment in Defendants' favor would be appropriate if those exhibits were excluded; and thus, this Court need not in this decision dive too deeply into the details of the summary judgment motions. Based upon Plaintiffs' concessions and this Court's review of their claims and the entire

record, Plaintiffs are not entitled to summary judgment on any of their claims, and Defendants are entitled to summary judgment on all of Plaintiffs' remaining claims. The Court briefly discusses both motions below.

1.  Plaintiffs' motion for partial summary judgment

Plaintiffs seek partial summary judgment on certain of their state law claims, arguing that the lists of orders show that the Susquehanna Defendants executed thousands of trades for their own accounts ahead of, and instead of, executing marketable orders from Plaintiffs to buy or sell the same options against pending contra-side orders at the same prices that they represented as an agent and fiduciary. [1473], at 6. Plaintiffs' motion for partial summary judgment is denied for the simple reason, as explained above, that the lists of orders do not show what Plaintiffs have long claimed they would show. Putting aside questions of admissibility, the lists of orders do not evidence trading ahead or any other failure to provide best execution on the part of the Defendants. Robert DeMeritt, who did the filtering of Last Atlantis' internal data to come up with the list of orders, testified at his deposition that the list of orders he created was "a list of unfilled orders" compiled "without regard as to why they were unfilled." Rule 30(b)(6) Deposition of Last Atlantis, through Robert DeMeritt, taken 9/23/08 (attached as Exhibit 76 to Declaration of Ellen Wheeler in support of Defendants' response to Plaintiffs' motion for partial summary judgment [1500]), p. 48. Plaintiffs' expert, Roy Freedman, testified that the list of relevant orders does not identify orders that were actually mishandled: "Plaintiffs' methodology identifies relevant orders so that

they – they may have been mishandled." Deposition of Roy Freedman taken 7/7/15 [1559-2], p. 310. Consistent with this testimony, at the evidentiary hearing, DeMeritt conceded that his lists of orders likely included orders that were not submitted by Plaintiffs, that the lists failed to account for various market conditions that would undermine any claim of mishandling, and that the lists failed to consider any factors relevant to the best execution analysis other than a time interval he deemed inadequate (as a lay opinion rather than qualified expert opinion). Beyond the inadequate showing above, Plaintiffs have no rabbits to pull from the hat.

2. <u>Defendants' motion for summary judgment</u>

The Defendants seek summary judgment on all claims, arguing predominantly that Plaintiffs have offered no evidence that any of the orders included on the lists of orders was actually mishandled. Defendants further contend that, by Plaintiffs' own admission, the lists do not identify orders that were mishandled, but only orders that might have been mishandled. Defendants argue that, after 12 years of litigation, Plaintiffs still have not offered any evidence showing that any Defendant, in fact, mishandled any order submitted by any Plaintiff. Accordingly, Defendants request judgment in their favor across the board.

In response to Defendants' motion, Plaintiffs declined to address the merits of the vast majority of Defendants' claims, arguing instead that Defendants waived the arguments made in support of summary judgment by failing to raise them in their prior motions. Plaintiffs declined to address the substance of Defendants' arguments, despite this Court's specific admonition before briefing on Plaintiffs'

response that they needed to address both the waiver issue *and* the substantive arguments. The briefing strategy adopted by Plaintiffs was ill-advised – in light of the chronology set forth above, the waiver argument is a loser. It is clear from the record that Judge Bucklo did not intend for her prior summary judgment rulings to foreclose future motions once merits discovery was complete. Indeed, all of the prior motions were preliminary in nature, made before any full discovery had been conducted. Merits discovery did not even begin in earnest until after Judge Bucklo issued her June 6, 2011 summary judgment ruling and Judge Keys lifted the two-year-old stay.

Turning to the substance of Defendants' arguments, this Court notes that, although Defendants' motion addresses each claim and establishes on an element-by-element basis why Plaintiffs' claims fail, the Court need not detail those arguments (which are instead incorporated herein by reference). Plaintiffs have conceded on several occasions that they cannot prove their claims without the lists of orders. At the status hearing on October 13, 2016, counsel for the Plaintiffs conceded that "the specific spreadsheets with the specific – identifying the specific orders, that's critical to the case, correct." Transcript of Proceedings of 10/13/16 [1578], p. 7. Counsel for Plaintiffs also conceded that none of the pending claims would survive unless the orders were admitted. *Id.*, pp. 8-9. At the conclusion of the recent evidentiary hearing, the Court reiterated that Plaintiffs had offered everything they had on what they conceded were the crucial exhibits:

THE COURT: That concludes your evidence, right, Counsel?

MR. FRIEDMAN: Yes.

THE COURT: Okay. I want to confirm what you indicated earlier that – because, you know, it's been stated multiple times on the record and in written orders, but let me do it again. The purpose of this hearing was the Rule 11 certification, the various motions *in limine* and the admissibility of the plaintiffs' key exhibits and related testimony including what's been referred to as the relevant orders. And because the Court wanted a foundation for what those were rather than a proffer because the method of receiving a proffer, which is, you know, a legitimate method for a variety of pretrial rulings was, based on my review of the record here, unsuccessful, the Court conducted a – devoted two full days – it's past 5:30 now at this point – to ascertain whether or not these key exhibits and related testimony would – and the various subjects that are the motion – that are the subject of the various motions *in limine*, exactly how that would play out. Because it was important because it relates, if nothing else, to the summary judgment motion. Counsel chose to – plaintiffs' counsel chose to make procedural arguments with respect to the motion for summary judgment rather than addressing the merits, which the Court specifically told him to address the merits in the alternative. But it doesn't really matter because at this point, as plaintiffs' counsel has conceded, that if these key exhibits are not admitted, then there's no question for the jury to determine with respect to either the securities claims or the state law claims. That's still your position, right? Without this key evidence, you can't go forward, correct?

MR. FRIEDMAN: Yes, your Honor. But the other thing I wanted to say was, you know, we had intended in terms of getting these – the full basis for the admissibility of these spreadsheets to also have the witnesses from the exchanges, their deposition testimony read in, as well as questioning some of the witnesses from the defendants as to how these spreadsheets, the spreadsheets from which we extracted the information were prepared by the exchanges.

THE COURT: Well, in terms of the admissibility of your exhibits, you've already concluded your evidence, and none of that was included. So that is not in front of me because after two full days and more than I believe 12 hours of testimony, no such exhibits were presented to me. And I got Plaintiffs' Exhibits 1 through 20, and I have the oral testimony that was submitted today. So that's not part of any testimony that you've proffered to me, and you've already indicated that you've concluded your testimony so –

MR. FRIEDMAN: Well, your Honor, in the summary judgment papers, we did submit the testimony of the representatives of the exchanges with respect to how they prepared some of those trading ahead spreadsheets and the firm quote trade spreadsheets.

THE COURT: The purpose of this hearing is to determine whether or not you can get past a directed verdict, whether or not you can get past a summary judgment. Because as you've indicated, if you don't have these exhibits in, you would not get past a summary judgment; is that correct? I mean, regardless of what you responded to in the summary judgment, if your Exhibits 1 through 20 are not in, how are you going to meet the elements of your case?

MR. FRIEDMAN: Yeah, those have to be in, yes.

THE COURT: Okay. So for the purposes of summary judgment, if – and I'm not saying this is what the Court's ruling is. The Court hasn't issued a ruling yet. But if 1 through 20 or some material subset of those are not admissible, then the defendants would be entitled to judgment as a matter of law because there would be nothing for the jury to decide, right?

MR. FRIEDMAN: Yes, that's correct.

Transcript of Proceedings of 11/14/16 [1624], pp. 598-99.

Having determined that the lists of orders – that is, Exhibits 1, 2, and 3, are inadmissible, in light of counsel's concessions, and based upon the record and the arguments set forth in Defendants' motion for summary judgment, the Court finds that Defendants are entitled to judgment as a matter of law on all remaining claims.

With regard to the peripheral motions attacking Defendants' motion for summary judgment, the Court denies Plaintiffs' motion to strike Defendants' motion for summary judgment [1479]. As explained, the motion was substantively and procedurally appropriate. Plaintiffs' motion to strike the declaration of Brian

Sopinsky [1534] and Plaintiffs' motion to bar Defendants' use of Crystal Ambron and to strike parts of her declaration [1546] are denied as moot. Neither declaration played any role in the Court's decision today.

C.    Additional Pending Motions

As explained above, most of the parties' motions *in limine* remain pending, as do numerous trial-related motions, including Defendants' motion to bar Plaintiffs' counsel from testifying [1558]; Defendants' motion for sanctions and an adverse inference instruction due to Plaintiffs' spoliation [1579]; Plaintiffs' motion to file instanter a corrected opposition to Defendants' motions *in limine* [1603]; and Defendants' motion to strike Plaintiffs' corrected opposition [1604]. Given the Court's findings above concerning the inadmissibility of Plaintiffs' critical trial exhibits, and the finding that there will be no trial, all of these motions are denied as moot.

Conclusion

For the reasons explained above, the Court finds that Plaintiffs' lists of orders−marked for purposes of the October 27 and November 14 evidentiary hearing as Exhibits 1, 2, 3, 11, and 12–are inadmissible under Rule 403.

Exhibits 1, 2, and 3 are also inadmissible because Plaintiffs failed to demonstrate either their relevance or reliability.

And Exhibits 11 and 12, along with any other evidence relating to the datasets underlying exhibits 1, 2, and 3, are also inadmissible because Plaintiffs failed to authenticate them or to otherwise lay an evidentiary foundation for them.

As a result, and in light of Plaintiffs' concession, the record and Defendants' summary judgment submissions, Defendants are entitled to judgment as a matter of law on all pending claims.

Plaintiffs' motion for partial summary judgment is denied. All pending trial-related motions are denied as moot.

The Clerk is directed to enter judgment against Plaintiffs and in favor of the Susquehanna Defendants on all pending claims. Civil case terminated.

Date: May 2, 2017

ENTERED:

John Robert Blakey
United States District Judge